CRH/MAA/IC
F. #2017R00906

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                                                                  No. 21-CR-265 (S-1) (PKC)

ZHU YONG,
        also known as "Jason Zhu,"

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ZHU YONG'S MOTION
TO EXCLUDE STATEMENTS AND EVIDENCE

                                                BREON PEACE
                                                United States Attorney
                                                Eastern District of New York

Craig R. Heeren
Meredith A. Arfa
Irisa Chen
Assistant United States Attorneys

Christine Bonomo
Trial Attorney
National Security Division
(Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .......................................................................................................... 2

ARGUMENT ................................................................................................................................ 7

I.   Applicable Law ................................................................................................................ 7

II.  Discussion ........................................................................................................................ 8

   A. The Defendant's <u>Miranda</u> Rights Were Not Violated .................................................. 8

   B. The Court Should Deny the Defendant's Motion Without
      an Evidentiary Hearing ............................................................................................... 13

CONCLUSION ........................................................................................................................... 14

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to defendant Zhu Yong's (also known as "Jason Zhu") motion to suppress his post-arrest statements made on October 28, 2020 to agents with the Federal Bureau of Investigation ("FBI"). (See generally Dkt. No. 173 (the "Motion" or "Mot.").)

The defendant's claim that he invoked his Miranda rights by requesting an attorney during his post-arrest interview is contradicted by the video recording of that interview. (See Ex. A (YZ0000002) (video of October 28, 2020 interview); see also Ex. B (transcript of interview).)[1] The video reflects that the defendant did not unequivocally invoke his right to counsel, and instead knowingly and voluntarily waived his Miranda rights before answering questions from law enforcement. Specifically, and as set forth in greater detail below, interviewing FBI agents

---

[1] The government will provide the exhibits to the Court and Zhu's counsel under separate cover. The defendant did not provide the government with a copy of the video he submitted to the Court on April 21, 2023, and accordingly the government separately is submitting the interview video recording as Exhibit A to ensure that the Court has a copy of the video with time stamps that match those cited herein. In addition, for the Court's convenience, the government is submitting as Exhibit B a rough transcription of the interview, which remains subject to revision, as well as an unredacted version of Exhibit C.

The government respectfully requests permission to file Exhibits A and B, and the unredacted version of Exhibit C, under seal. The government is sensitive to the need to minimize the amount of information in a criminal case that is filed under seal. See, e.g., United States v. Aref, 533 F.3d 72, 83 (2d Cir. 2008) (noting "requirement that district courts avoid sealing judicial documents in their entirety unless necessary"); Lugosch v. Pyramid Co., 435 F.3d 110, 120 (2d Cir. 2006) (noting that sealing orders should be "narrowly tailored"). However, sealing is necessary because the exhibits contain sensitive information, including victim identities. See United States v. Amodeo, 71 F.3d 1044, 1050-52 (2d Cir. 1995) (privacy interests of third parties may be compelling reason justifying sealing). The government respectfully submits that these reasons constitute a sufficient basis for the Court to make the "specific, on the record findings" necessary to support sealing, Lugosch, 435 F.3d at 120, and accordingly respectfully requests that the Court record those findings and file the exhibits under seal.

1

repeatedly explained the defendant's rights, including his right to an attorney; confirmed that the defendant understood his rights; and asked the defendant to review and sign a written Miranda waiver-of-rights form in his native language before they engaged in any questioning. The defendant confirmed that he understood his rights and indicated that he wanted to speak to the agents before he decided whether to request an attorney. The defendant did not request an attorney, and instead unambiguously stated that he was willing to proceed with the interview without an attorney present and then signed the waiver-of-rights form. (See Ex. C (YZ0000003) (signed waiver-of-rights form).) The Motion should be denied without a hearing.

STATEMENT OF FACTS[2]

The charges against the defendant arise out of a criminal conspiracy by the defendant and other individuals who, at the direction of officials of the People's Republic of China ("PRC"), engaged in an international campaign to threaten, harass, surveil, and intimidate the individuals referenced in the superseding indictment (the "Indictment") as John Doe #1, Jane Doe #1, and Jane Doe #2. (See Dkt. No. 76 ¶¶ 13, 16-17.) On October 27, 2020, the defendant was charged by complaint in the Eastern District of New York with conspiracy to act as an illegal agent of a foreign government, in violation of Title 18, United States Code, Section 371. (See Dkt. No. 1.)[3]

---

[2] All interview statements set forth herein attributed to the defendant were spoken in English by the linguist, and all statements of the defendant and the Agents set forth herein are provided in sum and substance and in part. The Statement of Facts addresses only facts relevant to the Motion and does not constitute a full summary of the facts that the government anticipates establishing at trial.

[3] The defendant subsequently was charged in the Indictment, returned by a grand jury sitting in the Eastern District of New York, with conspiracy to act as an illegal agent of a foreign government (Count One), a substantive count of acting as an illegal agent of a foreign government (Count Two), conspiracy to engage in interstate stalking (Count Three), and a substantive count of interstate stalking (Count Four), in violation of Title 18, United States Code, Sections 371, 951 and 2261A(1)(B). (See Dkt. No. 76.)

On October 28, 2020, following his arrest on the complaint, the defendant was interviewed at an FBI facility by two interviewing agents (respectively, "Agent 1" and "Agent 2," and collectively, the "Agents"). Also present was a linguist, who provided Mandarin interpretation for the interview. Notably, the defendant acknowledges in his affidavit in support of the Motion that the linguist "accurately convey[ed] Defendant's intention to the FBI Agent." (See Mot. at 4.) The interview, which lasted approximately two-and-a-half hours, was videotaped in its entirety.

At the outset of the interview, Agent 1 handed the defendant a written waiver-of-rights form, upon which the defendant pointed to language in the form and spoke with the linguist, who then stated, "Well, he asked -- he said that he has a right to have a lawyer. He ask about --." (See Ex. A at 2:21-44[4]; see also Ex. B at 2:26-28.) Agent 1 sought to clarify, "So do you want us -- so that's what I want to do is walk through those rights. Right? So what this form does is advise you of your rights. And at the end if -- it basically is asking you in order for us to talk and ask you questions, that you would understand your rights and you still would agree to speak with us. And you're basically waiving some rights." (See Ex. A at 2:45-3:17; see also Ex. B at 2:30-41.) The defendant nodded during the linguist's interpretation, then stated, "I don't know what you gonna ask me about. You got the wrong guy."[5] (See Ex. A at 2:55-3:44; see also Ex. B at 2:43-43.)

Agent 1 then attempted to explain to the defendant his rights, stating he was going to read through the waiver-of-rights form and ask the defendant to let the Agents know whether he understood each of the rights. (See Ex. A at 3:53-3:59; see also Ex. B at 3:04-07.) The

---

[4] Time citations for Exhibit A are to the times reflected on the video progress bar, rather than to the timestamps reflected on the video recording in white font. For example, "00:00" refers to the start of the video (zero minutes and zero seconds).

[5] In conveying the defendant's statements in English, the linguist at times used first-person pronouns and at times used third-person pronouns.

3

defendant, leaning forward and pointing at the form, responded that he understood it. (See Ex. A at 4:05-07; see also Ex. B at 3:09.) Agent 1 acknowledged the defendant's statement that he understood and then began to review the waiver-of-rights form, but the defendant stated, "I don't know what you're going to ask. And he mention I could have a lawyer here." (See Ex. A at 4:08-20; see also Ex. B at 3:13-15.)

In response, Agent 1 explained that, before the Agents asked the defendant any questions, the defendant needed to understand his rights, including his right to an attorney: "Well, there's a couple of rights. So before we ask you any questions, you must understand. So you have the right to remain silent. And anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you questions." (See Ex. A at 4:21-5:00; see also Ex. B at 3:17-25.) The defendant stated, "But I need to find a lawyer." (See Ex. A at 5:08; see also Ex. B at 3:27.)

At that point, Agent 1 sought to clarify: "So is that what -- you want to talk to a lawyer first or do you -- I mean, we need to understand whether you want to speak with us, understand your rights and waive those rights and we can ask you questions." (See Ex. A at 5:10-23; see also Ex. B at 3:29-35.) The defendant responded, "But I need to know what you're going to ask me about before I decide whether I need a lawyer or not." (See Ex. A at 5:30-34; see also Ex. B at 3:37-40.) Agent 1 consequently asked, "Well, can -- we'll finish the rest of these and then you can decide." (See Ex. A at 5:37-42; see also Ex. B at 3:42-44.) The defendant stated that he needed to "know what's going on so I know whether I need a lawyer or not." (See Ex. A at 5:47-51; see also Ex. B at 4:01-03.)

Agent 1 accordingly informed the defendant that he had been arrested on an arrest warrant from the Eastern District of New York and charged with conspiring to act as an illegal

4

agent of a foreign government. (See Ex. A at 5:56-6:39; see also Ex. B at 4:05-18.) Agent 1 further explained that the Agents wanted to ask the defendant questions about things he had done for the PRC government, and expressly advised: "[W]e can't ask you any questions unless you understand your rights. And that you're willing to answer our questions without a lawyer present." (See Ex. A at 6:48-7:21; see also Ex. B at 4:18-26.) The defendant responded: "Well, you can ask but if I feel -- I will answer. What I like, I will answer. But if I feel I don't want to answer certain questions, I'm not going to answer certain questions." (See Ex. A at 7:32-40; see also Ex. B at 4:28-33.)

Following the defendant's explicit consent to proceed with the interview, Agent 1 continued to review the waiver-of-rights form and to explain the defendant's rights, stating that he wanted to be certain that the defendant understood each of the rights on the waiver-of-rights form: "[B]ut I want to make sure, again, that we go through these rights because that's some of the ones that are at the bottom here. So I want to -- I'm going to read them again and make sure you understand each one. And then --." (See Ex. A at 7:44-8:02; see also Ex. B at 4:36-42.) Agent 2 similarly emphasized the importance of reviewing all of the defendant's rights, stating, "Let us get through them all and then we can talk." (See Ex. A at 8:07-12; see also Ex. B at 4:44-45.)

The Agents then continued to review the defendant's rights, following which the defendant agreed to proceed with the interview, stating he would decide based on the questions whether he needed to call a lawyer:

> [AGENT 1]: So before we can ask you questions, you must understand those rights. Before we can ask you (U/I). So again, you have right to remain silent. You don't have to say anything. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have a right to (U/I).

5

| | |
|---|---|
| LINGUIST: | You can ask. (U/I) then I'll decide whether I need to call a lawyer. |
| [AGENT 2]: | That's fair, that's fair. |
| [AGENT 1]: | But we're going to keep going. All right? You have the right to have a lawyer with you during our questions. If you cannot afford a lawyer, one will be appointed for you before any questions if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time. |
| [AGENT 2]: | Does he understand the (U/I). |
| [AGENT 1]: | If you understand them and you still want to speak with us, you know, our next step is that we sign the form. Right? |
| [AGENT 2]: | And then we can have the conversation with him and ask questions. Is he willing to do it? |
| LINGUIST: | Yeah. He say you can ask him whatever question you like. That's what I said. |

(See Ex. A at 8:14-10:16; see also Ex. B at 5:01-46.) Throughout this exchange, the defendant nodded his head, indicating he understood the information the linguist was conveying. (See Ex. A at 8:14-10:16.)

Following the exchange, the defendant confirmed he was willing to sign the waiver-of-rights form and did so, thereby attesting that he understood his rights. (See Ex. A at 10:25-38; see also Ex. C.)

After the defendant signed the waiver-of-rights form, the Agents interviewed him. During this interview, the defendant admitted, among other things, that defendant Hu Ji (a policeman with the Wuhan Public Security Bureau in the PRC) came to the United States from the PRC to look for John Doe #1; the defendant drove Hu Ji around while he was in the United States; Hu Ji directed the defendant to identify someone (i.e., a private investigator) to find John Doe #1, the defendant helped arrange to hire a private investigator; and the defendant shared personal

6

information (e.g., names and social security numbers) of John Doe #1, Jane Doe #1, and Jane Doe #2.

At no point during the interview did the defendant request an attorney, and indeed, he never even mentioned an attorney during the more than two hours the interview lasted after he signed the waiver-of-rights form.

## ARGUMENT

I.  Applicable Law

Under Miranda v. Arizona and its progeny, a defendant must be informed, among other things, of his right to counsel before law enforcement may conduct a custodial interrogation. See 384 U.S. 436, 444 (1966). Law enforcement officers may question a defendant if he knowingly and voluntarily waives these rights. See id. When a defendant signs a form waiving his Miranda rights, "[t]hat fact, alone, is enough to strongly support the finding that [the defendant] . . . knowingly and freely waived those rights." United States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011); see also United States v. Taylor, 745 F.3d 15, 23 (2d Cir. 2014) (defendant "who reads, acknowledges, and signs an 'advice of rights' form" generally waives his Miranda rights).

However, if a defendant invokes his Miranda rights, including his right to counsel, law enforcement officers may not continue to question him. See Davis v. United States, 512 U.S. 452, 458 (1994) ("[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."). To invoke the right to counsel, a defendant must make a clear request for an attorney; a defendant has not invoked his right to counsel if he "makes a reference to an attorney that is ambiguous or equivocal." Id. at 459. Thus, to invoke the right to counsel, the defendant must make, "at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." Id. Statements that lead a reasonable officer to

7

believe a suspect might be invoking the right to counsel are insufficient under this standard. Id. (emphasis in original). In Davis, for example, the Supreme Court held that the defendant's statement "[m]aybe I should talk to a lawyer" was not an invocation of his right to counsel. See id. at 462. Similarly, in Plugh, the defendant did not invoke his right to counsel when he stated, "I am not sure if I should be talking to you" and "I don't know if I need a lawyer." 648 F.3d at 124; see also United States v. Medunjanin, 752 F.3d 576, 587 (2d Cir. 2014) (defendant's question to law enforcement about whether his lawyer was aware of search warrant was not an invocation of defendant's right to counsel).

Even after a defendant invokes his right to counsel, he can reinitiate communications with law enforcement agents. See Edwards v. Arizona, 451 U.S. 477, 485, 485 n.9 (1981). The defendant reinitiates communication when he "evince[s] a willingness and a desire for a generalized discussion about the investigation." Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983) (plurality opinion). In Bradshaw, the defendant asking, "[w]ell, what is going to happen to me now," was sufficient to reinitiate communication with law enforcement. See id. As the Court explained, after the right to counsel has been asserted, further interview should not take place unless the defendant himself initiates further communication with law enforcement. See id. at 1046.

II.   Discussion

    A.   The Defendant's Miranda Rights Were Not Violated

The defendant contends that he "unequivocally communicated his desires to consult with an attorney on three separate occasions," but that the FBI agent[6] instead "opted to disregard

---

[6] The Motion repeatedly refers to "the FBI Agent," though two agents were present and conducted the interview.

8

his wishes and persisted with the interrogation," and that the defendant "at no time . . . intelligently and knowingly relinquished his right to counsel." (See Mot. at 3-4.) As set forth below, the defendant's Miranda rights were not violated. First, the defendant did not clearly and unambiguously invoke his right to an attorney. Second, instead, he knowingly and voluntarily waived his Miranda rights. Finally, even assuming, arguendo, the defendant did at some point invoke his right to an attorney, he subsequently reinitiated the conversation with the Agents such that the interview could proceed without an attorney.

          1.        The Defendant Did Not Clearly and Unambiguously Invoke His Right to an Attorney

The defendant's claim that he invoked his right to counsel at the beginning of the interview is contradicted by the video recording of his interview. In his affidavit, the defendant avers, among other things, that he "clearly expressed [his] desire to consult with a lawyer on at least three separate occasions to the FBI Agent, but the FBI Agent chose to ignore [his] requests to have an attorney to represent [him]," and that the defendant "at no time [] intelligently and knowingly relinquished [his] right to counsel." (See Dkt. No. 179, ¶¶ 15-16.) However, as the video recording reflects, the defendant never stated that he wanted a lawyer, that he wanted the Agents to get him a lawyer, or that he no longer wished to speak to the Agents without a lawyer. Rather, as relevant to this Motion, the defendant (as conveyed to the Agents by the linguist) at various times stated: "Well, he asked -- he said that he has a right to have a lawyer. He ask about -- ."; "And he mention I could have a lawyer here."; "But I need to find a lawyer."; the defendant needed to "know what's going on so I know whether I need a lawyer or not."; and "You can ask. (U/I) then I'll decide whether I need to call a lawyer." (See Ex. A at 2:37-40, 4:18-20, 5:08, 5:47-51, 10:14-16; see also Ex. B at 2:26-28, 3:14-15, 3:27, 4:01-03, 5:44-46.)

9

None of these statements invoked the defendant's right to counsel, and certainly none clearly and unambiguously declared that the defendant did not wish to be questioned before speaking with an attorney. Cf. Davis, 512 U.S. at 459. To the contrary, the defendant's statements were akin to the statement "[m]aybe I should talk to a lawyer," which the Supreme Court found to be ambiguous in Davis, 512 U.S. at 462, and other statements the Second Circuit found did not constitute an invocation of Miranda rights, including a suspect's statement that he "was going to get a lawyer," United States v. Scarpa, 897 F.2d 63, 68 (2d Cir. 1990), and a suspect's statement that "perhaps I should get a lawyer" or "maybe I need a lawyer," Wood v. Ercole, 644 F.3d 83, 91 (2d Cir. 2011) (emphasis omitted) (dicta).

Moreover, the defendant's behavior in engaging with the Agents – including telling them that he needed additional information to determine whether an attorney was necessary, asking them about the reasons for his arrest, agreeing that the Agents could ask questions but that he might choose not to answer all of them, and stating that he understood his rights and was willing to waive his right to counsel and proceed with the interview – did not indicate that he wished to stop speaking with the Agents or that he wished to have an attorney. (See Ex. A at 5:30-34, 5:47-51, 7:32-40, 8:14-10:38; see also Ex. B at 3:37-40, 4:01-03, 4:28-33, 5:01-46.) Under these circumstances, the defendant's statements and actions would not have led a reasonable law enforcement officer to believe that the defendant was invoking his right to counsel. See Davis, 512 U.S. at 459. At most, they might have led a reasonable officer to believe that the defendant "might be invoking the right to counsel," which is insufficient under the Supreme Court's standard in Davis to stop questioning based on an invocation of the right to counsel. See id. (emphasis added).

10

Indeed, the ambiguity of the defendant's statements is reflected in the Agents' measured and appropriate responses. In response to the defendant's statements, the Agents proceeded cautiously, repeatedly explaining to the defendant his rights, asking him to review his rights in writing, and requiring that he confirm his understanding of his rights in writing before they engaged in any substantive questioning. Far from "disregard[ing] his wishes and persist[ing] with the interrogation" (Mot. at 4), the Agents spent significant time reviewing the defendant's rights and the waiver-of-rights form, and only proceeded once the defendant's desire to proceed was reaffirmed by his written waiver and his statements that he wished to speak to the Agents.

Notably, the defendant does not contend that he requested an attorney at any point later in the interview, nor does he contend that he ever revoked his waiver. (See generally Mot., Dkt. No. 179.) After stating that the Agents could ask him questions and then he would decide whether he needed to call an attorney, and subsequently confirming both orally and in the written waiver-of-rights form that he understood his rights and waived his right to an attorney, the defendant did not even mention an attorney for the remainder of the interview. And tellingly, the defendant indisputably understood that he could refuse to answer questions at any point during the interview, given his express statement to the Agents that they could ask him questions but that he might answer only "certain" questions. (See Ex. A at 7:32-40; see also Ex. B at 4:28-33.)

    2.  The Defendant's Miranda Waiver Was Knowing and Voluntary

Based on the videotaped interview reflecting the defendant's statements and actions, it is evident that he fully understood his Miranda rights and knowingly and voluntarily waived them. At the beginning of the interview, the Agents advised the defendant of his Miranda rights – repeatedly – and the defendant indicated that he wished to waive those rights and speak with the Agents. Specifically, as set forth above, while the Agents reviewed the defendant's rights and the waiver-of-rights form, the defendant repeatedly indicated that he understood his rights and

11

nodded his head. (See, e.g., Ex. A at 4:05-07, 8:14-10:16; see also Ex. B at 3:09, 5:01-46.) After the Agents comprehensively reviewed the defendant's rights, during which time they stated on multiple occasions that he had a right to an attorney, the defendant confirmed he was willing to sign the waiver-of-rights form and did so, thereby attesting that he understood his rights. (See Ex. A at 10:25-38; see also Ex. C.) Indeed, the video recording clearly depicts the defendant freely signing the waiver-of-rights form. (See Ex. A at 10:25-38.) And notably, the waiver-of-rights form – in which the defendant pointed to specific language while the Agents reviewed his rights – was written in Chinese, his native language.

The defendant's verbal and written waivers of his rights after repeatedly and consistently confirming that he understood his rights plainly demonstrates that he knowingly and voluntarily waived those rights – including his right to counsel – before he was questioned by law enforcement. The very fact of the defendant's signed waiver-of-rights form alone "strongly support[s]" this conclusion. See Plugh, 648 F.3d at 127.

   3.  Even Assuming, Arguendo, the Defendant Invoked His Right to Counsel, He Reinitiated Contact with the Agents Such That the Interview Could Proceed

Even if the defendant had invoked his right to counsel by virtue of his early statements referencing an attorney, the defendant's subsequent statements and conduct demonstrate that he reinitiated contact with the Agents.

As detailed above, after making those attorney references, the defendant continued to engage with the Agents – including agreeing that the Agents could ask questions but that he might choose not to answer all of them, stating that he would determine whether he needed an attorney based on the Agents' questions, expressing that he understood his rights and was willing to waive his right to counsel and proceed with the interview, and signing the waiver-of-rights form. (See Ex. A at 7:32-40, 8:14-10:38; see also Ex. B at 4:28-33, 5:14-46; Ex. C.) Thus, even if the

12

defendant's early interview statements somehow could be construed as invoking his right to counsel – which the government maintains they cannot – his subsequent conduct unquestionably reinitiated contact with the Agents and waived his Miranda rights such that the interview could proceed. See Bradshaw, 462 U.S. at 1045-46.

      B.      The Court Should Deny the Defendant's Motion Without an Evidentiary Hearing

The defendant has not requested an evidentiary hearing, and the Court need not hold one to decide the Motion. See, e.g., United States v. Watson, 404 F.3d 163, 167 (2d Cir. 2005) (court need not hold evidentiary hearing on motion to suppress evidence). Rather, a hearing is justified only where there exists a material factual dispute. See United States v. Ashburn, 76 F. Supp. 3d 401, 436 (E.D.N.Y. 2014) (NGG) (collecting cases for proposition that "defendant must show that disputed issues of material fact exist before an evidentiary hearing is required" (internal quotations omitted)).

Here, there are no disputed issues of material fact that necessitate a hearing. The circumstances surrounding the defendant's purported requests for counsel are clear from the video recording of his interview and the corresponding transcript. (See generally Exs. A, B.) The defendant has not proffered factual allegations regarding his purported invocation of his right to counsel that include events occurring outside the videotaped interview, and the recording of the interview and the statements at issue "leave[] no doubt as to what occurred." United States v. Paul, 904 F.3d 200, 203 (2d Cir. 2018). Moreover, as the defendant acknowledges, there is no dispute that the linguist accurately interpreted the defendant's statements regarding his purported desire for an attorney. Accordingly, the government respectfully submits that the Court should decide the Motion based on the record submitted with the parties' filings.

13

## CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court deny the Motion in its entirety, without a hearing.

Dated:   Brooklyn, New York
         April 27, 2023

                                    BREON PEACE
                                    United States Attorney
                                    Eastern District of New York

By:   /s/
      Craig R. Heeren
      Meredith A. Arfa
      Irisa Chen
      Assistant U.S. Attorneys
      (718) 254-7000

      MATTHEW G. OLSEN
      Assistant Attorney General
      Department of Justice
      National Security Division

By:   /s/
      Christine Bonomo
      Trial Attorney