CRH/MAA/IC
F. #2017R00906

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – X

   UNITED STATES OF AMERICA

      - against -

   MICHAEL MCMAHON,
   ZHENG CONGYING and
   ZHU YONG,
       also known as "Jason Zhu,"

            Defendants.

– – – – – – – – – – – – – – – – – – X

No. 21-CR-265 (S-1) (PKC)


THE GOVERNMENT'S MEMORANDUM OF LAW OPPOSING THE DEFENDANTS'
MOTIONS FOR JUDGMENTS OF ACQUITTAL AND NEW TRIALS


                            BREON PEACE
                            United States Attorney
                            Eastern District of New York

Craig R. Heeren
Meredith A. Arfa
Irisa Chen
Assistant United States Attorneys

Christine Bonomo
Trial Attorney
National Security Division

    (Of Counsel)

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT .......................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 2

I.      The Charges and Allegations Against the Defendants ............................................. 2

II.     The Trial ................................................................................................................... 3

        A.     Summary and Relevant Background Facts .................................................... 3

        B.     The Evidence Against Zhu Yong .................................................................. 5

        C.     The Evidence Against Michael McMahon ................................................... 10

        D.     The Evidence Against Zheng Congying ....................................................... 26

        E.     Additional Evidence of the Conspiracy and Related Criminal Conduct ........... 28

        F.     Evidence of Substantial Emotional Distress ................................................ 30

III.    The Verdict .............................................................................................................. 32

LEGAL STANDARD .......................................................................................................... 32

I.      Rule 29 Motion for a Judgment of Acquittal ........................................................... 32

II.     Rule 33 Motion for a New Trial ............................................................................... 35

RESPONSE TO ARGUMENTS BY DEFENDANT ZHU YONG ....................................... 37

I.      There Was Sufficient Evidence to Convict Zhu Yong of Counts One, Three and Four ................................................................................................................... 37

        A.     There Was Sufficient Evidence to Convict Zhu Yong of Conspiracy to Act as an Illegal Agent of a Foreign Government (Count One) ....................... 37

        B.     There Was Sufficient Evidence to Convict Zhu Yong of Conspiracy to Commit Interstate Stalking and Substantive Stalking (Counts Three and Four) ............. 42

II.     Counsel for Michael McMahon's Remarks During Summation Do Not Warrant a New Trial for Zhu Yong ...................................................................................... 48

        A.     Zhu Yong Waived Any Challenge to McMahon's Summation ........................ 48

        B.     Defense Counsel's Statements Were Neither Racist Nor an Attack on Zhu ..... 50

i

RESPONSE TO ARGUMENTS BY DEFENDANT MICHAEL MCMAHON ......................... 53

I.    There was Sufficient Evidence to Convict Michael McMahon of Counts Two, Three and Four ................................................................................................ 53

    A.    There Was Sufficient Evidence to Convict Michael McMahon of Knowingly Acting as an Agent of the PRC (Count Two) ..................................................... 53

    B.    There Was Sufficient Evidence to Convict Michael McMahon of Conspiracy to Commit Interstate Stalking and Stalking (Counts Three and Four) ................. 68

II.    The Verdicts Rendered Against Michael McMahon Were Not Inconsistent ............ 78

    A.    Michael McMahon Cannot Challenge His Conviction Based on Inconsistent Verdicts ....................................................................................................... 78

    B.    The Verdicts Against Michael McMahon Are Not Inconsistent ....................... 80

III.    The Government's Publication of Documentary Evidence Was Proper ................... 84

IV.    The Government's Rebuttal Argument Was Appropriate ........................................ 89

    A.    Michael McMahon's Failure to Object During Rebuttal Waives the Argument 89

    B.    The Government Raised No New Arguments in Rebuttal................................. 90

    C.    The Government Did Not Make Any False Representations on Rebuttal......... 93

    D.    There Was No Substantial Prejudice ................................................................ 95

V.    Exhibit 704A Was Properly Admitted at Trial Pursuant to Rule 801(d)(2)(E) ........ 97

    A.    Michael McMahon Waived Any Objection to Exhibit 704A or Is Subject to Plain Error Review........................................................................................... 98

    B.    Exhibits 704A Was Properly Admitted as Co-conspirator Statements ............. 99

VI.    The Government Did Not Make False Representations Regarding McMahon's Access to Government Databases or His Underreported Income Tax Records................... 102

    A.    The Government Did Not Make Any Misrepresentations............................... 102

    B.    McMahon's Claim is Legally Flawed............................................................. 106

RESPONSE TO ARGUMENTS BY DEFENDANT ZHENG CONGYING ........................... 108

I.     There Was Sufficient Evidence to Convict Zheng Congying of Interstate Stalking (Count Three) ...................................................................................................... 108

       A.     The Evidence of Interstate Stalking Was Sufficient ........................................ 108

       B.     Zheng's Challenges to His Conspiracy Conviction Should Be Denied........... 109

       C.     Zheng's Conviction for Interstate Stalking Conspiracy Is Consistent with the Acquittal on Section 951 Charges.................................................................... 115

II.    A New Trial on Zheng Congying's Interstate Stalking Conviction Is Not Warranted ...................................................................................................................... 116

       A.     A New Trial Is Not Warranted Based on Sufficiency of the Evidence or Because of Purported Multiple Conspiracies ................................................................. 116

       B.     A New Trial Is Not Warranted as the Court Properly Limited Zheng's Cross-Examinations of the Victims.......................................................................... 116

CONCLUSION.................................................................................................................... 124

# TABLE OF AUTHORITIES

**Cases**

Anderson v. United States,
  417 U.S. 211 (1974)........................................................................... 101

Bank of Nova Scotia v. United States,
  487 U.S. 250 (1988)............................................................................. 85

Blumenthal v. United States,
  332 U.S. 539 (1947)............................................................ 111, 113, 114

Dunn v. United States,
  284 U.S. 390 (1932)............................................................................. 78

Gonzalez v. Sullivan,
  934 F.2d 419 (2d Cir. 1991) ................................................................ 96

Holland v. United States,
  348 U.S. 121 (1954)............................................................................. 34

In re Terrorist Bombings of U.S. Embassies in E. Afr.,
  552 F.3d 93 (2d Cir. 2008) ................................................................ 113

Jackson v. Virginia,
  443 U.S. 307 (1979)............................................................................. 32

Jones v. Berry,
  880 F.2d 670 (2d Cir. 1989) .............................................................. 123

Langston v. Smith,
  630 F.3d 310 (2d Cir. 2011) ................................................................ 63

Lavender v. Kurn,
  327 U.S. 645 (1946)............................................................................. 63

Mallette v. Scully,
  752 F.2d 26 (2d Cir. 1984) .................................................................. 34

Old Chief v. United States,
  519 U.S. 172 (1997)............................................................................. 88

Siewe v. Gonzales,
  480 F.3d 160 (2d Cir. 2007) ................................................................ 63

United States . Bowen,
  969 F. Supp. 2d 546 (E.D. La. 2013)................................................... 88

United States v. Acosta,
  17 F.3d 538 (2d Cir. 1994) .................................................................. 79

United States v. Allums,
  No. 15-CR-153 (VSB), 2018 WL 2128372 (S.D.N.Y. May 9, 2018) .................... 85

United States v. Al-Moayad,
  545 F.3d 139 (2d Cir. 2008) .............................................................. 101

United States v. Anderson,
   747 F.3d 51 (2d Cir. 2014) ............................................................................ 34

United States v. Archer,
   977 F.3d 181 (2d Cir. 2020) .......................................................................... 35

United States v. Arras,
   373 F.3d 1071 (10th Cir. 2004) ..................................................................... 64

United States v. Atilla,
   966 F.3d 118 (2d Cir. 2020) ........................................................................ 119

United States v. Ayala-Vieyra,
   No. 21-1177, 2022 WL 190756 (6th Cir. Jan. 21, 2022) ............................. 87

United States v. Baker,
   923 F.3d 390 (5th Cir. 2019) ........................................................................ 85

United States v. Banki,
   685 F.3d 99 (2d Cir. 2011) ............................................................................ 96

United States v. Banki,
   733 F. Supp. 2d 404 (E.D.N.Y. 2010) .......................................................... 96

United States v. Best,
   219 F.3d 192 (2d Cir. 2000) .......................................................................... 67

United States v. Bland,
   237 F. App'x 268 (9th Cir. 2007) ................................................................ 101

United States v. Blaszczak,
   No. S1 17-CR-357 (LAK), 2018 WL 2387353 (S.D.N.Y. Apr. 30, 2018) ............ 89

United States v. Bruce,
   75 F. App'x 849 (2d Cir. 2003) ..................................................................... 71

United States v. Cambindo Valencia,
   609 F.2d 603 (2d Cir. 1979) ........................................................................ 113

United States v. Cassese,
   428 F.3d 92 (2d Cir. 2005) ............................................................................ 33

United States v. Chang An-Lo,
   851 F.2d 547 (2d Cir. 1988) .......................................................................... 78

United States v. Chartier,
   No. 17-CR-372 (JS), 2021 WL 3795352 (E.D.N.Y. Aug. 26, 2021) ............ passim

United States v. Clark,
   613 F.2d 391 (2d Cir. 1979) .......................................................................... 99

United States v. Conrad,
   507 F.3d 424 (6th Cir. 2007) ....................................................................... 101

United States v. Coplan,
   703 F.3d 46 (2d Cir. 2012) ...................................................................... 91, 96

United States v. Coven,
 662 F.2d 162 (2d Cir. 1981) ................................................................. 118

United States v. Crowley,
 318 F.3d 401 (2d Cir. 2003) ................................................................... 53

United States v. Cruz,
 894 F.2d 41 (2d Cir. 1990) ................................................................... 117

United States v. Davis,
 159 F.3d 1348 (2d Cir. 1998) ................................................................. 81

United States v. Denton,
 944 F.3d 170 (4th Cir. 2019) ................................................................. 85

United States v. Deutsch,
 451 F.2d 98 (2d Cir. 1971) ..................................................................... 58

United States v. Downing,
 297 F.3d 52 (2d Cir. 2002) ..................................................................... 73

United States v. Eldridge,
 860 F. App'x 773 (2d Cir. 2021) .......................................................... 107

United States v. Elias,
 285 F.3d 183 (2d Cir. 2002) ................................................................... 96

United States v. Eppolito,
 543 F.3d 25 (2d Cir. 2008) ........................................................ 34, 43, 63

United States v. Espinal,
 981 F.2d 664 (2d Cir. 1992) ................................................................... 96

United States v. Faisal,
 282 F. App'x 849 (2d Cir. 2008) ...................................................... 91, 97

United States v. Farhane,
 634 F.3d 127 (2d Cir. 2011) ................................................................. 100

United States v. Figueroa,
 No. 08 CR 749 (ARR), 2010 WL 11463852 (E.D.N.Y. Mar. 2, 2010) ............... 106

United States v. Flaharty,
 295 F.3d 182 (2d Cir. 2022) ........................................................ 40, 120

United States v. Forlorma,
 94 F.3d 91 (2d Cir. 1996) ..................................................................... 107

United States v. Frazier,
 No. S6 15-CR-153 (VSB), 2019 WL 761912 (S.D.N.Y. Feb. 21, 2019) ............... 89

United States v. Friedman,
 998 F.2d 53 (2d Cir. 1993) ..................................................................... 33

United States v. Gambino,
 59 F.3d 353 (2d Cir. 1995) ..................................................................... 35

United States v. Geibel,
     369 F.3d 682 (2d Cir. 2004) .................................................................... 113

United States v. Giuliano,
     348 F.2d 217 (2d Cir. 1965) ...................................................................... 81

United States v. Graziano,
     616 F. Supp. 2d 350 (E.D.N.Y. 2008) ....................................................... 64

United States v. Griffith,
     284 F.3d 338 (2d Cir. 2002) .................................................................... 121

United States v. Guadagna,
     183 F.3d 122 (2d Cir. 1999) ...................................................................... 33

United States v. Guzman Loera,
     24 F.4th 144 (2d Cir. 2022) ..................................................................... 120

United States v. Hamlett,
     No. 19-3069, 2021 WL 5105861 (2d Cir. Nov. 3, 2021) ................................ 119, 121

United States v. Hoskins,
     44 F.4th 140 (2d Cir. 2022) ....................................................................... 41

United States v. Huezo,
     546 F.3d 174 (2d Cir. 2008) ...................................................................... 33

United States v. Jackson,
     335 F.3d 170 (2d Cir. 2003) ................................................................. 32, 33

United States v. Jackson,
     636 F.3d 687 (5th Cir. 2011) ................................................................... 101

United States v. Kennedy,
     46 F. App'x 200 (4th Cir. 2002) ................................................................ 88

United States v. Kenner,
     272 F. Supp. 3d 342 (E.D.N.Y. 2017) .................................................... 49, 89

United States v. Kozeny,
     667 F.3d 122 (2d Cir. 2011) ...................................................................... 61

United States v. Landesman,
     17 F.4th 298 (2d Cir. 2021) ............................................................... passim

United States v. Lawes,
     292 F.3d 123 (2d Cir. 2002) ............................................................. 118, 119

United States v. Lorenzo,
     534 F.3d 153 (2d Cir. 2008) ...................................................................... 33

United States v. Mack,
     No. S11 18 CR. 834 (PAE), 2020 WL 114509 (S.D.N.Y. Jan. 10, 2020) ............... 83

United States v. MacPherson,
     424 F.3d 183 (2d Cir. 2005) ...................................................................... 47

United States v. Magluta,
  418 F.3d 1166 (11th Cir. 2005) ............................................................. 101

United States v. Maldonado-Rivera,
  922 F.2d 934 (2d Cir. 1990) ................................................................... 111

United States v. Manarite,
  448 F.2d 583 (2d Cir. 1971) ................................................................... 111

United States v. Mariani,
  725 F.2d 862 (2d Cir. 1984) ..................................................................... 34

United States v. Martinez,
  54 F.3d 1040 (2d Cir. 1995) ..................................................................... 33

United States v. Martinez,
  921 F.3d 452 (5th Cir. 2019) .................................................................... 64

United States v. McCain,
  No. 21-2982, 2023 WL 2335332 (2d Cir. Mar. 3, 2023) ................................. 119, 120

United States v. McCourty,
  562 F.3d 458 (2d Cir. 2009) ..................................................................... 35

United States v. McDermott,
  277 F.3d 240 (2d Cir. 2002) ................................................................... 110

United States v. Memoli,
  No. 13-CR-214, 2014 WL 5313707 (D. Conn. Oct. 16, 2014) ........................... 41

United States v. Miller,
  No. 17-CR-415 (MKB), 2019 WL 2232124 (E.D.N.Y. May 23, 2019) ............... 90

United States v. Moncada,
  101 F.3d 681 (2d Cir. 1996) ................................................................. 92, 93

United States v. Nosov,
  221 F. Supp. 2d 445 (S.D.N.Y. 2002) ..................................................... 121

United States v. O'Connor,
  650 F.3d 839 (2d Cir. 2011) ..................................................................... 52

United States v. O'Sullivan,
  Mem. & Order, No. 20-CR-262 (PKC) (ECF No. 302) (Apr. 6, 2022) ....... 42, 47, 62

United States v. Orekyeh,
  812 F.2d 1402 (4th Cir. 1987) .................................................................. 88

United States v. Ouedraogo,
  531 F. App'x 731 (6th Cir. 2013) .............................................................. 64

United States v. Pauling,
  924 F.3d 649 (2d Cir. 2019) ................................................................. 42, 63

United States v. Payne,
  591 F.3d 46 (2d Cir. 2010) ................................................................... 113

United States v. Persing,
    436 F. App'x 13 (2d Cir. 2011) ....................................................... 101

United States v. Person,
    No. 15-CR-466 (ILG), 2017 WL 2455072 (E.D.N.Y. June 6, 2017) ...................................... 81

United States v. Pettway,
    No. 20-63, 2021 WL 4188716 (2d Cir. Sept. 15, 2021) ...................................... 119

United States v. Powell,
    469 U.S. 57 (1984) ........................................................ 78, 79, 116

United States v. Prado,
    815 F.3d 93 (2d Cir. 2016) ............................................................. 50

United States v. Pugh,
    945 F.3d 9 (2d Cir. 2019) ............................................................. 34

United States v. Pugliese,
    712 F.2d 1574 (2d Cir. 1983) ........................................................ 117

United States v. Quinones,
    511 F.3d 289 (2d Cir. 2007) ........................................... 48, 84, 89

United States v. Raniere,
    No. 18-CR-204 (NGG), 2023 WL 3092991 (E.D.N.Y. Apr. 26, 2023) ........................... 118

United States v. Rea,
    958 F.2d 1206 (2d Cir. 1992) ...................................................... 42, 71

United States v. Rigas,
    No. S102-CR-1236, 2004 WL 2434965 (S.D.N.Y. Nov. 1, 2004) ................................. 80, 83

United States v. Rivera,
    971 F.2d 876 (2d Cir. 1992) ...................................................... 92, 93

United States v. Rodriguez,
    392 F.3d 539 (2d Cir. 2004) ........................................................... 33

United States v. Rodriguez, 968 F.2d 130 (2d Cir. 1992) ......................................... 96

United States v. Roldan-Zapata,
    916 F.2d 795 (2d Cir. 1990) ........................................................... 95

United States v. Romano,
    879 F.2d 1056 (2d Cir. 1989) ........................................................... 80

United States v. Rosenthal,
    9 F.3d 1016 (2d Cir. 1993) ............................................................. 34

United States v. Rubinson,
    543 F.2d 951 (2d Cir. 1976) ...................................................... 92, 93

United States v. Salameh,
    152 F.3d 88 (2d Cir. 1998) ............................................................. 52

United States v. Sanchez,
  969 F.2d 1409 (2d Cir. 1992) ............................................................ 35

United States v. Saneaux,
  365 F. Supp. 2d 493 (S.D.N.Y. 2005) ............................................... 101

United States v. Serrano,
  No. 13-CR-58 (KBF), 2015 WL 81974 (S.D.N.Y. Jan. 6, 2015) ............ 78

United States v. Shareef,
  190 F.3d 71 (2d Cir. 1999) ............................................................... 96

United States v. Snype,
  441 F.3d 119 (2d Cir. 2006) .............................................................. 51

United States v. Solorio-Soto,
  300 F. App'x 487 (9th Cir. 2008) ..................................................... 101

United States v. Stanchich,
  550 F.2d 1294 (2d Cir. 1977) ............................................................ 99

United States v. Sureff,
  15 F.3d 225 (2d Cir. 1994) .............................................................. 111

United States v. Svoboda,
  347 F.3d 471 (2d Cir. 2003) .............................................................. 61

United States v. Tejada,
  956 F.2d 1256 (2d Cir. 1992) ........................................................... 114

United States v. Thomas,
  377 F.3d 232 (2d Cir. 2004) .............................................................. 96

United States v. Tines,
  70 F.3d 891 (6th Cir. 1995) .............................................................. 88

United States v. Tocco,
  135 F.3d 116 (2d Cir. 1998) .............................................................. 97

United States v. Tragas,
  727 F.3d 610 (6th Cir. 2013) ........................................... 84, 85, 86, 87

United States v. Turner,
  720 F.3d 411 (2d Cir. 2013) ............................................................ 120

United States v. U.S. Gypsum Co.,
  333 U.S. 364 (1948) ........................................................................ 100

United States v. Ulbricht,
  31 F. Supp. 3d 540 (S.D.N.Y. 2014) ................................................ 111

United States v. Van Manen,
  No. 18-CR-030, 2019 WL 5092013 (S.D.N.Y. Oct. 11, 2019) .............. 35

United States v. Villegas,
  899 F.2d 1324 (2d Cir. 1990) ............................................................ 52

x

United States v. Vizcarra-Millan,
    15 F.4th 473 (7th Cir. 2021) ................................................................ 101

United States v. Wexler,
    522 F.3d 194 (2d Cir. 2008) ................................................................ 34

United States v. White,
    692 F.3d 235 (2d Cir. 2012) ................................................................ 122

United States v. White,
    7 F.4th 90 (2d Cir. 2021) ................................................................ 32, 33

United States v. Wilson,
    879 F.3d 795 (7th Cir. 2018) ................................................................ 64

United States v. Young,
    470 U.S. 1 (1985) ................................................................ 96

United States v. Yu-Leung,
    51 F.3d 1116 (2d Cir. 1995) ................................................................ 48

United States v. Zane,
    495 F.2d 683 (2d Cir. 1974) ................................................................ 79, 80, 83

**Statutes**

18 U.S.C. § 115 ................................................................ 44

18 U.S.C. § 2261A ................................................................ 44, 109

18 U.S.C. § 371 ................................................................ 109

18 U.S.C. § 951(d) ................................................................ 81

22 U.S.C. § 611 ................................................................ 78

**Rules**

Fed. R. Crim. P. 29(c) ................................................................ 32

Fed. R. Crim. P. 33(a) ................................................................ 35

Fed. R. Evid. 1002 ................................................................ 86

Fed. R. Evid. 401 ................................................................ 121

**Treatises**

1 McCormick on Evid. § 51 (8th ed.) ................................................................ 86

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the motions for judgments of acquittal and new trials filed by defendants Michael McMahon (ECF No. 279 ("McMahon Br.")), Zheng Congying (ECF No. 278 ("Zheng Br.")), and Zhu Yong (ECF No. 277 (Zhu Br.")).[1] These defendants were convicted at trial for various crimes arising out of a scheme directed by the government of the People's Republic of China (the "PRC" or "China"), as part of the "Fox Hunt" and "Sky Net" repatriation programs, to locate, surveil and harass U.S. residents and their family members for the purpose of coercing those victims to return to China.

The defendants' instant motions, based on a purported lack of evidence to support their convictions and supposed trial errors, are without merit. With respect to their arguments for acquittal, the evidence presented at the three-week trial against each defendant was overwhelming and far exceeds the applicable standard under Federal Rule of Criminal Procedure 29. The defendants' arguments are not based on any actual showing of insufficient evidence, but instead impermissibly rely upon alternative inferences that the jury was entitled to—and did—reject when it rendered its guilty verdicts. As to their arguments for new trials, the defendants do not identify any actual defects that arose at trial, and moreover, failed to contemporaneously preserve objections to most of the issues they now raise. In any event, it would not be a "manifest injustice" to permit the guilty verdicts to stand, as required to grant a new trial under Federal Rule of Criminal Procedure 33, if any of these issues actually constitute trial errors.

Accordingly, and for the reasons set forth below, the government respectfully requests that the Court deny the defendants' motions.

---

[1] The government herein adheres to the naming conventions used in the superseding indictment (the "Indictment" or "Ind.") (See ECF No. 76.)

1

FACTUAL BACKGROUND

I.     The Charges and Allegations Against the Defendants

Defendants Michael McMahon, Zheng Congying and Zhu Yong (also known as "Jason Zhu") (collectively, the "Trial Defendants"), together with co-defendants Hu Ji (also known as "Eric Yan"), Li Minjun, Tu Lan, Zhu Feng (also known as "Johnny Zhu"), and Zhai Yongqiang (collectively, together with the Trial Defendants, the "Defendants") were charged in the Indictment with conspiracy to act as illegal agents of a foreign government (Count One), a substantive count of acting as an illegal agent of a foreign government (Count Two), conspiracy to engage in interstate stalking (Count Three), and a substantive count of interstate stalking (Count Four), in violation of Title 18, United States Code, Sections 371, 951 and 2261A(1)(b).[2]  (Ind. ¶¶ 56-65.)

The Indictment alleged that, between 2016 and 2019, the Defendants participated in an international campaign to threaten, harass, surveil and intimidate Xu Jin, Liu Fang and their adult daughter, Xu Xinzi (also known as "Sabrina Xu"),[3] with the goal of forcing Xu Jin to return from the United States to the PRC, as part of programs known as "Operation Fox Hunt" and "Operation Sky Net."  (Id. ¶¶ 13-14.)  The Indictment alleged that these actions were directed by the PRC government and PRC government officials, that the Trial Defendants and their co-conspirators knew they were acting on behalf of the PRC and that they failed to provide prior notice to the Attorney General that they were acting as foreign government agents.  The Indictment

---

[2] Defendants Tu Lan and Zhu Feng were additionally charged with obstruction of justice and conspiracy to commit same.  (See id. at ¶¶ 66-69.)  The Defendants were previously charged alongside Hongru Jin, Rong Jing and Kuang Zebin, all of whom subsequently pled guilty to offenses arising out of the same criminal conduct.  See United States v. Rong Jing, No. 21-CR-112 (PKC); United States v. Jin Hongru, No. 21-CR-313 (PKC).

[3] Referred to as "John Doe #1," "Jane Doe #1" and "Jane Doe #2," respectively, in the Indictment.

additionally alleged that the Trial Defendants engaged in interstate and international stalking and harassment of the victims.

II.    The Trial

    A.    Summary and Relevant Background Facts

        At trial, the government put on more than 20 witnesses and over 300 exhibits to prove the allegations against the Trial Defendants. The evidence established that the PRC government targeted Xu Jin and Liu Fang, Chinese nationals who had moved to the United States and settled in New Jersey, and sought to coerce their return to China. The scheme occurred over the course of several years and in multiple phases carried out by the Trial Defendants and others.

        As an initial matter, the government established the existence of the PRC government-operated programs known as "Fox Hunt" and "Sky Net." Professor Andrew Wedeman, an expert on the Chinese government, the Chinese Communist Party, and the PRC's policy initiative to repatriate PRC nationals living abroad, testified that Operation Fox Hunt was "an operation designed to try and repatriate individuals who have moved overseas that the Chinese government believes have committed criminal offenses" and that Sky Net was an expansion of that program. (Tr. 568:13-15, 569:18-570:1.)[4] He explained that the Chinese government, which operated in a hybrid "party-state" apparatus, relied upon several departments, agencies and organizations to carry out Fox Hunt and Sky Net, including "procuratorates" (PRC prosecutors' offices), the Ministry of Public Security (the Chinese equivalent to the Federal Bureau of Investigation, also known as the "MPS"), the Central Commission for Discipline Inspection and the Overseas Chinese Affairs Department. (See GX 441; Tr. 566:20-567:12, 567:15-568:7, 571:8-

---

[4] "Tr." references the trial transcript. Government exhibits are herein referenced as "GX", while Zhu Yong exhibits are herein referenced as "ZYX".

11, 571:12-20.)  Professor Wedeman further testified that the PRC government carried out these programs through, among other things, compelling return through persuasion by family members, "pressure" on the individual to come back to China, and instilling fear that failure to return "is putting the family in danger."  (Tr. 574:18-576:9.)

The government established that several of the defendants and their co-conspirators were PRC government officials who worked for the same entities responsible for Fox Hunt and Sky Net actions.  Hu Ji was a policeman with the Wuhan Public Security Bureau, a police agency under the MPS, and Tu Lan was a prosecutor in a local procuratorate.  (See GX 431B; GX 431O; Tr. 568:3-7.)  As discussed below, several other conspirators who coordinated directly with the Trial Defendants were also PRC government officials.  The evidence established that both Xu Jin and Liu Fang were targeted for repatriation as part of this PRC government program.  The two victims, as well as their family members, testified that, beginning around 2015 and 2016, Xu and Liu were wanted by the Chinese government for alleged criminal activity, and learned of their status through, among other places, Chinese and English-language media reports.  (Tr. 76:1-19, 788:13-789:5, 1388:7-16.)  Additionally, as detailed below, Michael McMahon uncovered a newspaper article that described Sky Net and identified the victims as targets of the program, and also determined that Interpol "red notices" (i.e., arrest warrants) were promulgated by the Chinese government for both victims.  (GX 434; GX 4019B; Tr. 1779:21-1780:4.)  None of the Trial Defendants, nor any of their co-defendants, provided prior notice to the Attorney General that they were acting as agents of a foreign government, as required by law.  (GX 203.)

Liu Fang testified that she and her husband took steps to obscure their residence from the Chinese government.  (Tr. 699:3-14.)  The evidence demonstrated that one of the primary goals of the PRC government was to locate the victims' home address, so that they could take

more direct actions to compel the victims' return to China.  For example, Liu Yan, the sister of Liu Fang, testified that she was visited on two occasions by men who demanded to know Xu Jin's location; when Liu Yan refused to disclose the location, one of the men advised her that she should tell Xu Jin he had two choices: return to the PRC or kill himself.  (Tr. 76:18-79:9.)

### B.  The Evidence Against Zhu Yong

#### 1.  Zhu Yong Hires U.S.-Based Private Investigator Michael McMahon to Locate and Target the Victims for the PRC Government

The evidence at trial established that Zhu Yong knowingly agreed to work for the PRC government to locate the victims so that they could be forced to return to China.  In August 2016, after returning to the United States from a trip to the PRC (see GX 402Y), Zhu contacted an attorney in New York in order to identify a New Jersey private investigator who could locate the victims; the attorney, in turn, recommended Michael McMahon.  (Tr. 1744:7-1745:3.)  The attorney provided a retainer agreement, which Zhu forwarded to an email account belonging to Sun Hui, a "political commissar" at the Wuhan Public Security Bureau, the same entity where co-defendant Hu Ji was employed.  (GX 431K-M; ZYX A; Tr. 1761:20-1763:15.)

Zhu subsequently traveled back to China in September 2016.  (GX 402Y.)  While there, Zhu contacted a Queens-based translator, Lina Xu, whom he used to contact and hire McMahon.  (See GX 906; GX 901D; GX 201 ¶ 19; Tr. 300:4-304:25; 347:8-13.)  Zhu requested that McMahon be hired "as soon as possible" because "**we** hope to generate a weekly work in progress report."[5]  (GX 901D at 4 (emphasis added).)  In additional messages, Zhu—who was listed in the translator's phone as "Middleman" (GX 901D; Tr. 345:25-346:6)—continued to make clear that he was working on behalf of a group or organization.  When the translator advised Zhu

---

[5] Unless otherwise indicated, all spelling and grammar in quoted materials is as it appears in the original document.

that McMahon requested certain information, Zhu demanded that she "leave these information blank in the contract," that "**we** will provide him the information" after the contract was signed and that "**our** requirement is to have this done as soon as possible." (GX 901D at 7-8 (emphasis added).) Zhu eventually received a contract and request for a $5000 deposit to hire McMahon, as well as wire transfer information. (GX 1012; GX 1026; GX 901D at 8, 17.) On September 29, Zhu signed the contract; he identified "Xu, Jin" as the target, and provided a social security number, green card number, New Jersey driver's license number and date of birth. (GX 3009.)

      2.    <u>Zhu Yong Provides Direction to Michael McMahon and Meets McMahon with PRC Police Officer Hu Ji</u>

After hiring McMahon, Zhu Yong provided additional sensitive information about the victims and directed McMahon to gather intelligence on Xu Jin and his family. For example, Zhu passed along purported driver's license and social security numbers for Liu Fang, Xu Jin and their daughter Xinzi Xu, and address information for their relatives, Liu Yan and her husband. (GX 901D at 9-11.) Zhu also disseminated purported Chinese government identification information for Xu Jin. (GX 901-D at 13-14; GX 1025 (providing Hong Kong and Macau travel numbers).) Zhu directed the translator to tell McMahon that "what we need is to locate the person" and to "look into more details, where do they work, which company, living conditions, etc." (GX 901D at 12.) On or about October 5, 2016, the translator told McMahon that Zhu had called and advised that Xu Jin's parents were going to Newark International Airport, and that Zhu directed McMahon to conduct surveillance because "[m]aybe this a lead to find Mr. Jin Xu." (GX 4004 at 777, 783.) Zhu received intelligence and surveillance reports and photographs from McMahon and provided feedback in response. (GX 1041; GX 1043-GX 1045; GX 1048-GX 1049.) For example, after being asked about the identity of a particular woman in a photograph, Zhu

6

responded (through the translator) that "the female . . . at one of the houses was Yan Liu, she is our subject's sister-in-law." (GX 1043; GX 4004 at 786.)

Zhu next set up multiple in-person meetings between Zhu, McMahon and a PRC official to further the operation. On October 27, 2016, the translator told McMahon that Zhu wanted to meet in person "ASAP" to "discuss Jin Xu's case," and that Zhu would meet "anywhere . . . because he seemed like he really need to talk in person." (GX 4004 at 787-89.) McMahon proposed that they meet at a Panera Bread in New Jersey. That same day Zhu, McMahon and PRC police officer Hu Ji met at the Panera Bread, as documented in a photograph found in Zhu Yong's Apple iCloud account. (See GX 902D; GX 902E; GX 201, ¶ 20.) Additionally, phone records establish that Zhu Yong was in contact with both Hu and McMahon shortly before and after this meeting. (See GX 316 at 2-3.) Zhu secured additional information after the meeting from McMahon, this time focused on the victims' daughter, Xinzi Xu, and Xu Jin's banking information. (GX 4004 at 790-92; GX 4008 at 830-40.)

A few days later, Zhu Yong requested another meeting with McMahon, which occurred on November 1, 2016 at an office in Hackensack, New Jersey. (GX 4008 at 841-43.) The evidence shows that Hu Ji attended this meeting as well. Specifically, the day before the meeting, McMahon told his friend and Drug Enforcement Administration ("DEA") contact, Greg Finning, that he needed the U.S. government information McMahon requested about the victims (discussed below), because "[m]y **clients** flew in from China and I'm meeting them this eve." (GX 4006B at 824 (emphasis added); see also GX 402Y (Zhu and Hu border records).) At the same time, Zhu confirmed he was coming with others, advising that "**we** want to discuss the next step plan.with you," and border records establish that Hu was still in the United States, where he remained until November 5, 2016. (GX 4008 at 841 (emphasis added); GX 402Y.)

7

After meeting with McMahon and PRC police officer Hu Ji, Zhu contacted McMahon directly to advise McMahon of a transition in his handler.  On November 8, 2016, Zhu told McMahon that Zhu had "given the person who's looking for Jin Xu-our subject your email address" and directed that any future correspondence continue to be routed through "Emily" (a name used by Lina Xu, the translator).  (GX 4007 at 829.)  As discussed further below, McMahon subsequently communicated directly with Hu Ji (using the pseudonym "Eric Yan"), and later communicated with Zhu Feng when they executed the operation to bring Xu Jin's elderly father to the United States for the purpose of coercing Xu Jin to return to China.

### 3. Zhu Yong's Ongoing Relationship with the PRC Government

Other evidence was admitted that tended to establish that Zhu Yong had an ongoing and close relationship with the PRC government and PRC government officials involved in the scheme to repatriate the victims.  Zhu's iCloud account contained a picture of Zhu at an event with Li Hongzhong, one of the most senior members of both the Chinese government and Chinese Communist Party.  (See GX 9; GX 902M; Tr. 553:18-554:24, 565:10-24 (Li Honzhong is "a member of the Politburo," "vice-chairman of the National People's Congress" and "one of the top two dozen people" in the party).)  Zhu's iCloud account also contained a phone number and contact entry associated with Hu Ji, and phone records establish that Zhu had numerous calls with Hu in October 2016.  (See GX 902B-C; GX 308; GX 316.)

Zhu Yong continued to participate in the scheme to locate, harass and attempt to repatriate the victims to China well into 2018.  Zhu's iCloud account contained a screen shot, taken in May 2018, of the address of Liu Yan and her husband.  The account also contained several photographs of Liu Yan's residence and her family car, which, according to metadata, were taken in or around May 9, 2018.  (See GX 902D; GX 902G-I; see also Tr. 69:14-71:1, 1368:18-1369:8, 1386:14-24.)  Four days after the photographs were taken, Zhu traveled back to China.  (See GX

8

402U.)  This series of events is particularly noteworthy because, as discussed below, Xu Jin and Liu Fang had refused to return to China after McMahon and others brought Xu Jin's elderly father to the United States in 2017.  A few months after Zhu took those surveillance photographs, Trial Defendant Zheng Congying delivered an overtly threatening note to the victims; in 2019 Liu Yan and her husband began to receive coercive and threatening mailings from China.

### 4. Zhu Yong Admits to Knowingly Working for the PRC Government to Coerce and Harass the Victims

After his arrest, Zhu Yong admitted that he knew that he was participating in a scheme to harass and coerce the victims that was directed by PRC officials.  (See GX 703C; GX 703D.)[6]  Zhu told U.S. law enforcement officers that he knew "these people are wanted in China" and had heard the persons he was working with talk about how they were "fugitive[s] from Wuhan."  (Id.)  He specifically identified "Mr. Hu," a reference to Hu Ji, and "the young man," a reference to Zhu Feng, and said they came to the United States to "look for that person."  (Id.)  Zhu said that he believed they had come here for the "Communist Party," and that, while he was unsure whether Hu Ji was in fact police, he was part of the "Overseas Chinese Affairs Office," a reference to one of the PRC organizations involved in the Fox Hunt and Sky Net operations.  (Id.)  Zhu was also specifically aware of the scheme to use Xu Jin's elderly father to harass Xu Jin, stating "the parent of this person, Xu Jin—actually came and try to ask Xu Jin to go back."  (Id.)  Zhu also admitted that he knew there were "several departments looking for [Xu Jin]" and that the one to find him "gets an award."  (Id.)

---

[6] GX 703D is a transcript of GX 703C; the transcript was not admitted at trial, but is cited here for the Court's convenience. The government similarly cites to other demonstrative transcripts, in addition to the recordings that were admitted, for convenience.

C.    The Evidence Against Michael McMahon

1.    McMahon's Initial Retention Under Suspicious Circumstances

The evidence established that Michael McMahon was a private investigator and sophisticated former police officer who knowingly agreed to take direction from PRC government officials and participated in a scheme to harass the victims. McMahon worked in the New York City Police Department ("NYPD") in the mid-1990s. (Tr. 1490:19-21, 1772:20-22.) He was described by fellow former NYPD officer Eric Gallowitz as a "highly decorated police officer" who obtained the rank of "detective sergeant." (Tr. 1780:20-22.) Gallowitz also confirmed that NYPD police officers, like McMahon, were familiar with arrest warrants and understood that the police officers and prosecutors who effectuate arrest warrants are government employees. (Tr. 1825:8-1826:10.)

McMahon was contacted by a translator in September 2016 and hired to work on the campaign to investigate, locate and harass Xu Jin and Liu Fang. As discussed above, the translator was hired by Zhu Yong; but the translator did not immediately share this fact. McMahon was then provided vague, suspicious and ever-changing information about who, in fact, was his client. First, the translator advised McMahon that the client was a woman who found McMahon's name on the internet and "doesn't speak English at all, so she asked us to contact you." (GX 3003.) The translator subsequently described the client as a "female client" and "lady" who "probably has been through a lot" and would only provide personal information after learning "about your end of responsibility." (GX 3005.) The translator did not answer any of McMahon's questions, such as "what the client hopes to accomplish," and McMahon did not press further except to note that he "still do[es]n't know what the case is about." (GX 3005.) Notwithstanding the lack of information, McMahon passed along a blank retainer agreement and a demand for a $5,000 retainer to begin work. (GX 3006.) Two days later, McMahon received a completed retainer agreement

10

from the translator that was signed not by a "lady" client, but by Zhu Yong (using his alias "Jason Zhu"). (GX 3009.) The translator advised that "Mr. Jason Zhu has signed the retainer agreement" and would wire the retainer fee; she did not explain the abrupt switch away from a supposed female client, and McMahon did not ask. (GX 3008.)

As discussed above, in early October 2016, McMahon was provided sensitive and personal information about Xu Jin, Liu Fang and their family, directed to gather additional information about them, and on October 5, 2016, directed to "track the person who accompanies Jin Xu's parents" to Newark International Airport. (GX 3011-GX 3013.) McMahon agreed to start immediately and requested more information about Xu Jin. (GX 3011; GX 4004 at 775.) McMahon again asked for "the reason [the client] needs information," and "is there a lawyer involved." (GX 3011.) McMahon was told that Xu Jin "ow[]ed a lot of money from Mr. Jason Zhu," had "run away," and that "Mr. Zhu needs to find where does Jin Xu live and other relate information." (GX 3011.) Notwithstanding the supposedly financial nature of the dispute, McMahon was told that "there's no attorneys involved." (GX 3011.) That McMahon was told there were no lawyers involved is notable because, in addition to being a red flag that McMahon ignored, it established that McMahon's work was unrelated to any legitimate civil litigation. Eventually, McMahon asked "how does [Zhu] know all this information" about Xu Jin and his family. (GX 4004 at 777.) The translator told McMahon that she "do[es]n't get to ask any information" of Zhu Yong but that she "guess[ed] they used to do business together" and so have "mutual friends" who provided the sensitive information. (GX 4004 at 777-778.) McMahon did not inquire how "mutual friends" would have the victims' Chinese passport number or "the exit-entry permit for traveling to and from Hong Kong and Macau," that Zhu provided. (GX 3013.)

11

Instead, McMahon reached out to fellow private investigator Eric Gallowitz to plan the requested surveillance.  (GX 4019B at 127-28.)

      2.    <u>McMahon Learns That the Victims Are Wanted by the PRC Government</u>

Less than a week after being retained, and before he conducted any surveillance, Michael McMahon learned that the targets of his investigation were wanted by the PRC government.  On October 5, 2016, McMahon obtained a "Comprehensive Report" from a database called TLO that stated Xu Jin was "INTERPOL MOST WANTED."  (GX 4012.)  McMahon noticed this, emailing Gallowitz that same day, writing "**tlo says he wanted by INTERPOL wow!!**" and advising Gallowitz to "**bring your gun**" to the surveillance.  (GX 4019B at 119-20) (emphasis added).)  McMahon also learned that the arrest warrant for Xu Jin was associated with the Chinese government.  On October 5, McMahon also obtained an English-language article from <u>China Daily</u>, which he also shared with Gallowitz.  (GX 4019B at 121-22.)  The article is titled "Interpol Launches Global Dragnet for 100 Chinese Fugitives."  (GX 4019B at 122; GX 434.)  Below the headline, the article explained that "[i]t's called Operation Sky Net" and that "arrest warrants were issued by Interpol China for former State employees and others suspected of a wide range of corrupt practices."  (GX 434.)  The article further noted that the publication "was authorized by the Chinese justice authorities" to publish information about the alleged fugitives. Pictures, biographical information, and charging information about various people were listed; both Xu Jin and Liu Fang's pictures and information were included.  (GX 434.)

At trial, Gallowitz testified that he remembered being told by McMahon that the victim was wanted on an "Interpol warrant" and being shown a "wanted poster" for the person they were hired to surveil.  (Tr. 1776:18-23, 1777:24-1779:5.)  He described the nature of the engagement as "atypical." (Tr. 1778:4-7.)  When Gallowitz was asked by defense counsel whether McMahon had "give[n] you any indication" or "thought that he was working on a criminal matter,"

Gallowitz responded, "yes," specifically referencing the "Interpol warrant" and the fact that "the person we were looking for" was "wanted."  (Tr. 1801:23-1802:6.)

That same day, McMahon wrote to the translator: "I just some checks on him. Looks like he's wanted in China for corruption," and sent her the same China Daily article.  (GX 4004 at 781-82.)  McMahon noted that one of the pictures sent to McMahon of Xu Jin was the same picture as was contained in the article; as noted above, the article indicated that these pictures were provided by the Chinese government.  (Id.)  The translator asked McMahon whether it would "be ok to share this information with Mr. Zhu."  (GX 4004 at 781.)  McMahon did not answer the question, instead stating "I'm sure he knows this but he didn't tell us" and that "I think he should have."  (GX 4004 at 782.)  After being told by McMahon that Xu Jin was wanted by the Chinese government, the translator responded "I see.  I think now I know what is going on with JIN XU's case."  (GX 4004 at 783.)  Rather than ask the natural question in response ("what do you think is going on?"), McMahon chose to remain silent.

Despite learning that the victims were wanted by the Chinese government, McMahon conducted surveillance, along with Gallowitz, and passed photographs and other information about the victims back to the translator, who advised that she was providing it to Zhu Yong.  (GX 1034-39; GX 1031-33; GX 3020.)  McMahon also conducted substantial research on Xu Jin's daughter, Xinzi Xu.  (GX 4004 at 784-86; GX 3021; GX 3024-3028; GX 4004 at 789-92.)  Although the matter was purportedly a financial dispute about Xu Jin, McMahon was asked for detailed information about Xu Jin's daughter's whereabouts and other unusual information, like identifying her college major.  (GX 3026.)  McMahon provided various addresses associated with Xinzi Xu, as well as a description of her purported college residence.  (GX 3027; GX 3028.)

13

Xinzi Xu testified, via Rule 15 deposition, and confirmed that many of the addresses located by McMahon were addresses where she had once lived.  (GX 713 at 15-16; GX 3063; GX 3065.)

### 3.    McMahon Communicates Directly with PRC Official Hu Ji

As discussed above, on October 27, 2016, and then again on November 1, 2016, McMahon met in person with Zhu Yong and PRC police officer Hu Ji.  (See GX 902D-E; GX 201, ¶ 20; GX 4008 at 841-43.)   And, as noted above, shortly after these meetings, Zhu advised McMahon that McMahon should communicate with "the person who's looking for Jin Xu."  (GX 4007.)  On November 13, 2016, Hu Ji (using the name "Eric Yan") emailed McMahon that Hu was "back to China and reported all we found to my boss of the company."[7]  (GX 3047.)  Hu directed McMahon to perform several additional investigative tasks, including obtaining financial information and an "off shore property investigation."  (GX 3047.)  Hu advised that his "uncle" will transfer money for the work.  (GX 3047.)  Notwithstanding that the person who wanted information on the victims had changed yet again—from a "female" client, to Zhu Yong, to Eric Yan, to Eric Yan's "boss" or "uncle"—McMahon did not challenge the story or stop performing work for his array of clients.  Instead, McMahon wrote that he would "get the pricing" for the work, and about a month later, accepted nearly $6,000 that he placed in his personal checking account rather than his business account.[8]  (GX 3049; GX 403A - GX403L.)  Less than a week later, McMahon obtained and passed U.S. government information to Hu.

---

[7] Despite several references to a "company" by both Hu Ji and Zhu Feng, no company name was ever specified.

[8] As reflected in written records from McMahon's bank account, the wire transfer was executed by Li Feng, another PRC-based prosecutor.  (See GX 403E.)

4.   McMahon Acquires Sensitive U.S. Government Records and Passes the Information to Chinese Government Officials

Evidence at trial demonstrated that McMahon knew his activities were improper, because he went far beyond providing information from commercially available databases available to a typical private investigator involved in lawful conduct.  Instead, he used his law enforcement contacts to obtain information from sensitive federal government databases, which he then passed back to his PRC handlers.

A day after learning that the victims were wanted by the Chinese government, McMahon contacted Greg Finning, a DEA agent and supervisor of a joint task force in New York involving other federal law enforcement agencies.  (GX 4006B at 821; GX 316; Tr. 1442:1-10.)[9] Two weeks later, on October 20, 2016, McMahon had a 41-minute phone call with Finning; after the call, McMahon texted the victims' names, social security numbers, dates of birth, and driver's license information.  (GX 316; GX 306A; GX 4006B at 819.)  About a week later, on October 28, McMahon requested a status update on his request for information.  (GX 4006B at 823-24.)  This request came the day after McMahon met with Zhu Yong and PRC police officer Hu Ji.  (See GX 902D-E; GX 201, ¶ 20.)  Finning responded "they are working on it."  (GX 4006B at 823.)

A few days later, on October 31, 2016, McMahon advised Finning that he needed the information because "[m]y clients flew in from China and I'm meeting them this eve."  (GX 4006B at 824.)  Finning responded that he did not have the information because his "HSI guy"—a reference to an agent with Homeland Security Investigations ("HSI"), a federal agency that is part of the Department of Homeland Security ("DHS") and was involved in Finning's joint

---

[9] The evidence at trial established that McMahon communicated by text and phone with a person identified as "Greg" in his contact information; that the phone number associated with "Greg" was registered by a DEA employee responsible for providing work phones to DEA agents; and that the phone was registered to a DEA facility.

task force—was not at work due to the Halloween holiday.  (GX 4006B at 824.)  As noted above, the day after McMahon requested this second update from Finning, McMahon met with Zhu Yong and Hu Ji a second time.  That same day, November 1, 2016, government records reflect that HSI Special Agent Naviene Habeeb requested information from DHS databases related to Liu Fang and Xu Jin.  (GX 424-425; GX 429.)  The email, which attached some of the database information, included a warning noting that the information was "not to be released to the public or other personnel who do not have a valid 'need-to-know' without prior approval of an authorized DHS official."  (GX 429.)  Notably, phone records establish that McMahon and Finning had several phone calls shortly before and after the queries were conducted.  (GX 316.)

HSI Special Agent Naviene Habeeb testified that HSI controlled access to DHS databases that contain information about international travel and ongoing criminal investigations.  (Tr. 1447:9-1449:4.)  Habeeb explained that DEA agents typically did not have direct access to the database and that, though she was permitted to share database information with DEA agents for law enforcement purposes, that information could not be shared with people outside of law enforcement.  (Tr. 1450:7-1452:19.)  Special Agent Habeeb testified that HSI and DEA agents both received training on the proper handling of information contained in government databases.  (Tr. 1449:9-1450:13.)  Special Agent Habeeb recalled the queries for information for Xu Jin and Liu Fang reflected in the database records.  While she had run thousands of such queries, these were "weird" because she did not conduct investigations involving Chinese subjects, nor subjects located in the United States.  (Tr. 1460:1-10.)  Habeeb did not recall specifically who asked her to run these queries, but generally remembered that Greg Finning "had something to do with" the queries.  (Tr. 1460:21-24.)

16

On November 17, 2016, Hu Ji emailed McMahon and requested "Fang liu exit board information" and "more details about her leaving USA." (GX 3050.) That same day, McMahon and Finning had a 20-minute phone call. (GX 316.) The following day, November 18, 2016, McMahon sent an email to Hu Ji with the subject "FANG LIU EXIT INFORMATION" and wrote that "Fang Liu left Los Angeles on August 8th 2015 on a plane bound for Australia" and noted that "my contact could not obtain her passport number." (GX 3051.) The information McMahon shared is materially identical to the information from one of the database checks run by HSI Special Agent Habeeb for Greg Finning on November 1, 2016. (GX 425.)[10] Rather than use his federal law enforcement relationship with Finning to report the suspicious nature of the arrangement, McMahon instead sought out sensitive information to further the scheme.

5.   McMahon's Role in the Scheme to Use Xu Jin's Elderly Father to Locate and Harass Xu Jin

Several months later, in March 2017, Hu Ji (as "Eric Yan") contacted McMahon and requested that he participate in a scheme involving the victim's elderly father. On March 27, 2017, Hu told McMahon that Xu Jin's father would "visit him from China this Saturday," that they wanted McMahon to "trace him to find Xujin's address," and that Hu Ji's "friend in Newyork will meet [McMahon] to give the money in cash, and tell [him] the time Xu's father arrive at the house." (GX 3067.) McMahon agreed to partake and began coordinating the planned surveillance with Eric Gallowitz. (GX 4019B at 194-97.) Hu advised McMahon that his "friend"—later identified as Zhu Feng—would be in touch in the next few days. (GX 3068.)

While McMahon was preparing for his role, his co-conspirators prepared to bring Xu Jin's elderly father from China to the United States against his will. Hongru Jin testified that

---

[10] McMahon made an apparent typo, writing "August 8th 2015"; the database information reflected travel on August 18, 2015.

he was hired by his friend Zhu Feng to help participate in an operation to bring a former Chinese official back to China. (Tr. 969:8-14.) Zhu Feng needed another person to carry out the scheme and explained to Hongru Jin what his role would be, confirming that they were working for the Chinese government, and that their task was to "persuade" this official to "return to China." (Tr. 973:11-974:10; GX 807F at 4.) Hongru Jin was told that he was going to pick up Zhu Feng and Tu Lan from Newark airport, that a doctor would be accompanying the target's elderly father who would be involuntarily flying to New Jersey, and that a private investigator (i.e., McMahon) was involved. (Tr. 974:14-976:7, 1012:5-22.) Zhu Feng coordinated through WeChat messages with PRC official Li Feng (from whom McMahon received wired funds to participate in the scheme) about the statements Xu Jin's father would make to evade suspicion at the U.S. border. (See GX 808C.)

On April 3, 2017, PRC prosecutor Tu Lan and Zhu Feng traveled from China to New Jersey, were picked up by Hongru Jin, and the three drove to a hotel. (GX 402Y; GX 111; GX 112; Tr. 974:14-21, 996:6-997:9.) After they arrived at the hotel, Tu Lan, Zhu Feng and Hongru Jin discussed the plan to use Xu Jin's elderly father to locate and coerce Xu Jin. (Tr. at 1000:12-1001:5.) They discussed that, after the father arrived accompanied by a doctor, they would bring the father to Liu Yan's home, where Hongru Jin and the private investigator would conduct surveillance in the hopes of locating Xu Jin's residence. (Tr. 1001:6-20.) Much of this meeting was recorded by Zhu Feng. (GX 704; Tr. 1002:9-1021:20.) The recording further established that Xu Jin's father did not want to come to the United States (GX 704A at 1 ("he himself does not want to come here, either")); the operation was coordinated by Hu Ji (GX 704A at 6 ("with Captain Hu last time")); Zhu Feng had previously surveilled the victims (GX 704A at

6-9); and the Chinese government was funding the operation (GX 704A at 50 ("CCP paid" for Zhu Feng's hotel)).

Hongru Jin explained that prosecutor Tu Lan referred to locating Xu Jin's home as the "backup plan" on the recording because the hope was that the father would convince Xu Jin to return to China, but that if he did not, "I will stalk the person and get his license plate number, et cetera." (Tr. 1018:11-17.) Hongru Jin understood that "the private detective" (i.e., Michael McMahon) was also part of the "backup plan" to stalk the victim if the use of the father to coerce Xu Jin failed. (Tr. 1018:11-17.) During the hotel meeting, Hongru Jin advised Zhu Feng and Tu Lan to "tell the other party that [Jin was] also involved," which Jin testified meant that he wanted the private detective to "know that I'm also doing the same thing as they were doing." (GX 704A at 4; Tr. 1015:2-8.) PRC Prosecutor Tu Lan and Zhu Feng discussed McMahon in some detail during this meeting, and Tu Lan ultimately directed Zhu Feng to "tell him clearly about everything." (GX 704A at 3.)

The next day, April 4, 2017, Zhu Feng and Hongru Jin met with McMahon at the same Panera Bread where McMahon previously met with Zhu Yong and Hu Ji. (Tr. 1033:18-25; GX 115.) The meeting lasted a little less than an hour. During the meeting, Zhu Feng paid McMahon $5,000 in cash as documented in an invoice to "Eric Yan and J. Zhu" (not any particular company) that McMahon sent the next day. (GX 707A-D; GX 3072; GX 3073; Tr. 1036:16-17.)

On April 5, 2017, Xu Jin's elderly father and PRC doctor Li Minjun arrived at Newark International Airport on a flight from China. (GX 402Y.) Zhu Feng then texted McMahon that Zhu "just got the package," an apparent reference to Xu Jin's father, and that their "eta" was "7:40pm." (GX 4010 at 848.) Hongru Jin, who was conducting surveillance at the time, observed Zhu Feng and Li Minjun drive Xu Jin's father to Liu Yan's residence, walk the father to the door,

19

and leave him there.  (Tr. 1054:6-18.)  Afterwards, Zhu Feng and Dr. Li provided Hongru Jin with night vision goggles to assist with the surveillance.  (GX 501; GX 501A; Tr. 1054:16-20.)

Liu Yan testified that her father-in-law had unexpectedly arrived at their home while she was walking her dog.  (Tr. 80:3-83:25.)  After learning this from her 15-year-old daughter, she returned home, where her father-in-law told her that he was brought to the United States by a "Dr. Li" (Li Minjun) and PRC prosecutor Tu Lan.  He also told Liu Yan that he was tasked with persuading Xu Jin to return to China.  (Tr. 84:1-85:16.)[11]  The elderly father, who had medical issues, had been given a flip phone and papers with instructions for what to say to U.S. border enforcement, and a paper with PRC officials' and their intermediaries' numbers to call.  (GX 437; Tr. 85:17-92:4, 93:22-94:8, 1395:1-1396:13.)  Liu Yan contacted her sister and brother-in-law, and they decided to have the father meet Xu Jin the next day, at the Livingston Mall, in an attempt to evade surveillance by the Chinese government.  (Tr. 1389:23-1390:2.)

McMahon, along with Eric Gallowitz, conducted surveillance for the scheme on April 5, 2017.  McMahon notified the local police department that they were present in the area, which Gallowitz testified was done, in part, because "if [the police] get a call for a suspicious vehicle, they're less likely to show up."  (Tr. 1831:9:12.)[12]  During their surveillance, McMahon observed Xu Jin's father arrive at Liu Yan's home the evening of April 5.  (GX 4010 at 849-50.)[13]  As they watched the operation unfold, Gallowitz asked McMahon "you trust them?" and

---

[11] The father later told both Xu Jin and Liu Fang a similar explanation for his appearance. (Tr. 697:18-699:2, 1390:18-1391:2.)

[12] McMahon previously notified local police of his surveillance in October 2016 as well. At that time, McMahon specifically confirmed to Gallowitz that he did not tell the police why they were conducting surveillance.  (GX EG-3.)

[13] McMahon saw Hongru Jin driving around as well.  (GX 4010 at 848-49; GX 4019B at 235-38; Tr. 1055:17-1056:9.)

McMahon responded: "No." (GX 4019B at 239-40.) Gallowitz later testified that he had conducted dozens of surveillance operations as a private investigator, and had never been involved in one that related to a client bringing an elderly man from a foreign country to the United States. (Tr. 1833:25-1834:4.) Nevertheless, McMahon continued to work and assist with the scheme.

On the morning of April 6, 2017, Liu Yan drove her father-in-law to Livingston Mall to meet Xu Jin. During that trip, Liu Yan noticed someone who she thought might be following her. (Tr. 99:2-20.) The evidence at trial established that Liu Yan's observations were accurate: McMahon, together with another private investigator he hired, was surveilling Liu Yan, took photographs of her, and shared those photographs and reports with Zhu Feng. (GX 4010 at 852-52; GX 4010A; Tr. 108:5-109:11.) During the meeting at the mall, Xu Jin's father told Xu Jin that he was forced to come to the United States to convince Xu to repatriate because PRC officials told the father that if he refused, they would put his daughter (Xu Jin's sister) in jail. (Tr. 1390:21-1392:4.) Eventually, Xu Jin's father was sent back to China; Xu testified that his father returned because his wife and daughter were still in China, and the father was worried about his wife's health and the possibility of his daughter being sent to jail. (Tr. 1394:12-16.)

At the direction of Zhu Feng, McMahon continued surveillance on April 6, 2017 because they still had not located Xu Jin's residence. During the surveillance, McMahon sent himself the China Daily article that stated that Xu Jin was wanted by the Chinese government. (GX 4011 at 922.) During the operation that day, McMahon conducted a query of New Jersey Motor Vehicle Commission ("NJMVC") records and passed information he learned from those records to Zhu Feng. (GX 805B at 8-9; GX 408H.) Notably, McMahon had previously signed a memorandum with the NJMVC, which stated that the database "shall be used only for specific reasons in application **and prohibits using records to conduct surveillance or to investigate or**

**locate an individual for reasons not specifically related to motor vehicle activity.**" (GX 408A (emphasis added).) As with the information that he obtained from a federal database, McMahon engaged in inappropriate conduct because he knew he was engaged in a larger illicit scheme.

Later that same day, McMahon finally located Xu Jin and Liu Fang's home in New Jersey, and passed the address along to Zhu Feng. (GX 805B at 5.) As discussed below, the address obtained by McMahon was relied upon later in the larger harassment scheme: Trial Defendant Zheng Congying and his conspirator, Kuang Zebin, conveyed a threatening message to Xu Jin at that very address the next year. Indeed, cell site location information showed that Kuang's phone connecting to the same cell tower near Xu Jin's residence in 2018 that McMahon's phone did in 2017. (GX 442 at 17.) That night, after finally locating Xu Jin's residence, McMahon discussed the day's events with Eric Gallowitz. McMahon said it went "great," that they "got em," and the "client was very happy." McMahon said he was "waiting for a call" to find out what to do next. Gallowitz responded "Yeah. **From NJ State Police about an abduction**" and McMahon wrote back "**lol**." (GX 4019B at 244-57 (emphasis added).)

In the ensuing days, as the plan to use the father to coerce Xu Jin's return did not seem to be working, McMahon discussed with Zhu Feng more aggressive ways in which they could harass and coerce the victims. On April 9 and 10, 2017, Zhu Feng texted McMahon, letting him know the evolving operational plans, explaining that rather than focusing on financial information, "[t]hey want to figure out their physical activities first." (GX 805B at 20.) McMahon and Zhu Feng then discussed when the father would be sent back to China, and how long Zhu Feng would be staying for the operation. Zhu Feng responded that it could be "long work" because "[t]hey already told me **they will try everything they can to get Xu plead** and return the money." (GX 805B at 22 (emphasis added).) McMahon, a former police sergeant and investigator, did not

inquire about how a company—as opposed to government actors—could force a person to "plead" to certain conduct.  Notably, in addition to these text messages, McMahon participated in a number of telephone calls with Zhu Feng in and around the time of this operation.  (GX 317.)  As discussed below, McMahon later conceded that he talked with Zhu Feng about the goals of the operation during one or more of these calls.  (GX 701A.)

The next day, Zhu Feng advised McMahon that he had to return to China for "the meeting."  (GX 805B at 31.)  Zhu Feng provided an overseas number to McMahon, and then advised him that they would "grant u a nice trip **if they can get Xu back to China** haha."  (GX 805B at 32.)  McMahon responded "oh nice" and then proposed to Zhu Feng a more aggressive method of coercion: "**I think if we harass Xu.  Park outside his home and let him know we are there**.  I did that before on another case."  (GX 805B at 32 (emphasis added).)  Zhu Feng declined the suggestion to engage in this type of harassment at that moment, but advised that "they are very happy for what u have done" for the scheme.  (GX 805B at 32-33.)

6.    McMahon's Suspicious Financial Behavior

The evidence at trial also demonstrated that Michael McMahon knew he was engaging in illegal activity given the way in which he directed payments that he received for his role in the scheme to target the victims.  McMahon was paid more than $19,000 in total.  On October 4, 2016, McMahon deposited the initial $5,000 retainer from Zhu Yong, through the translator, in his business bank account, the "McMahon Investigative Group" account.  (GX 403B; GX 403E; GX 404B.)[14]  The following day, after McMahon found the China Daily article and

---

[14] Bank records reflect that the check was dated October 1, 2016, deposited by McMahon on October 4, 2016, and posted on October 5, 2016.  (GX 403B.)

Interpol information which indicated that the victims were wanted by the PRC government.  He never deposited any additional money for this work into his business account thereafter.

In December 2016, McMahon coordinated with Hu Ji (using the name "Eric Yan") to provide McMahon a wire transfer of $5,945 listed as for "ERIC TRAVELING FEE" and identified as coming from "Li Feng" in McMahon's bank records.[15]  This time, McMahon sent the payment to a personal checking account.  (GX 403A; GX 403K.)[16]  Later, on April 27, 2017, McMahon received a $200 wire transfer directed by Hu Ji, and McMahon again used his personal checking account.  (GX 403K-GX 403L.)

Next, on April 4, 2017, McMahon received $5,000 in cash from Zhu Feng when they met at the Panera Bread shortly before the actions involving Xu Jin's father.  The evidence reflected that the money was not deposited in any bank account controlled by McMahon, and thus that he kept this cash out of the financial system.  (GX 3072; GX 3073.)

On April 10 and April 11, 2017, McMahon received two payments of $2,000 and $1,000 from Zhu Feng.  Notably, McMahon wanted to receive this money in cash as well:  Zhu Feng complained about having to drive from New York to New Jersey to hand-deliver the cash, and asked if he could instead deposit the money by bringing it to a nearby bank branch.  (GX 805B at 16 ("Mc can I deposit cash to ur account instead of driving 2 hours").)  McMahon agreed but, rather than provide his business account information, McMahon provided his son's student

---

[15] The evidence established that Li Feng was an "officer" in a local PRC prosecutor's office (like Tu Lan) who also worked with Zhu Feng to facilitate the entry of Xu Jin's elderly father into the United States.  (GX 431I-GX 431J.)

[16] McMahon originally provided his business account number to Hu Ji, with his personal name rather than the business entity name.  When Hu advised McMahon that the wire could not go through because the name and account number did not match, McMahon provided the personal account information rather than correct the business entity name.  (GX 3061.)

checking account as the location for the money to be deposited.  (GX 805B at 16-17; GX 403F-I.) A few weeks later, McMahon used that $3,000 to pay his and his wife's credit card debt.  (GX 3075; GX 403J; GX 436A.)

       In addition to the suspicious handling of payments, the evidence also indicated that McMahon underreported his taxes in a manner that is consistent with concealing these payments. McMahon received nearly $11,000 in 2016 for his work on this case.  McMahon reported gross profits of $40,734 on his 2016 tax return.  (GX 432A; GX 452.)  But McMahon's business account reflected more than $56,001 in deposits (approximately $15,267 more than reported); the amount in his account itself underrepresents his business income, because, as noted above, McMahon received $5,495 from Hu Ji that McMahon deposited in his personal account.  (GX 403A-N.) McMahon received $8,200 in 2017 for his work on the case.  He reported gross profits of $46,898 on his 2017 tax return.  (GX 433A.)  But McMahon's business account reflects more than $46,229 in deposits, and none of the $8,200 he received in 2017 was deposited into his business account. Thus, his 2017 return underreported his income as well.

       7.   <u>McMahon Admits to Knowing that the PRC Government Was Involved in the Scheme</u>

       After McMahon was arrested, he admitted to knowing that he was participating in a scheme to coerce Xu Jin to return to China to face alleged criminal charges.  McMahon conceded that he knew "the goal" of the operation was that "they were trying to get [the victim] back to China . . . **so they could prosecute him**."  (GX 701A; GX 701B at 4 (emphasis added).) McMahon elaborated, explaining that the father was flown from China to the United States to "convince the son" to return "out of honor for the [family] name."  (GX 701A; GX 701B at 4.) McMahon later reiterated this, stating that the elderly father had come to the United States "to get his son to go back to China."  (GX 701A; GX 701B at 7.)  McMahon understood the purpose was

to get Xu Jin to "face the consequences back in China." (GX 701A; GX 701B at 5.) McMahon admitted that he discussed the purpose of their operation with "[t]he guy on the text messages," a reference to Zhu Feng, and said that they discussed the plan on the phone. (GX 701A; GX 701B at 6.)

McMahon was also asked about his involvement in stalking and harassing the victims. McMahon was confronted with his text message to Zhu Feng, where he proposed to "harass" Xu Jin. McMahon initially lied to the federal agents, claiming that the message must be a "typo." (GX 701A; GX 701B at 2.) McMahon then attempted a different explanation: McMahon said that he was thinking about a prior instance in which he "sat outside a guy's house" to "let him know we were outside," and that he suggested doing so with respect to Xu Jin because if the target "knows you're sitting outside" then he would think that "maybe he should turn himself in." (GX 701A; GX 701B at 5.)

    D.    <u>The Evidence Against Zheng Congying</u>

The government proved at trial that Zheng Congying, together with his co-conspirator Kuang Zebin, traveled in September 2018 to Xu Jin's residence to harass Xu Jin and his family, and deliver a threatening message.

On September 4, 2018, Xu Jin and Liu Fang were home in New Jersey, when they heard what sounded like someone banging on their front door and trying to enter their home. (Tr. 701:6-12, 1397:5-17.) They were frightened, did not answer the door, called the FBI and watched their home security camera system. (Tr. 701:21-702:16, 1397:18-22.) They saw that the two men had arrived in a car and approached their front door. (Tr. 702:23-703:5.) The men were smoking cigarettes and using a cell phone. (Tr. 703:6-705:2, 1398:13-17.) They also saw one of the men carrying a tape dispenser and saw both linger at their front door. (Tr. 711:1-4.) Xu Jin and Liu Fang watched as the men entered their backyard, walked onto their deck, and peered through the

back glass door into their home.  (Tr. 703:10-704:9; 1398:5-12.)  After the two men left, Xu Jin

and Liu Fang went outside and discovered a note affixed to their front door, which advised that, if

Xu Jin returned to China and spent 10 years in jail, his family would be safe and "that will be the

end of it."  (Tr. 714:1-716:15, 1399:19-1400:16.)  The following day, one of the two men returned,

walked up to their residence, and then left.  (Tr. 724:5-725:4, 1402:5-13.)

    Kuang Zebin testified and admitted that he was one of the two men, along with

Zheng, to deliver the threatening note that was found by the victims.  Kuang explained that he was

directed by a friend, Chen Chaohong, to accompany Zheng to a location in New Jersey and bring

three pieces of paper with messages written on them.  (Tr. 1243:5-1244:13.)  Chen directed Kuang

to write the threatening messages, which said "if you are willing to go back to China to serve a ten

years prison . . . sentence, you wife and your children will be okay.  That's the end of the matter."

(Tr. 1244:5-13.)  Kuang testified that he understood the reference to "mainland" in the note was a

reference to "mainland China," and that "prisons" in China were operated by the government.  (Tr.

1287:19-24, 1290:6-8.)  Kuang understood that Chen had also spoken to Zheng about the plans,

as Zheng knew the address to travel to in New Jersey.  (Tr. 1244:14-20, 1246:8-13, 1251:23-25.)

Kuang and Zheng were instructed to look for people at the location and, if they found them, to

hand them the notes or tape the notes to the door with a tape dispenser brought by Zheng.  (Tr.

1246:14-17; 1248:15-22.)  Kuang said that he knew, from social media, that the PRC government

was trying to get officials to return to China.  (Tr. 1254:24-1255:20.)

    Kuang wrote the threatening notes as directed.  (Tr. 1246:18-24.)  Zheng then

picked Kuang up from Kuang's home in New York, and they drove together to New Jersey.  (Tr.

1250:2-1252:5.)  They located the residence, parked Zheng's car, knocked on the door, rang the

doorbell and tried to turn the door handle.  (Tr. 1255:21-1259:9.)  During the incident, Kuang was

on the phone with Chen Chaohong, and two other people.  (Tr. 1259:11-1261:23.)  Zheng used a tape gun to post three notes on the door, later returning and removing two of the notes from the door.  (Tr. 1262:1-13, 1263:21-1264:13.)  Kuang described going to the backyard and looking inside to see if anyone was home.  (Tr. 1262:11-1263:2.)

Physical evidence corroborated the testimony of the victims and Kuang, proving Zheng's involvement in this incident.  Surveillance video and images showed Zheng and Kuang come to the home, tape notes to the front door, walk into the backyard and peer inside the house. (GX 108; GX 709A-L; GX 710; GX 710A-H.)  The government introduced the physical notes, including the note that was crumpled up, as well as a photograph of the note while it was affixed to the door.  (GX 505; GX 505A-505C.)  Forensic analysis and corresponding testimony revealed that Zheng's DNA was found on a cigarette butt recovered from the residence, and that Zheng's fingerprints were on the threatening notes.  (GX 505-2; GX 503A; Tr. 727:10-22, 1521:17-24, 1629:1-6, 1638:1-15.)

After his arrest, Zheng—like Zhu and McMahon—made statements where he admitted to being involved in the scheme to deliver the threatening notes.  (GX 702A; GX 702C.) Zheng admitted to knowing Chen Chaohong, picking up Kuang in New York and driving him to New Jersey, and being aware that Kuang had brought notes that were supposed to be left for the victim.  (Id.)  Zheng falsely claimed that only Kuang posted the notes, but admitted that he had the tape dispenser that was used to affix the notes.  (Id.)  Zheng also admitted to ringing the doorbell, as well as to returning the following day.  (Id.)

E.    Additional Evidence of the Conspiracy and Related Criminal Conduct

1.    The Harassment of Xinzi Xu

At trial, the government also presented evidence that Xinzi Xu, also known as Sabrina Xu, was targeted for harassment as part of the campaign to coerce her father to return to

28

China.  In mid-2018, Xinzi Xu discovered that her friends were receiving harassing messages about her family on Facebook.  (GX 713 at 20:10-22:10.)  The messages stated that "her parents Xu Jin and Liu Fang are wanted by International Criminal Police Organization as they were involved in massive corruption within public office in China"; alleged other bad conduct; claimed that Xinzi Xu "knows all about her parents' corruption"; and stated that "their defiance and evasion of laws should be condemned by the public."  (GX 107.)  Xinzi Xu told her mother, Liu Fang, about these messages, and the two subsequently agreed that they would send each other daily text "emojis" to confirm each other's safety.  (GX 713 at 17-18, 23; Tr. 730:15-20.)

### 2.   Harassing Mailings Sent to the Victims' Family

The government also offered evidence to establish that the victims were sent mailings from China, which were designed to further harass Xu Jin, and coerce him to return to China.  In 2019, Liu Yan began to receive numerous letters and packages from China.  (Tr. 112:3-17.)  Liu Yan read the first one; she recalled that it said something about Xu Jin's parents getting older, and that he should return to China to "resolve some issues."  (Tr. 113:10-25.)  The mailings were ostensibly coming from Xu Jin's sister, Xu Qin, though Xu Jin testified that based on the tone and tenor of the messages, he understood that she had been compelled to write them.  (Tr. 112:18-113:3, 1406:21-1407:3.)  Liu Yan told her sister and brother-in-law that she was receiving these mailings, but attempted to return the mailings, because she did not want her sister to read them.  (Tr. 114:5-19.)  Liu Yan ultimately provided some of the mailings to law enforcement.  (Tr. 116:1-3.)  The mailings included a letter and a DVD with two video files.  (GX 203; GX 506; GX 506A-B; GX 507; GX 507A-C.)

The letter mailing was dated January 28, 2019, addressed to "brother and sister-in-law," and purportedly from "Xiao Qin" (Xu Jin's sister's name is Xu Qin).  (GX 507C.)  The letter described Xu Jin's parents as in ailing health, explaining that they were in the hospital and hoping

Xu would "suddenly appear in front of them." (Id. at 3.)  The letter mentioned the "Red Notice in April of 2015," "the crime you committed" and how Xu Jin's parents were supposedly shamed by his conduct.  (Id. at 3-4.)  The letter also indicated that Xu Jin's sister was an "accomplice" who "pleaded guilty" and spent time in prison until she was shown "leniency" and "released to go home."  (Id. at 4.)  The letter ends with an appeal for Xu to "admit to the crime you committed" to "not keep resisting" and to "come back earlier" to get "leniency."  (Id. at 4.)

The government also published one of the two videos contained on the DVD from the mailing that had been admitted into evidence.  (GX 506G.)  The video was titled "A Family Letter to Brother—Xu Qin." (Id. at 00:05.)  The video contained subtitles, which spoke about Xu Jin's family, while various pictures transitioned across the screen of Xu Jin's mother, father, daughter as a young child and other family members.  (Id.)  Similar to the letter ostensibly from the sister, the video subtitles claim that Xu Jin's parents are in poor health, stating they miss Xu Jin and Xu Jin's daughter.  At one point, the subtitles state "When parents are alive, you can still call someplace a home; when parents are gone, you can only prepare for your own tomb."  (Id. at 03:27.)  The video ends with the subtitles exhorting Xu Jin to return to China: "Come home, brother!"  (Id. at 03:27.)  The images from the video include a photo of Xu Jin's father sitting beside a desk; prominently placed in front of the father and positioned towards the camera for the viewer of the video to see, is a copy of "On Governance," a book written by Xi Jinping, the leader of the PRC government.  (Id. at 01:06; GX 506F; Tr. 577:14-579:5.)

F.    Evidence of Substantial Emotional Distress

The government admitted testimony that established that each of the victims suffered from "substantial emotional distress" as a result of the conduct described above.  Liu Yan testified that she was "shocked" when her elderly relative was brought to the United States, further stating, "I have no proper words to describe the mental pain we have suffered."  (Tr. 126:5-8,

30

126:14-19.) Liu Yan testified that her sister, Liu Fang, was "on the verge of collapsing" from the incidents, and stopped communicating with her family. Liu Yan also described how her husband could not visit his father in China before he died because he was afraid from the attacks on their family. (Tr. 126:22-127:12.) Indeed, Liu Yan became so emotional describing how she and her family felt, that counsel for McMahon noted that she needed a break before he could begin his cross-examination. (Tr. 127:19-128:2.)

Liu Fang also described the substantial stress and emotional toll that she and her family suffered because of the actions by the Trial Defendants and their co-conspirators. Liu Fang explained how she "felt bad" about her elderly father-in-law being forced to come to the United States, and worried about her father-in-law facing "lengthy questioning or interrogations by the Chinese Communist Party when he returned home." (Tr. 699:10-14, 752:1-7.) She described feeling "scared" and "very unsafe" when Zheng Congying and his confederate came to her home in 2018, explaining that she worried about what would have happened if the locks on her home were not strong enough to keep them outside. (Tr. 714:20-715:1, 725:13-14.) Liu Fang was also angry about the harassment of her daughter and feared for her daughter's safety. (Tr. 730:15-20.) Overall, Fang testified that her "life was turned upside down" because of the actions taken against "all the family members and the extended family." (Tr. 732:18-733:1.) She explained that, because she did not "want to be harmed" she "chose to be away from [her family]" and "cut off all communications." (Tr. 732:18-733:1.) As a result of "seal[ing] myself up," Liu Fang testified she "lost my friends and all the connection with my relatives and friends in China." (Tr. 733:2-6.)

Xu Jin testified that he was "in shock" and "angry" about his father's forced trip to the United States, and he was also worried about his father's health conditions. (Tr. 1396:16-17.) Xu Jin explained that the threatening notes left by Zheng Congying made Xu realize that this was

not just a "mental threat," but also a "physical threat," and that he was worried about his wife's and daughter's safety.  (Tr. 1400:19-1401:3.)  Xu Jin characterized the overall experience as frightening because it threatened his personal safety as well as the safety of his family.  (Tr. 1409:14-15.)

III.    The Verdict

On June 20, 2023, the jury returned its verdicts.  The jury found Zhu Yong guilty on all four counts.  The jury found Michael McMahon guilty of acting as an agent of a foreign government without prior notification (Count Two), conspiracy to engage in interstate stalking (Count Three) and substantive interstate stalking (Count Four); the jury found McMahon not guilty of conspiracy to act as an agent of a foreign government (Count One).  The jury found Zheng guilty of conspiracy to commit interstate stalking and interstate stalking (Counts Three and Four), but not guilty of conspiracy to act as an illegal agent of a foreign government and acting as an illegal agent of a foreign government (Counts Two and One).

## LEGAL STANDARD

I.    Rule 29 Motion for a Judgment of Acquittal

Rule 29(c) of the Federal Rules of Criminal Procedure permits a Court to set aside a verdict and enter an acquittal "only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt."  United States v. White, 7 F.4th 90, 98 (2d Cir. 2021) (internal citations and quotations omitted).  A defendant challenging the sufficiency of the government's evidence pursuant to Rule 29 shoulders "a heavy burden."  United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (citation omitted).  A jury's verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).  A court must view the evidence "in the light most favorable to the government, crediting every inference that could

32

have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  White, 7 F.4th at 98 (internal quotations omitted). "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed a crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (internal citation and quotation omitted).

The court should not "weigh competing inferences and explanations" to determine "which explanation is more likely."  United States v. Friedman, 998 F.2d 53, 56 (2d Cir. 1993) (citations omitted).  Rather, "it is the task of the jury, not the court to choose among competing inferences."  United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995) ; see also United States v. Huezo, 546 F.3d 174, 182 (2d Cir. 2008) ("[J]urors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences.").  "A district court entertaining a motion for a judgment of acquittal must be "careful to avoid usurping the role of the jury."  Jackson, 335 F.3d at 180 (citation omitted).  "Even when the Court concludes that a guilty or not guilty verdict are both fairly possible, the Court must let the jury decide the matter."  United States v. Landesman, 17 F.4th 298, 319 (2d Cir. 2021) (cleaned up).

Furthermore, "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'"  United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quoting United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir. 2004)).   Even then, "the evidence must be viewed in its totality," because each fact presented at trial may be affected and given context by the other facts.  See Landesman, 17 F.4th at 319 (quoting United States v. Cassese, 428 F.3d 92, 98-99 (2d Cir. 2005)); see also United States

33

v. Pugh, 945 F.3d 9, 19 (2d Cir. 2019) ("The jury may reach its verdict based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation." (quoting United States v. Eppolito, 543 F.3d 25, 45 (2d Cir. 2008))).  When making a case based on circumstantial evidence, the government need not "exclude every reasonable hypothesis other than that of guilt."  Holland v. United States, 348 U.S. 121, 139 (1954); see also United States v. Rosenthal, 9 F.3d 1016, 1024 (2d Cir. 1993) ("The government need not eliminate every theory of innocence, and the reviewing court must consider pieces of evidence not in isolation, but in conjunction.").  There is no exception to this rule for mens rea elements such as intent or knowledge; circumstantial evidence is sufficient.  See Mallette v. Scully, 752 F.2d 26, 32 (2d Cir. 1984) ("[I]t is seldom possible to present testimonial or direct evidence of an accused's state of mind . . . Circumstantial evidence of this subjective fact is therefore indispensable.") (citations omitted).

This "high degree of deference" given to the jury's verdict "is especially important when reviewing a conviction of conspiracy."  Landesman, 17 F.4th at 320.  "'This is so because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'"  Id. (quoting United States v. Anderson, 747 F.3d 51, 73 (2d Cir. 2014)).  "The 'agreement to participate in the conspiracy may be inferred from the facts and circumstances of the case,' and 'both the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence.'"  Id. (quoting United States v. Wexler, 522 F.3d 194, 207-08 (2d Cir. 2008)).  "Moreover, 'seemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general.'"  Id. (quoting United States v. Mariani, 725 F.2d 862, 865-66 (2d Cir. 1984)).

II.    Rule 33 Motion for a New Trial

Federal Rule of Criminal Procedure 33 permits a court, upon motion by the defendant, to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  Ordering a new trial is an extraordinary remedy that is "disfavored in this Circuit," and, as a result, "the standard for granting such a motion is strict." United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995).  "The test [for a Rule 33 motion] is whether it would be a manifest injustice to let the guilty verdict stand." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992) (internal quotations omitted).  The defendant bears the burden of proving "that there is a real concern that an innocent person may have been convicted." United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009).

A court's "general posture of deference" to the jury's factual determinations must remain on a Rule 33 motion. United States v. Van Manen, No. 18-CR-030, 2019 WL 5092013, at *2 (S.D.N.Y. Oct. 11, 2019) (quoting McCourty, 562 F.3d at 475).  "[A] district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." United States v. Archer, 977 F.3d 181, 188 (2d Cir. 2020); see also Landesman, 17 F.4th at 330-31.  In both Archer and Landesman, the Second Circuit reversed a district court's decision to grant a Rule 33 motion, concluding in each case that the district court had improperly usurped the role of the jury in weighing the evidence and inferences drawn from that evidence.  The Court provided the following explanation of the "preponderates heavily" standard in Landesman:

> Under the "preponderates heavily" standard, which was first articulated in Sanchez and later applied in Archer, "a district court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." Archer, 977 F.3d at 188 (internal quotation marks omitted).  "To the

35

contrary, absent a situation in which," for example, "the evidence was 'patently incredible or defie[d] physical realities,' . . . where an evidentiary or instructional error compromised the reliability of the verdict," . . . or where the government's case depends upon strained inferences drawn from uncorroborated testimony, "a district court must 'defer to the jury's resolution of conflicting evidence.' . . . Moreover, in applying the "preponderates heavily" standard, a district court "must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis."

17 F.4th at 331 (citations omitted).

<u>RESPONSE TO ARGUMENTS BY DEFENDANT ZHU YONG</u>

I.    <u>There Was Sufficient Evidence to Convict Zhu Yong of Counts One, Three and Four</u>[17]

    A.    <u>There Was Sufficient Evidence to Convict Zhu Yong of Conspiracy to Act as an Illegal Agent of a Foreign Government (Count One)</u>

        Zhu Yong moves for a judgment of acquittal pursuant to Rule 29, challenging his conviction for conspiring to act as an agent of a foreign government without prior notification to the Attorney General (Count One).[18]  Specifically, he argues that the government did not prove that he "knowingly and intentionally" became a member of that conspiracy (the "Section 951 Conspiracy").  (<u>See</u> Zhu Br. at 10.)  That argument is without merit.

        1.    <u>The Jury Reasonably Concluded There Was Sufficient Evidence That Zhu Knowingly and Intentionally Participated in the Section 951 Conspiracy</u>

        There was overwhelming evidence from which the jury could have reasonably found that Zhu intentionally joined and participated in the Section 951 Conspiracy.  The evidence established that:

- Zhu traveled between the PRC and the United States, the timing of which suggested that the travel helped facilitate the conspiracy.  In late July 2016, Zhu traveled from the PRC to the United States (GX 402Y) and, shortly thereafter, contacted a New York attorney to find a private investigator to locate the victims.  (Tr. 1744:7-1745:3.)  Similarly, Zhu returned to the United States in late October 2016, one day before he and Hu Ji met with Michael McMahon, the private investigator Zhu hired.  (GX 402Y; GX 902D-GX 902E.)  In 2018, Zhu traveled to the PRC only a few days after he secured new surveillance photographs of Liu Yan's residence and car.  (GX 402Y; GX 902D; GX 902G.)

- Zhu's own words in text messages showed that he knew he was working with other conspirators.  For example, he stated: "**We** hope to generate a weekly work in progress

---

    [17] Zhu does not challenge his conviction for a substantive violation of Section 951 (Count Two).  (<u>See</u> Zhu Br. at 1 (stating that the defendant wants to "accept responsibility for failing to register before acting at the behest of a police officer from the country where he was born").)

    [18] The Trial Defendants generally contend that their various Rule 29 arguments also warrant relief under Rule 33.  To the extent their respective arguments fail under Rule 29 for the reasons below, they also fail under the more exacting Rule 33 standard.

report."; "**We** will fill them [the blank information] out when we sign the contract!"; "**We** need to review his contract!"; "Then **we** will provide him the information!"; "**Our** requirement is to have this done as soon as possible."; "What **we** need is to locate the person." (See GX 901D at 4, 7-8, 12 (emphasis added); see also GX 4008 at 841 (asking McMahon to meet because "**we** want to discuss the next step plan.with you") (emphasis added).

- Zhu played a critical early role in the criminal scheme and ensured its success by taking steps, and ultimately succeeding, in hiring private investigator Michael McMahon. (Tr. 1744:7-1745:3; see, e.g., GX 901D at 2 (Zhu engaging translator, Lina Xu, whom he used to hire McMahon).) Zhu signed the retainer agreement with "McMahon Investigative Group" for the "Xu, Jin" case, which listed on the agreement Xu Jin's social security number, date of birth, driver's license, and green card number. (See GX 3009.) Moreover, Zhu reported his efforts directly back to the PRC government: for example, Zhu forwarded the retainer agreement received from the attorney Zhu contacted to help his cause, to Sun Hui, a "political commissar" at the Wuhan Public Security Bureau. (See ZYX A; GX 431K-GX 431L; GX 906; GX 901D; Tr. 568:3-5, 1746:3-4.)

- Zhu's role as the go-between for McMahon and co-conspirators who lived in the PRC was plain—the translator had saved Zhu in her phone as "Middleman." (See GX 901D.) Zhu provided specific directions, emphasizing to the translator that "[w]hat we need is to locate the person," and directing that McMahon should "[l]ook into more details, where do they work, which company, living conditions, etc." (See GX 901D at 12.) Zhu directed surveillance activity, instructing McMahon to surveil Xu Jin's elderly father when he was driven to Newark International Airport. (See GX 4004 at 777 ("Mr. Zhu called me a few minutes ago, he said someone will take Mr. Jin XU's parents to Newark tomorrow at 11:55. Maybe this a lead to find Mr. Jin Xu.").)

- Zhu also provided McMahon, through the translator, sensitive personal information about Xu Jin and his family. (See, e.g., GX 901D at 8-15; GX 1020; GX 1025.) In October 2016, he provided a document containing, among other things, photographs of the victims, photographs of their family members in China, and Xu Jin's Chinese passport number, Chinese identification number, and his exit-entry permit number for traveling to and from Hong Kong and Macau. (See GX 1020 at 1-2; GX 3011 at 1.) Likewise, Zhu received intelligence and surveillance reports and photographs from McMahon, which the jury could reasonably infer was relayed back to Zhu's co-conspirators in the PRC. (See GX 1041; GX 1043-GX 1045; GX 1048-GX 1049; GX 3020; GX 4004; see also GX 4004 at 786 (Zhu informing McMahon that the female in one of the photographs McMahon provided was "our subject's sister-in-law").)

- Zhu also met with his co-conspirators. On October 27, 2016, Zhu, McMahon and PRC police officer Hu Ji met at a Panera Bread. (See GX 902D-GX 902E; GX 316 at 2-3 (phone records reflecting Zhu in contact with both Hu Ji and McMahon before and after the meeting).) On or about October 31, 2016, Zhu requested another meeting with McMahon (see GX 4008 at 841), which text messages reflect occurred on November 1, 2016, at an office in Hackensack, New Jersey (see GX 4008 at 842-43.) Evidence

presented at trial also showed that Hu Ji attended the meeting.  (See GX 4006B; GX 4008 at 841; GX 402Y.)

- In addition to his role as "Middleman," Zhu introduced co-conspirators to one another: on November 8, 2016, Zhu advised McMahon that Zhu had "given the person who's looking for Jin Xu-our subject your email address" and requested that any future updates be sent directly to Emily, which the evidence established was a name used by Lina Xu.  (See GX 4007 at 829.)

- Zhu continued to work for the conspiracy through May 2018, when according to Zhu's iCloud account, photographs were taken of Liu Yan and her husband's home and the license plate of their family car.  (See GX 902D at 2-3; GX 902G-GX 902I; see also Tr. 68:11-18 (Liu Yan testimony identifying photographs in GX 902H as her home); see also Tr. 1368:6-1369:18.)  As noted above, Zhu returned to the PRC four days after taking these photographs.

- Moreover, after his arrest, Zhu admitted his knowledge of the PRC government's involvement in the repatriation scheme.  Zhu conceded that he knew the victims were "wanted in China" and were "fugitive[s] from Wuhan."  (See GX 703C-GX 703D at 2.)  Zhu further admitted that "Mr. Hu and the young man" were in the United States to "[l]ook for that person."  (See GX 703C-GX 703D at 2.)  Zhu stated he believed the individuals looking for the fugitive, whom he identified as Xu Jin, were working for the Communist Party, and that he was aware that Xu Jin's parent had come to the United States to ask Xu Jin to go back.  (See GX 703C-GX 703D at 2-3.)  Zhu stated that he was not certain whether Hu Ji was part of the police, but that Zhu knew he was part of the Overseas Chinese Affairs Office—a party-state organization that liaisons with non-Communist organizations and individuals outside of the PRC, and has a role in Operation Fox Hunt "helping the other agencies locate and repatriate individuals to China."  (See GX 703C-GX 703D at 4; Tr. 573:23-574:16.)  Zhu further stated that there were "several departments" looking for Xu Jin and that whomever found him first "gets an award."  (See GX 703C-GX 703D at 4.)

From this, the jury reasonably could have found that, in 2016, Zhu knowingly participated in a conspiracy directed by the PRC government to locate Xu Jin in order to force his repatriation to the PRC.  For instance, the evidence supports the jury's determination that Zhu, who then was traveling between the PRC and the United States, hired McMahon and provided him with personal information about Xu Jin (and his family) for the purpose of locating Xu Jin in order to force his repatriation at the behest of PRC government officials.  In addition, the jury could have reasonably inferred that at least some of the sensitive information Zhu provided to McMahon— such as the victims' PRC government identification numbers and immigration records—was

39

obtained, either directly or indirectly, from the PRC government.   Likewise, the jury was reasonable in determining Zhu knowingly participated in the Section 951 Conspiracy given his direct interactions with co-conspirators Sun Hui, a "political commissar" in the PRC, and Hu Ji, who Zhu admitted he knew was a part of the Overseas Chinese Affairs Office.   Zhu's knowledge that several PRC government departments were looking for Xu Jin also permitted a jury to reasonably find that Zhu understood the efforts to repatriate Xu Jin, and his participation in the scheme, were being directed by the PRC government.   In sum, the evidence presented at trial permitted the jury to find that Zhu knowingly participated in the Section 951 Conspiracy.

2.   Zhu Yong's Challenges to the Sufficiency of the Evidence Are Without Merit

Zhu makes several arguments in support of acquittal on Count One, all of which should be rejected.   Zhu first argues that "on or after October 28, 2016 [he] was dropped or eliminated from the circle by the Chinese officials," thus demonstrating that he "was never considered by the Chinese officials that he was or should be part of the group to accomplish their common goal to locate the fugitive for the Chinese government." (Zhu Br. at 10.)   Zhu's argument is a "withdrawal" defense, and it is both legally and factually defective.

The burden of establishing withdrawal from a conspiracy rests on the defendant. See United States v. Flaharty, 295 F.3d 182, 192 (2d Cir. 2022) ("It is well established that where the government has shown that a conspiracy existed and that a given defendant was a member of it, his membership is presumed to continue until the last overt act by any of the coconspirators, unless the defendant proves that the conspiracy was terminated or that he took affirmative steps to withdraw.").   Zhu did not raise this affirmative defense and, even if he had, he would not have been able to make the requisite factual showing.   The Court instructed the jury as to withdrawal based on a defense raised by Zhu's co-defendant Zheng, and properly advised that a person

"remains a member [of a conspiracy] until he withdraws from it," that "[a]ny withdrawal must be complete and it must be done in good faith," can only be done by "taking some affirmative steps to terminate or abandon his participation in and efforts to promote the conspiracy, " and that "merely ceas[ing] conspiratorial activity is not enough." (Jury Inst. at 32-33.)

There was no evidence presented at trial that Zhu took any step consistent with withdrawal: he did not attempt to warn law enforcement, make any efforts to frustrate the crime, or otherwise act inconsistent with the object of the conspiracy and make efforts to communicate those acts to his co-conspirators. Instead, Zhu argues merely that he ceased conspiratorial activity after October 28, 2016. That is "not enough." (Jury Inst. at 32-33.) See United States v. Hoskins, 44 F.4th 140, 155-56 (2d Cir. 2022); see also United States v. Memoli, No. 13-CR-214, 2014 WL 5313707, at *4 (D. Conn. Oct. 16, 2014) (finding defendant's contention that he withdrew from conspiracy when alleged co-conspirator stopped using defendant because alleged co-conspirator did not want to pay defendant did not establish withdraw because it "suggest[ed] no affirmative intent, let alone action, on Defendant's part to withdraw").

In any event, there was ample evidence from which the jury could have found that Zhu did not "cease[] conspiratorial activity" after October 28, 2016, the day of the Panera Bread meeting with Hu Ji and McMahon. Even to the extent Zhu's communications with Hu Ji, McMahon, and Lina Xu declined after November 2016, the jury reasonably could have inferred, based upon Zhu's 2018 travel to Liu Yan's home in New Jersey, that Zhu remained a knowing participant—and in communication with other co-conspirators—in the criminal conspiracy.

Zhu makes several additional arguments—that his purportedly meager compensation reflects that he "was never considered as an integral part of the[] alleged plan" and that he did nothing more than "introduce[] his Chinese contacts to the private investigator

41

[McMahon] he found through the attorney Liping Shi," (see Zhu Br. at 11)—that amount to nothing more than claims that the jury should have drawn a different inference from the evidence presented. But, "[i]t is not for the Court to decide which of the parties' competing inferences is more likely correct; rather, the Court must 'credit[] every inference that could have been drawn in the government's favor," and only then determine whether the evidence was sufficient for the jury to find guilt beyond a reasonable doubt." United States v. O'Sullivan, Mem. & Order at 47, No. 20-CR-262 (PKC) (ECF No. 302) (Apr. 6, 2022) (emphasis and brackets in original) (hereafter "O'Sullivan") (quoting United States v. Pauling, 924 F.3d 649, 656 (2d Cir. 2019)); see also United States v. Rea, 958 F.2d 1206, 1221-22 (2d Cir. 1992) ("Matters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and [the court is] not entitled to second-guess the jury's assessments.").

Finally, to the extent Zhu argues acquittal is required because he played only a minor role in the Section 951 Conspiracy, that is neither a valid claim under Rule 29, nor accurate under the law. Zhu does not dispute that the Court properly instructed the jury that in the context of conspiracies, "[t]he extent of a defendant's participation has no bearing on the issue of a defendant's guilt" and "even a single act may be sufficient to draw [a] Defendant . . . within the circle of the conspiracy." (Jury Inst. at 26.) Thus, regardless of whether the jury determined that Zhu played a significant or minor role in the Section 951 Conspiracy (though the evidence supports that his role was significant) its determination is sufficient to sustain his conviction on Count One.

B.    There Was Sufficient Evidence to Convict Zhu Yong of Conspiracy to Commit Interstate Stalking and Substantive Stalking (Counts Three and Four)

Zhu also argues that the government has not "provided any direct evidence to demonstrate that Mr. Zhu possessed the intent to harass or intimidate the victims, nor that he shared

42

this intent with any other defendants."[19] (See Zhu Br. at 2.) Zhu further argues that the government has not "provided evidence that he reasonably foresaw or did in fact cause substantial emotional distress." (Id.) As set forth below, the government presented considerable evidence—both direct and circumstantial—from which the jury could have inferred that Zhu possessed the requisite intent to engage in interstate stalking and reasonably expected to cause the victims substantial emotional distress.

> 1.   The Jury Reasonably Found That Zhu Possessed the Requisite Intent to Engage in Interstate Stalking

There was significant evidence for the jury to reasonably conclude that Zhu possessed the requisite intent to harass or intimidate the victims. A jury reasonably could have drawn such an inference based on, among other things:

- Zhu's various efforts to locate Xu Jin, as well as his family members (including his daughter), in order to force Xu Jin's repatriation to the PRC;

- Zhu's retention and subsequent direction of McMahon for the purpose of locating and carrying out the repatriation scheme;

- The nature of the sensitive personal information Zhu provided to McMahon (through Lina Xu) regarding not only Xu Jin, but also his family members;

- Zhu's admission that he knew that Xu Jin's elderly father was brought to the United States to try to coerce Xu Jin to return to the PRC, and Zhu's request that McMahon surveil Xu Jin's parent upon arrival at the airport;

- Zhu's decision to photograph Liu Yan's home in New Jersey in 2018, after Xu Jin's residence had been located, such that there was no even purported reason to surveil Liu Yan in order to locate Xu Jin; and

---

[19] Zhu's reference to "direct evidence" is misplaced. It is well-established that the government need not rely upon direct evidence, and instead can rely upon circumstantial evidence. See, e.g., Eppolito, 543 F.3d at 45 ("The jury may reach its verdict based on inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation.") (internal quotations and citations omitted).

43

- The timing of Zhu photographing Liu Yan's home relative to Zhu returning to the PRC a few days later, and Liu Yan subsequently receiving unsolicited threatening mail from the PRC at that same residence.

This evidence, among others, was sufficient to permit the jury to conclude that Zhu hired McMahon in 2016 to find Xu Jin in order to coerce him—through harassment and intimidation of Xu Jin and his family, including of his elderly father and daughter—to return to the PRC. The jury also reasonably inferred that, in May 2018, Zhu photographed Liu Yan's home and license plate in order to further the efforts to harass Xu Jin through his family members, to coerce him to return to the PRC. Specifically, the jury could have inferred that Zhu was seeking to confirm that Liu Yan still lived there, so the PRC government could continue a harassment campaign against her, just as it did when it subsequently sent her numerous harassing and unsolicited mailings from the PRC.

### 2. The Jury Also Reasonably Determined That the Victims Suffered Substantial Emotional Distress

Zhu Yong argues that he should be acquitted of the interstate stalking charges because the only evidence of substantial emotional distress was one brief portion of testimony from Xu Jin. (See Zhu Br. at 7-8.) This claim ignores the evidence on which the government relied to prove that Zhu caused, attempted to cause or reasonably expected to cause substantial emotional distress to the victims, who include not only Xu Jin, but also his immediate family members Liu Fang and Xu Xinzi.[20] And Zhu's suggestion that such distress was not "substantial" is flatly contradicted by their trial testimony. The evidence of distress included, among other things:

---

[20] The emotional distress element of the interstate stalking counts encompasses emotional distress to a victim's immediate family member, which includes spouses, parents, siblings, and children. See 18 U.S.C. § 2261A; 18 U.S.C. § 115.

44

- Xu Jin's testimony regarding his father's unexpected arrival in the United States: "My first impression was that I was in shock. And my second feeling was that I was very angry. It was because earlier in that year my father had the surgery done and his health condition has been weakened, and previously he had a brain hemorrhage and started saying that he's getting headaches. My family members were very concerned and worried about his conditions; however, under such condition he was still being forced to come to the U.S. It was very shocking. First of all, it was very shocking for me to see that being done and, secondly, I was very angry because the Wuhan officials and the prosecutor's office did things like this to an 80 some what year old man and he had a bad health condition and he was being forced to come to the U.S. I was very angry about that." (Tr. 1396:14-97:4.)

- Xu Jin's testimony regarding the September 2018 threatening note posted on his door: "When I saw that note my reaction at the time was that I had two feelings. Before I saw this I felt that the threats from the Chinese Communist Party was only a mental threat to me; however, when I saw that note, I realized that it had become a physical threat and it is close first to my life. That is how I feel at the time. That's my first feeling. Secondly, I feel that I was very worried about my wife and my daughter. I've become the target of the Chinese government and they have become the subjects of the persecution. I was very worried about their safety." (Tr. 1400:17-1401:3.)

- Xu Jin's testimony regarding the events in 2017, 2018, and 2019 collectively: "First of all, I felt frightened because it was not only to my personal safety, it was also a threat. And secondly, I was very angry because the measures of the prosecutors they have performed was not only on me, it was also towards my parents, my younger sister, my wife, and my daughter. They did not let go of any one of them, so I was very angry." (Tr. 1409:9-20.)

- Liu Fang's testimony regarding her father-in-law's forced arrival in the United States: "I feel bad. In order to serve their purpose, they have forced and threatened an 80-year-old man to come from China to the U.S. In my view their action is equivalent to kidnapping." (Tr. 699:20-23.)

- Liu Fang's testimony regarding her and Xu Jin's response to the men who came to her home on September 4, 2018: "[W]e are very scared when we heard the rude and loud noise, slamming of the door, and also the door handle." (Tr. 701:24-02:02.)

- Liu Fang's testimony regarding Zheng and Kuang's arrival at her home in September 2018: "Their arrival made me feel like even though it was under broad daylight and I stayed in my home and locked my door, I was still very unsafe. . . . It was because they brought great fear to me. I cannot imagine that if on that day my doors locked was not strong enough, what happened if they were able to come in?" (Tr. 714:17-14:1.)

- Liu Fang's testimony regarding Zheng's return to her home on September 5, 2018: "It made me feel very unsafe. . . . It was because on the first day they came, they slammed on the door rudely and they tried to get in, but they could not. On the second day, he dare to come again. I felt very scared." (Tr. 725:7-14.)

45

- Liu Fang's testimony regarding the reasons Xu Jin took various measures—including installing metal chain safety locks on both outside and inside doors of their home, purchasing additional cameras for home security surveillance, changing their sheer curtains to opaque curtains, and purchasing "private property" signs for the residence— in response to the men who came to her home on September 4 and 5, 2018: "It was because their action on September 4th and 5th made me feel very unsafe.  As I said earlier, even though it was under broad daylight, I was in my home and I locked my home, I was still very unsafe."  (Tr. 729:8-30:5.)

- Liu Fang's testimony regarding the Facebook harassment campaign against her daughter, Xi Xinzi: "I felt that my daughter was very angry and they were using such demeaning way to harass her.  I felt very angry about it.  I am also very concerned about the safety of my daughter. Therefore, I ask my daughter from then on to send me a message every day, no matter how busy she was, even though an emoji would do, just to say that she's safe."  (Tr. 730:15-20.)

- Liu Yan's testimony regarding the response of her sister, Liu Yan, to the events in 2017, 2018, and 2019: "My sister, my older sisters was almost collapse—on the verge of collapsing.  She could not eat, could not sleep and getting thinner and thinner.  Yeah, I was scared that she would not be able to take it anymore.  She distant away from all the Chinese people and friends from who—who are from China.  He distant or disconnected himself with family."  (Tr. 126:3-19.)

- Xu Xinzi's testimony regarding the Facebook harassment campaign against her: "I felt stressed, unsafe. . . . I send my mom an emoji every day to let her know that I'm safe. . . . My mom sends me an emoji back, or a hi, every day."  (GX 713 at 23:10-22.)

Based on the evidence presented, including the jury's own observations of the victims who were visibly emotional,[21] the jury reasonably could have found that the victims named (by pseudonym) in the indictment—Xu Jin, Liu Fang, and Xu Xinzi[22]—suffered substantial emotional distress as a result of the scheme to harass and intimidate them.

Zhu also appears to argue that there was insufficient evidence that he agreed with others to engage in a scheme to cause substantial emotional distress.  (See Zhu Br. at 8.)  There was significant evidence from which the jury could have inferred that Zhu conspired with others

---

[21] Indeed, Liu Yan was so upset that defense counsel for McMahon offered to give the witness time to compose herself.  (Tr. 127:19-128:2.)

[22] Xu Xinzi is identified as a victim for Count Three, but not Count Four.

to cause substantial emotional distress to the victims. Based on much of the same evidence described above, the jury reasonably could have found that Zhu hired McMahon in 2016 to find Xu Jin in order to harass and intimidate Xu and his family, with the ultimate goal of coercing Xu to return to the PRC. A rational jury could have found that, in 2018, Zhu photographed Liu Yan's home and license plate in order to further the efforts to harass Xu Jin through his family members. Specifically, the jury could have inferred that Zhu was seeking to confirm that Liu Yan still lived there, so the PRC government could continue a harassment campaign against her, just as it did when it subsequently sent her numerous harassing and unsolicited mailings from the PRC.

       3.     <u>Zhu's Arguments Are Invalid Attempts to Urge an Alternative Inference</u>

As with his Section 951 Conspiracy arguments, Zhu challenges the sufficiency of the evidence regarding the interstate stalking charges by arguing the jury should have drawn alternative inferences. For example, he argues that "after Mr. Zhu introduced McMahon to the Chinese official on October 27, 2016 at the Panera Bread Restaurant in New Jersey, the date the three men had a picture taken together (GX 902F), Mr. Zhu was dropped or eliminated by the Chinese government official from further participation in the circle." (Zhu Br. at 9.) But, as described above, there was sufficient evidence from which the jury reasonably could have concluded that, based on his conduct in 2018, Zhu remained part of the criminal scheme to harass and intimidate Xu Jin and his family. Under such circumstances, it does not matter whether the jury could have drawn a different conclusion. See <u>O'Sullivan</u>, at 47; <u>United States v. MacPherson</u>, 424 F.3d 183, 190 (2d Cir. 2005).

        Similarly, Zhu argues that he went to Short Hills in 2018 "not for the purpose to commit an interstate stalking, but to collect information about Xu Jin's sister's address." (Zhu Br. at 8-9.) Setting aside that the inference Zhu urges is consistent with the theory that he was "collect[ing] information about Xu Jin's sister" <u>for the purpose</u> of stalking her and her family,

47

Zhu's argument amounts to nothing more than a claim that the jury should have drawn a different inference from the evidence presented. But, again, it does not matter whether the jury could have drawn a different conclusion. There was sufficient evidence from which the jury reasonably could have inferred that Zhu went to Liu Yan's home to collect information in order to further the efforts to harass or intimidate her.[23]

II.    **Counsel for Michael McMahon's Remarks During Summation Do Not Warrant a New Trial for Zhu Yong**

Lastly, Zhu claims counsel for McMahon argued "that the United States government should have protected his client from the Chinese defendants" (Zhu Br. at 3). Zhu argues, specifically, that these statements "transformed Mr. McMahon's counsel into a second prosecutor, buttressing the government's case and adding an additional party attacking and trying to convict Mr. Zhu" and "had the effect of inviting the jury to consider xenophobic and racist ideas when it deliberated." (Zhu Br. a 1-3, 5-6.) Zhu's argument is unpreserved and unfounded.

A.    **Zhu Yong Waived Any Challenge to McMahon's Summation**

As a threshold matter, Zhu did not object to any of the statements by McMahon's counsel that Zhu now argues warrant a new trial, nor request a limiting instruction. Having failed to do so, Zhu's objection was waived and should be rejected. If a party "consciously refrains from objecting as a tactical matter, then that action constitutes a true 'waiver,' which will negate even plain error review." United States v. Yu-Leung, 51 F.3d 1116, 1122 (2d Cir. 1995); see also United States v. Quinones, 511 F.3d 289, 321 (2d Cir. 2007) (same); United States v. Chartier, No. 17-

---

[23] Zhu also argues that his surveillance activity in 2018 proves that he "was kept out of the circle" and "[h]is knowledge about Xu Jin's address was out of date" because "[n]o one in the circle updated Mr. Zhu with Xu Jin's new address." (See Zhu Br. at 9.) This argument is in tension with his earlier claim that Zhu went to Short Hills "to make sure that Xu Jin's sister was still living there." (See id. at 8.) In any event, it amounts to an argument that the jury should have accepted a competing inference, which should be rejected for the reasons above.

CR-372 (JS), 2021 WL 3795352, at \*42 (E.D.N.Y. Aug. 26, 2021) (finding that defendant "arguably waived this argument because he did not object . . . after the Government rested or at any point in summations" and this "constitutes a waiver of those objections") (internal citation omitted).

Counsel for Zhu Yong made a strategic decision at trial not to object to a co-defendant's argument.  During trial, counsel made clear to the jury that it should carefully delineate the difference between an individual with Chinese ethnicity and an agent for the PRC government: for example, he expressed appreciation to the Court in his opening statement for reminding the jury that "this case is not about United States versus China" (Tr. 59:13-14), established during cross-examination that "not every Chinese [person] is a member of the Chinese Communist Party not every person of Chinese origin is an equivalent of being an agent for the Chinese government" (Tr. 588:24-589:2), and argued in closing that "we cannot assume that everyone who is Chinese origin, such as Yong Zhu, is automatically an agent of [the] Chinese government."  (Tr. 2070:23-25.)  Notably, Zhu's summation came after McMahon's summation in which the supposedly improper statements were made.  Given Zhu's counsel's focus on this issue, and the fact that he responded to any perceived racism or xenophobia in his own summation, it is fair to conclude that the decision not to object to McMahon's statement was a tactical decision not to object to a co-defendant's argument.  Accordingly, Zhu's argument is waived.

Even if the Court were to conclude that this argument was not waived, the Court should review the purportedly prejudicial statements for "plain error".  See, e.g., United States v. Kenner, 272 F. Supp. 3d 342, 414-15 (E.D.N.Y. 2017) (finding that defendant waived challenge to verdict form due to failure to object and holding that "assuming arguendo that the defendant had not waived this ground for Rule 33 relief, plain error review would apply") aff'd sub nom.

United States v. Constantine, No. 20-4278, 2022 WL 950954 (2d Cir. Mar. 30, 2022).  Under this standard, Zhu must establish that there was (1) error; (2) the error was clear or obvious, rather than subject to reasonable dispute; (3) the error affected the defendant's substantial rights, which generally means it affected the outcome of the proceedings; and (4) the error seriously affected the fairness, integrity, or public reputation of the trial.  See United States v. Prado, 815 F.3d 93, 100 (2d Cir. 2016).  Zhu has not made, and cannot make, any such showing.

### B.    Defense Counsel's Statements Were Neither Racist Nor an Attack on Zhu

The few identified statements from McMahon's summation also did not infuse xenophobia or racism into the trial.  The statements about which Zhu complains were neither xenophobic nor racist.  McMahon was not urging any sort of prejudicial sentiment, but rather was arguing that he sympathized with the government's desire to protect the victims from harm directed by a foreign government.  (Tr. 2045:16-18.)  The statement by McMahon's counsel, which came only a few moments later, that McMahon was "manipulated by the Chinese" was, in context, clearly a reference to the PRC government.  (Tr. 2046:9-11.)[24]  Zhu's claim that McMahon's counsel was arguing that McMahon was a victim of the PRC "and by implication, the codefendants," is a tortured interpretation wholly unsupported by its context or any other evidence of any similar impropriety by defense counsel.  Construing these stray comments in the manner Zhu advocates is wholly inconsistent with the statements themselves, their surrounding context,

---

[24] Zhu notes that the government objected to some of these statements. (Zhu Br. at 4.)  The government objected not because of any perceived racism, but because it was improper to suggest that the jury should acquit McMahon on the basis that the government has some duty to "protect" McMahon from the PRC government.  The Court correctly inferred this basis for the objection when it subsequently instructed the jury to "completely disregard any suggestion that the Government had some duty to protect Mr. McMahon."  (Tr. 2046:9-2047:22.)

the entire defense presented by McMahon's counsel and counsel's professional conduct throughout trial.

But even assuming, <u>arguendo</u>, the statements were racially tinged, they were isolated remarks during a lengthy summation, in the course of a three-week trial, and expressly cured by the Court's instructions to the jury.  At the conclusion of trial, the Court expressly instructed the jury that "it would be improper for you to consider, in reaching your decision as to whether the Government sustained its burden of proof, any personal feelings you may have about the Defendants' race, religion, national origin, sex, or age."  (Jury Inst. at 17-18.)[25]  "The law recognizes a strong presumption that juries follow limiting instructions."  <u>United States v. Snype</u>, 441 F.3d 119, 129 (2d Cir. 2006).  Here, because the Court instructed the jury not to base its verdict on race, national origin, or other potential biases, there can be no serious claim that Zhu was prejudiced by McMahon's counsel's comments, let alone that there was "substantial prejudice" rising to "manifest injustice."

Zhu's arguments rest, in part, on the theory that McMahon's statements converted McMahon's counsel into "a second prosecutor."  (Zhu Br. at 5.)  The "second prosecutor" concept typically arises where a defendant is claiming that his defense is mutually antagonistic to a co-defendant's defense, such that severance is required.  To demonstrate a mutually antagonistic or irreconcilable defense, the court must find that acceptance of one party's defense would tend to preclude the acquittal of the other.  "[T]he mere fact that codefendants seek to place the blame on each other" does not warrant severance.  <u>United States v. Villegas</u>, 899 F.2d 1324, 1346 (2d Cir.

---

[25] Additionally, in response to comments by Zheng's counsel in his opening, which are not at issue here, the Court also cautioned the jury:  "You heard some references just now to the geopolitical relationship between the US and China.  I just want you to understand that none of that is relevant to this case." (Tr. 58:11-14; 59:13-14.)

1990).  If such circumstances do not require severance, McMahon's few stray comments during his summation—which did not directly implicate Zhu, and fall far short of a mutually antagonistic or irreconcilable defense—also cannot necessitate a new trial.  Moreover, as was presented at trial, McMahon's and Zhu's defense theories were not antagonistic, but rather had overlapping themes, including that both defendants believed they were working to locate and harass Xu Jin in order to collect on a business debt.[26]

For the foregoing reasons, Zhu's motion for a judgment of acquittal and a new trial should be denied.

---

[26] Zhu's reliance on United States v. Salameh, 152 F.3d 88, 116-17 (2d Cir. 1998), and United States v. O'Connor, 650 F.3d 839, 858 (2d Cir. 2011) (see Zhu Br. at 5-6), is misplaced. Both cases address severance motions and, importantly, make clear that severance may be—but is not necessarily—required even where defendants raise mutually antagonistic defenses.  Here, Zhu never even sought severance—which Federal Rule of Criminal Procedure 12 requires defendants to do prior to trial, in order to avoid precisely this type of issue during or following trial.  Notably, Zhu identifies no case in which a new trial was granted pursuant to Rule 33 on a severance-type "second prosecutor" claim.

<u>RESPONSE TO ARGUMENTS BY DEFENDANT MICHAEL MCMAHON</u>

I.    <u>There was Sufficient Evidence to Convict Michael McMahon of Counts Two, Three and Four</u>

        A.    <u>There Was Sufficient Evidence to Convict Michael McMahon of Knowingly Acting as an Agent of the PRC (Count Two)</u>

At trial, overwhelming evidence established that Michael McMahon acted as an agent of the PRC government without prior notification to the Attorney General, in violation of 18 U.S.C. § 951.  McMahon nevertheless contests the sufficiency of the evidence of his Section 951 conviction, claiming that a rational jury could not have concluded, based on the trial evidence, that McMahon knew he was acting on behalf of the PRC government or its officials.  (<u>See</u> McMahon Br. at 22-23.)  His arguments ignore Rule 29 standards, failing to draw all reasonable inferences in favor of the jury's verdict, and attacking the government's evidence piecemeal.

        1.    <u>McMahon Knew That He Was Working for the PRC Government</u>

Ample direct and circumstantial evidence at trial established that McMahon knew he was working on behalf of the PRC government.

First, contrary to McMahon's suggestion, and notwithstanding the fact that a defendant's <u>mens</u> <u>rea</u> is almost always proven through inference, <u>see</u> <u>e.g.</u>, <u>United States v. Crowley</u>, 318 F.3d 401, 409 (2d Cir. 2003), the government presented direct evidence of McMahon's knowledge: his post-arrest interview admissions of what he believed at the time of the events.  During that interview, McMahon admitted to understanding that he had been retained to locate Xu Jin in order to facilitate efforts to repatriate him to the PRC for prosecution, stating, "Yeah.  I think he had mentioned to me that they were trying to get him to come back to China. . . **So they could prosecute him**. . . And then the father had flown in from I think he said China. . . . To convince the son because of, out of you know, out of honor for the name. . . . You got to face, the consequences back in China."  (GX 701A at 3:55 (emphasis added).)  A few minutes later in

53

the interview, when explaining a text to Zhu Feng in which McMahon suggested overt surveillance, McMahon again suggested he understood that he was working for a government-led law enforcement operation: "Listen, if he [Xu Jin] knows you're sitting outside, he knows that . . . you're out there and that maybe **he should turn himself in**." (Id. at 5:19 (emphasis added).) Especially when considered in the context of McMahon's law enforcement background, these admissions belie McMahon's claim that he did not know he was working for the PRC government to repatriate Xu Jin to China for criminal prosecution.

Second, substantial additional evidence established that McMahon knew that the man he was hired to investigate and locate was "wanted" by the PRC government for alleged PRC criminal offenses, including the following:

- On October 5, 2016, at the onset of his retention, McMahon conducted his own research on Xu Jin and learned that the PRC government wanted to find and arrest Xu. McMahon downloaded a "Comprehensive Report" from an online database, revealing that Xu Jin was on an "INTERPOL MOST WANTED" list for several crimes (see GX 4012), and emailed that report to his friend and fellow private investigator, Eric Gallowitz (see GX 4019C at 027, 029). In the subject line of the email, McMahon highlighted his find, writing, "tlo report says wanted by interpole." (Id. at 027.)

- McMahon also found an online article from the publication China Daily with the headline, "Interpol Launches Global Dragnet for 100 Chinese Fugitives." (GX 434.) In describing the "global dragnet," the article elaborated: "It's called Operation Sky Net. Amid the nation's intensifying anti-graft campaign, arrest warrants were issued by Interpol China for former State employees and others . . ." (Id.) The article included pictures and information about Xu Jin and Liu Fang among the group of 100 "wanted" individuals. (See id.) McMahon texted a screenshot of the article to Gallowitz. (GX 4019B at 121-22.) In describing the fruits of his initial research on Xu Jin to Gallowitz, McMahon exclaimed in texts: "**Tlo says wanted by INTERPOL wow!! Bring your gun.**" (Id. at -119-20 (emphasis added).)

- On the same day, McMahon also texted the translator, Lina Xu a screenshot of the China Daily article, highlighting for her that Xu Jin was "**wanted in China for corruption**" and that he was "**sure [Defendant Zhu Yong] knows this but he didn't tell us**." (GX 4004 at 781-82 (emphases added).) In reply, Lina Xu remarked, "I see. I know now I know what's going on with JIN XU's case," to which McMahon did not respond. (Id. at 783.) Nor did he make any other effort to follow-up with Zhu Yong about Xu Jin's "wanted" status in the PRC. Instead, he began to investigate Xu Jin in earnest.

54

- Several months later, on April 6, 2017—the day that McMahon finally located Xu Jin and Liu Fang's home and reported that information to Zhu Feng—McMahon emailed himself a link to the same <u>China Daily</u> article he had found months earlier. (<u>See</u> GX 4018.) He wrote "**china most wanted**" in the subject line of the email. (<u>Id.</u>) In doing so, McMahon demonstrated that Xu Jin's "most wanted" status still remained top of mind months later.

- On April 10, 2017, McMahon and Zhu Feng texted each other about McMahon's work, with Zhu Feng commenting about McMahon's clients, "[t]hey already told me **they will try everything they can to get Xu plead** and return the money." (GX 805B at 22 (emphasis added).) The next day, Zhu Feng further emphasized to McMahon, "**They definitely grant you a nice trip if they can get Xu back to China** haha." (GX 805B at 31-32 (emphasis added).) In this latter exchange, there was no mention of giving McMahon a "nice trip" to China for successfully locating assets. And McMahon expressed no confusion about the ultimate aim of his work: getting Xu Jin "back to China" so he could "plead."

As discussed further below, a rational juror could readily infer from (i) McMahon's own research about Xu Jin, and (ii) his reactions to discovering that Xu Jin and Liu Fang were on PRC "most wanted" lists, that McMahon, a former police sergeant, knew that the victims were wanted for arrest by the PRC government. Even Eric Gallowitz, McMahon's own defense witness, friend and former private investigator colleague—who unlike McMahon did not meet and speak with the PRC government officials and intermediaries like Hu Ji and Zhu Feng—recognized the work McMahon was hired to perform was "atypical" and acknowledged that it was related to a criminal matter. (Tr. 1778:4-6.)

Third, the evidence at trial showed that the circumstances of McMahon's work fell far afield of normal private investigator services or the purported "debt collection" effort McMahon claims he believed was the purpose of his retention. In addition to the "most wanted" reports McMahon found, based on the following evidence, a rational juror could infer that McMahon—the former police sergeant and seasoned private investigator—knew that he was working for the PRC government's law enforcement operation:

- The purported client for whom McMahon worked changed multiple times throughout the relationship. When McMahon was first contacted by Lina Xu, the translator told

him the "female client" was a "Lady . . . [who] has been through a lot." (GX 3004 at 1.) A few days later, McMahon's supposed "female client" changed to "Mr. Jason Zhu," who made clear that there were "no attorneys involved," despite purportedly seeking McMahon's assistance to collect on a debt Xu Jin owed to Defendant Zhu Yong. (GX 3011 at 1.) By November of that year, McMahon was reporting to "Eric Yan" (a pseudonym for PRC police officer Hu Ji) and Eric Yan's "boss" and "uncle." (GX 3047.) The next April, McMahon was taking direction not only from "Eric" but also Zhu Feng, or "Erics Friend from China." (See, e.g., GX 4010 at 850 (Zhu Feng to McMahon: "Would u be able to shoot a picture on the old guy / Eric wants it"); GX 3072 (invoice from McMahon sent to Hu Ji's and Zhu Feng's email addresses).)

- The amount and type of information his PRC clients provided him during his work was also highly suspect. As noted, when McMahon first learned Xu Jin's identity, Zhu Yong provided McMahon with a packet containing an extensive amount of personal identifying information about Xu Jin and his family. This information included dates of birth, Chinese identification numbers, green card numbers, social security numbers, border exit-entry information concerning the victims' and their family members' travel to Hong Kong and Macau, and the flight date, carrier and flight number for Xu Jin's parents' travel from the United States to China in October 2016 (see GX 1020 at 1-2)—a collection of information about these individuals that only could have been obtained from the PRC government.

- Relatedly, significant information that McMahon was asked to obtain about Xu Jin and Xu Jin's family was plainly irrelevant to collecting on a purported debt. In October 2016, for example, McMahon reported to his PRC client details about Xu Jin's daughter, Xu Xinzi, including her graduate school and the layout and location of the graduate residences in which she lived. (GX 3027 at 1; GX 3028 at 3.) Later that month, McMahon also obtained what he believed to be international travel information about Xu Jin's wife, victim Liu Fang. (See GX 3051.)

- Finally, and perhaps most significantly, a rational juror could infer that the forced visit to the United States of Xu Jin's father was an obvious sign to McMahon that he was not involved in ordinary debt collection or asset recovery work. As described above, McMahon admitted to knowing about the operation to use Xu Jin's elderly and sickly father and "honor for the [family] name," to intimidate Xu Jin into returning to China for criminal prosecution. (GX 701A at 3:55; GX 701B at 4-5.) Even Gallowitz admitted that he had never before seen such an operation as a part of his day-to-day private investigator surveillance work. (See Tr. 1833:25-1834:4.)

Based on this evidence, a rational juror could infer that McMahon must have known that he was not actually working on debt collection or a "company" lawsuit.

Fourth, there is ample circumstantial evidence of McMahon's consciousness of guilt from which a rational juror could infer that he knew he was part of an illegal scheme—

working for the PRC government—rather than conducting lawful private investigator work.  This evidence included: (i) the manner and method of communication between McMahon and the PRC officials and intermediaries; (ii) McMahon's financial activities; (iii) McMahon's efforts to evade detection from local law enforcement during surveillance; and (iv) McMahon's irregular or unauthorized access of sensitive information from government databases.  (See Jury Inst. at 22 ("Willful intent or guilty knowledge may be inferred from the secretive or irregular manner in which a transaction is carried out.").)

> a.  Manner and Method of Communication with PRC Government Officials and Intermediaries

McMahon and others involved in the operation to repatriate Xu Jin communicated critical information using in-person meetings and phone calls—means of communication that ran far less risk of being intercepted by U.S. authorities.  For example:

- On October 27, 2016, Zhu Yong reached out to McMahon through Lina Xu, requesting an in-person meeting "ASAP" that afternoon to discuss Xu Jin's case.  (GX 4004 at - 787-788.)  Later that day, McMahon, Zhu, and Hu Ji met at a Panera Bread in New Jersey.  (GX 902D-GX 902E.)  The next day, Zhu followed up with McMahon about locating the address for Xu Jin's daughter.  (GX 4004 at 790-91.)  McMahon participated in at least one other in-person meeting with Zhu and Hu Ji on November 1, 2016.  (GX 4008 at 841-43.)  A few weeks later, McMahon obtained and passed what he believed to be Liu Fang's border crossing information to Hu Ji.  (GX 3051 at 1.)

- On April 3, 2017, PRC prosecutor Tu Lan, Zhu Feng, and Hongru Jin met in a hotel room to discuss Xu Cewei's forced visit to the United States and the plan to surveil and intimidate Xu Jin.  (See GX 704A.)  During that conversation, Tu Lan made clear to Zhu Feng that Zhu Feng should tell "Mike" "clearly, I mean, **you need to tell him clearly about everything**."  (GX 704A at 3 (emphasis added).)  The next day, on April 4, McMahon and Zhu Feng met for 51 minutes at a Panera Bread.  (See GX 103A - GX 103F; GX 707A – GX707D.)  Then, on April 5, when Xu Jin's father arrived in the country, Zhu Feng texted McMahon, without further explanation or context, "I got the package eta 7:40 p.m." (GX 4010 at 848.)  In these communications, McMahon expressed no confusion or misunderstanding about the operation involving Xu Jin's elderly father.  In addition to text messages, McMahon also exchanged several phone calls with Zhu Feng over the next several days.  (See GX 317.)

A jury could reasonably infer that, during these in-person meetings and phone calls, McMahon learned that he was working for a PRC law enforcement operation and planned and carried out steps to further this criminal objective.  The investigative steps he carried out—such as obtaining sensitive information about the victims (e.g., the addresses of Xu Jin's daughter or Liu Fang's border crossing information) and surveilling Xu Jin during the forced visit of his elderly father in April 2017—had no relevance to a civil lawsuit involving asset recovery or debt collection.  The inference that McMahon learned during these calls and meetings that he was working for the PRC government is even further supported by McMahon's own admission, described above, that he knew the goal of the work he performed was to repatriate Xu Jin to China to "prosecute" him (GX 701A at 3:55.)  That is a particularly reasonable inference given McMahon's admission during his post-arrest interview that he believed he was told about the goal of the operation on a phone call. (Id. at 6:20.)

  b.  Suspicious Financial Activity

  McMahon's financial activity related to his work for the PRC government was also consistent with consciousness of guilt.  Cf. United States v. Deutsch, 451 F.2d 98, 116 (2d Cir. 1971) (failure to report a financial transaction was "independently probative of [defendant's] guilt" because it "showed evasive conduct aimed at concealing the transaction and constituted circumstantial evidence of guilty consciousness").  As described above, McMahon handled his income from the PRC in a manner indicative of someone attempting to evade detection.  Over the course of his work for the PRC government, for example, McMahon received money for his work from at least four different sources, with several of the payments made in cash—which the evidence suggested he specifically requested.  Notably, after learning that Xu Jin was wanted by the PRC government, McMahon stopped depositing additional money for his work into his business account.  Instead, he subsequently used three other accounts, including his son's student

checking account.  McMahon also received at least $5,000 in cash that he never put in any of his accounts.  (See generally GX 403A - GX 403L; GX 3072 - GX 3073.)  Beyond this suspicious deposit activity, McMahon failed to report the income he received from the PRC government on his taxes.  (See generally GX 403A - GX 403N; GX 452.)

c.    Evasion of Local Law Enforcement

In addition to these in-person meetings, phone calls and depositing activity, the evidence at trial demonstrated that McMahon took other steps to avoid U.S. law enforcement detection of his criminal conduct.  During his surveillance of the victims and their family members in October 2016 and April 2017, McMahon contacted local police to prevent them from interfering with the operation.  (See GX EG-3 at 135-136; GX 4019B at 216-219; GX 407 at 1; Tr. 1831:9-12.)  A rational jury could infer from this evidence that McMahon contacted local law enforcement to avoid being caught committing a crime.

d.    Improper Access of Government Databases

Finally, evidence at trial demonstrated that McMahon improperly accessed sensitive information from government databases in furtherance of the criminal operation.  A rational jury could infer from this evidence that McMahon knew that his activities were improper, because he went far beyond providing information from commercially available databases of the type a private investigator involved in lawful conduct would ordinarily use.  Likewise, this evidence rebutted McMahon's claim that he was a law-abiding former police detective who acted openly and with propriety as a private investigator.  (See Tr. 514:6-520:18.)

The evidence established that McMahon solicited sensitive border-crossing information pertaining to the victims from his friend, DEA Special Agent Greg Finning.  (See GX 425 (DHS records showing database queries for exit and entry information pertaining to Xu Jin and Liu Fang); Tr. 1460:14-24  (testimony that Finning was involved in the request to run queries

59

in DHS databases on Xu Jin and Liu Fang); GX 316 (41-minute phone call on October 20 between McMahon and contact "Greg"); GX 4006B at 822, 824 (text messages between McMahon and "Greg" in which McMahon sent Greg the victims' personal information on October 20 and then, on October 31, asked for an update on information Greg was to obtain from his "HSI guy"); GX 3051 (McMahon emailed "FANG LIU EXIT INFORMATION" to Hu Ji).)[27]  McMahon was not authorized to know this information without prior approval of an authorized U.S. official, and certainly was not permitted to share that information with a PRC law enforcement official.  (See GX 429 at 1.)

In addition, McMahon violated the terms of his access to an New Jersey Motor Vehicle Commission ("NJMVC") database, using records from the database to conduct surveillance on the victims.  (See GX 408A at 4 (NJMVC agreement with McMahon Investigative Group prohibiting use of "Commission records to conduct surveillance or to investigate or locate an individual for reasons not specifically related to motor vehicle activity"); GX 4010 at 862, 871 (text messages between McMahon and Zhu Feng during surveillance of victims on April 6, 2017, in which Zhu Feng asked McMahon to run Xu Jin's license plate at approximately 7:23 p.m.); GX 408H (NJMVC database audit logs showing that McMahon ran Xu Jin's license place on April 6, 2017 at approximately 7:35 p.m.).)  Because this evidence shows that McMahon did not act openly, honestly and lawfully in performing work for the PRC (as he argued to the jury that he did), a rational jury could infer a guilty conscience from this conduct.

---

[27] McMahon's complaint that the government did not call Finning as a witness with respect to these events (McMahon Br. at 40 n.13) is unavailing.  The witness called by the government— HSI Special Agent Naviene Habeeb—coupled with corresponding communications between McMahon and Finning and the government records of the database queries, were sufficient to prove the chain of events.  The jury was permitted to draw reasonable inferences about McMahon's knowledge based on the evidence in the record, irrespective of the fact that Finning did not personally testify.

In sum, viewing the direct and circumstantial evidence in its totality and drawing all reasonable inferences in favor of the verdict, there was more than sufficient evidence that McMahon knew he was acting under the direction or control of the PRC government.

### 2.    At a Minimum, McMahon Consciously Avoided the Fact that He Worked for the PRC Government

A rational jury could alternatively have concluded that McMahon consciously avoided the truth that he worked for the PRC, and thereby acted knowingly.  See, e.g., United States v. Kozeny, 667 F.3d 122, 134 (2d Cir. 2011) ("[C]onscious avoidance may be established where[] a defendant's involvement in the criminal offense may have been so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge.") (internal quotation marks and alterations omitted); United States v. Svoboda, 347 F.3d 471, 477 (2d Cir. 2003) ("The conscious avoidance doctrine provides that a defendant's knowledge of a fact required to prove the defendant's guilt may be found when the jury is persuaded that the defendant consciously avoided learning that fact while aware of a high probability of its existence.") (internal citations and quotation marks omitted).  (See also Jury Inst. at 22.)

McMahon was a former police officer and detective sergeant—a job that required him to investigate suspicious activity and solve crimes.  (See Tr. 1780:20-23; 1823:16-1824:18.) He then became a private investigator whose main job description was similarly related to investigating facts and searching for information.  The red flags about his work for the PRC described above—including the China Daily article about Operation Sky Net, the Interpol red notice, the changing client identities and contacts, the highly sensitive information about the victims that his client already possessed, the unusual information that his client requested McMahon find (which had no relevance to the purported goal of asset recovery) and Xu Jin's

elderly father's forced visit to the United States—are more than sufficient to establish that, at minimum, McMahon consciously closed his eyes to what would have otherwise been obvious to him: that he was working for the PRC government.

### 3.  McMahon's Sufficiency Arguments Fail as a Matter of Law

Rather than viewing the evidence in its totality, McMahon critiques some—but not all—of the government's evidence.  And he argues that each piece of evidence is either insufficient to support an inference of guilt or consistent with an inference of innocence.  This is unpersuasive.

Even when viewed in isolation, much of this evidence is compelling proof of guilt. For example, the fact that McMahon located an article about the victims being sought for repatriation by the PRC government almost immediately after he was hired establishes, on its own, that McMahon knew of the exact scheme in which he was hired to participate.  Similarly, McMahon's post-arrest admissions, even considered apart from the wealth of other evidence, lay out precisely what he knew.  In any event, McMahon's "attempt to separate and isolate each piece of evidence, and then claim that each of these pieces of evidence are not sufficient to prove [his] guilt beyond a reasonable doubt," is improper.  See O'Sullivan, at 27 (explaining that "some individual pieces of evidence, standing alone, may be insufficient and yield equally plausible competing inferences of innocence is beside the point"); see also Landesman, 17 F.4th at 319 ("the evidence must be viewed in its totality, as each fact may gain color from the others.") (internal citations and quotation marks omitted); Eppolito, 543 F.3d at 45 ("The jury may reach its verdict based on inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation.") (internal quotation marks and citations omitted).  Accordingly, placing "each fact into the interconnected chain of events and actions," the evidence is more than sufficient to establish McMahon's guilt for the reasons explained above.  O'Sullivan, at 27.

62

McMahon's related overarching argument, that the government's case relied on impermissible "speculation" or "stacking inference upon inference" (McMahon Br. at 19), is also meritless. The government is entitled to prove its case through reasonable inferences drawn from circumstantial evidence, see Eppolito, 543 F.3d at 45, and doing so does not make the evidence impermissibly speculative. An inference is "a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." Pauling, 924 F.3d at 656 (quoting Siewe v. Gonzales, 480 F.3d 160, 168 (2d Cir. 2007)). And "the drawing of a fair inference inevitably entails some measure of speculation." Siewe, 480 F.3d at 167. As the Supreme Court has explained, "[w]henever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference." Lavender v. Kurn, 327 U.S. 645, 653 (1946). Speculation becomes impermissible "[o]nly when there is a complete absence of probative facts to support the conclusion reached." Id.

Simply put, there is no impermissible speculation here, as the ample evidence of McMahon's knowledge makes clear. The principal cases that McMahon invokes to support his assertion that the evidence against him is "speculative" (McMahon Br. at 23, 29) are all readily distinguishable. Each case involves instances in which the government presented far less circumstantial evidence than here, or no evidence in support of an element at all. See Pauling, 924 F.3d at 659 (insufficient evidence of drug quantity where government relied on (i) a single phone call referencing a temporarily unknown transaction not clearly linked to defendant, and (ii) the mere fact of ongoing relationship defendant and co-conspirators); Langston v. Smith, 630 F.3d 310, 317 (2d Cir. 2011) (insufficient evidence supported felony assault conviction premised on

possession of a handgun felony where no evidence linked later assault to furthering crime of unlawful weapons possession); United States v. Graziano, 616 F. Supp. 2d 350, 370-71 (E.D.N.Y. 2008) (insufficient evidence supported conviction based on Pinkerton theory for use of destructive device during a crime of violence where there was no evidence that defendant was aware of co-conspirators' planned use of incendiary device, nor did other circumstances point to a foreseeable need to use a destructive device); United States v. Ouedraogo, 531 F. App'x 731, 744 (6th Cir. 2013) (insufficient evidence supported kidnapping resulting in death conviction where there was no evidence when or how the victim died).

Nor is this a case of impermissible "inference stacking," which occurs when the government relies on a chain of multiple inferences stemming from one or two pieces of circumstantial evidence.  Compare, e.g., Graziano, 616 F. Supp. 2d at 370-72.  Here, in contrast, substantial evidence, both direct and circumstantial, all points to the same logical conclusion: McMahon knew he was working for the PRC government.  See, e.g., United States v. Martinez, 921 F.3d 452, 466 (5th Cir. 2019) ("Though the government cannot obtain a conviction by piling 'inference upon inference' the defendants cannot obtain an acquittal simply by ignoring inferences that can logically be drawn from the totality of the evidence."); United States v. Wilson, 879 F.3d 795, 802 (7th Cir. 2018) (affirming conviction based on circumstantial evidence, noting that while "we must not permit a verdict based solely on the piling of inference upon inference, [] we also must not rend the fabric of evidence and examine each shred in isolation"); United States v. Arras, 373 F.3d 1071, 1076 (10th Cir. 2004) (rejecting argument that government's case "merely piled inference upon inference" where "jury made a logical probabilistic determination" of guilt based on several pieces of circumstantial evidence).

Notwithstanding that McMahon's broader approach to attacking the government's case is fundamentally flawed, his specific attempts to critique or re-characterize certain pieces of the government's evidence also miss the mark.  Here, the government briefly addresses his specific arguments with respect to certain pieces of evidence in turn.

First, McMahon's assertion that the China Daily article does not explain what Operation Sky Net is (i.e., a repatriation program) and does not inform McMahon that he is a part of that repatriation effort, rather than part of a debt collection effort by a "Chinese construction company" (McMahon Br. at 23-26), ignores the jury's ability to draw logical inferences from the evidence.  McMahon had this article and other information in his possession that explained that there was a PRC government effort to arrest Xu Jin and Liu Fang—the same individuals he was hired to investigate under highly abnormal circumstances.  A jury could reasonably infer from this and other evidence that McMahon understood that he was a part of the PRC government criminal repatriation effort when he was retained in 2016.

Second, McMahon's claim that he was deceived into believing he had been retained by a Chinese "construction company" to recover stolen assets (McMahon Br. at 23-26) is an improper attempt to draw alternative inferences from the evidence, rather than drawing all inferences in favor of the government, as Rule 29 requires.  Indeed, a rational jury could reasonably reject McMahon's claim that he believed he was working for a "company" based on other evidence introduced at trial.  For one, the "atypical" circumstances of McMahon's retention, described above, undermine the contention that he sincerely believed he was working on a company's civil lawsuit, as opposed to a criminal law enforcement operation.  What is more, other irregularities about his communications with his client would allow a rational jury to reject McMahon's version of events, especially the fact that his supposed "company" client was never identified by name in

65

any communication with his PRC contacts or with his private investigator colleagues who assisted him with the work. (See Tr. 1827:5-9.) Nor was the purported "company" client included on any contract or invoice—instead, only Zhu Yong, "Eric Yan" and Zhu Feng were named. (See, e.g., GX 3009; GX 3073.)[28] In fact, there is no evidence in the trial record to support McMahon's claim to have worked on behalf of a "construction" company specifically. A rational jury could therefore have concluded that references to a supposed "company" were merely code language used to further obscure the criminal operation.[29]

Third, McMahon's contention that it is impermissible to infer his knowledge from the sequence of events between April 3, 2017, and April 5, 2017 (McMahon Br. at 26-31), as well as the numerous phone calls and in-person meetings between McMahon and PRC government officials or intermediaries (id. at 41-42), ignores the evidence. As explained above, the government did not simply introduce the mere fact of these events or the occurrence of phone calls and meetings involving McMahon. The government also introduced a range of other evidence surrounding these events, including McMahon's own post-arrest admissions, from which a rational juror could infer McMahon's knowledge.

---

[28] In contrast, invoices from McMahon's private investigator colleagues who assisted him with the surveillance of the victims were addressed to "McMahon Investigative Group," not McMahon personally. (See GX 3095; GX 3101; see also Tr. 1826:15-1827:4.)

[29] McMahon's suggestion that the government was required to call an expert to explain the meaning of this coded language (McMahon Br at 30 n.7), is meritless. Expert testimony generally is only appropriate where certain "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed R. Evid. 702. No "specialized knowledge" was necessary for interpreting McMahon's and Zhu Feng's vague references to a "company." A lay juror could easily understand the communications and draw any inferences about their meaning on her own.

Fourth, McMahon's argument that he used the word "prosecute" in his post-arrest statement to refer to a civil action (McMahon Br. at 33) strains credulity, especially given McMahon's background in law enforcement. In any event, this argument fails to draw all reasonable inferences in favor of the government. Here, a rational jury could certainly infer that by "prosecute," McMahon meant "prosecute" in the criminal sense of the word.

Fifth, McMahon's suggestion that any irregular or unauthorized conduct in which he engaged on behalf of the PRC (e.g., improper use of government databases)[30] does not reflect a guilty conscience amount to contentions that the jury could have also drawn inferences from this evidence consistent with McMahon's innocence. But in proving its case, the government "need not exclude every possible hypothesis of innocence." United States v. Best, 219 F.3d 192, 200 (2d Cir. 2000) (citations and quotation marks omitted). And any competing inferences that can be drawn from the evidence should be drawn in favor of the verdict. Id.

Sixth, McMahon's similar assertions that (i) he did not report his income on his tax returns for reasons unrelated to his guilty conscience (McMahon Br. at 47-49) and that (ii) he did not hide any of the money he received from the PRC (id. at 46-47) are also without merit.[31] Again, the fact that the jury could have drawn inferences from this evidence consistent with innocence does not undermine the overall sufficiency of the evidence. See Best, 219 F.3d at 200.

---

[30] To the extent McMahon argues that the government failed to prove that McMahon engaged in illegal or unauthorized conduct with respect to the NJMVC and DHS databases, that argument is without merit, as explained further in Part IV (McMahon). See also Part II (Factual Background); Part I (McMahon).

[31] To the extent that McMahon argues that the government failed to prove that McMahon handled his income from the PRC in an evasive manner or failed to report that income on his taxes, that argument is without merit, as discussed in Parts I and IV (McMahon). See also Part II (Factual Background)

B.    There Was Sufficient Evidence to Convict Michael McMahon of Conspiracy to Commit Interstate Stalking and Stalking (Counts Three and Four)

At trial, substantial evidence established that McMahon committed the substantive offense of aiding and abetting interstate stalking and harassment, in violation of 18 U.S.C. § 2261A,[32] and that he conspired to commit interstate stalking and harassment, in violation of 18 U.S.C. § 371.  Like his argument contesting his Section 951 conviction, McMahon's challenges to his stalking convictions largely focus on his state of mind, contesting his knowledge of the interstate stalking campaign and asserting that he did not knowingly aid the harassment or, similarly, that he did not knowingly agree to participate in the harassment.  McMahon also claims there was insufficient evidence that he, or his principals, caused substantial emotional distress. These arguments, however, ignore the evidence at trial, and principals of aiding and abetting and co-conspirator liability.  For the reasons below, the Court should reject them.

1.    McMahon Knowingly Participated in an Interstate Stalking and Harassment Campaign Against the Victims

The evidence at trial demonstrated that McMahon knew of Hu Ji's, Zhu Feng's, Tu Lan's and others' interstate stalking and harassment campaign and acted with intent to contribute to its success, which was sufficient to support a substantive interstate stalking conviction.  The evidence also established that McMahon knowingly and intentionally agreed with those same individuals to commit the offense of interstate stalking, sufficient to support a conspiracy

---

[32]  In the alternative, sufficient evidence established that McMahon committed the substantive offense of interstate stalking under a Pinkerton theory of co-conspirator liability.  (See Jury Inst. at 31.)  Under this theory, a rational jury could have found McMahon guilty of the substantive offense of interstate stalking given that there was sufficient evidence at trial that (i) the crime of interstate stalking was committed by someone; (ii) that person or persons were members of the interstate stalking conspiracy; (iii) the substantive crime was committed pursuant to the common plan that existed between the conspirators; (iv) McMahon was a member of the conspiracy; and (v) McMahon could have reasonably foreseen that interstate stalking might be committed by his co-conspirators, relying on the same evidence discussed in this Part.

conviction. In addition, the evidence established that the interstate stalking and harassment campaign, in which McMahon knowingly participated, caused or was intended to cause substantial emotional distress.

a.    <u>McMahon's Knowledge and Intent</u>

As described above, beginning in October 2016, McMahon knew of the PRC government's interstate stalking campaign, agreed with his co-conspirators to participate in that campaign and acted with intent to further it, initially through surveillance and collection of intrusive information about the victims. For example, in late October, McMahon met in person with Hu Ji and Zhu Yong at least twice. (<u>See</u> GX 902D - GX 902E; GX 4004 at 16-17.) As McMahon knew, both Hu Ji and Zhu Yong flew to the United States from the PRC for these meetings. (<u>See</u> GX 402Y; GX 4006B at 5.) A rational jury could infer, based on surrounding events, that during these meetings Hu Ji, Zhu Yong, and McMahon discussed the harassment campaign and agreed on the next steps for intrusive surveillance. Indeed, in his first email to McMahon after that meeting, Hu Ji wrote to McMahon in a manner that indicated they had previously discussed their joint efforts to target the victims. (<u>See</u> GX 3047 (discussing how he was "already back to China and reported all we found to my boss of the company").) At Hu Ji and Zhu Yong's request, McMahon agreed to pull extensive information about Xu Jin and Liu Fang's daughter, Xinzi Xu, including her major and dormitory—information that a rational jury could infer is irrelevant to a debt collection lawsuit but relevant to stalking and intimidation. (<u>See</u> GX 3027 at 1; GX 3028 at 3.) Moreover, McMahon improperly solicited sensitive border crossing information for the victims and provided to Hu Ji the information he obtained from a government database. (<u>See</u> GX 316; GX 425; GX 429; GX 4006B at 3, 5; GX 3051.)

McMahon's knowing and active contributions to the interstate intimidation and harassment campaign escalated a few months later. As described above, McMahon participated

69

in the April 2017 operation to bring Xu Jin's elderly and ill father, from the PRC to New Jersey in order to coerce the victims to return to the PRC. Both direct and circumstantial evidence established that McMahon was aware of this international operation and its goal—to harass and intimidate Xu Jin and his immediate family—and that he agreed with his principals and conspirators to further that goal, including:

- On April 5, when Xu Jin's father arrived in the country, Zhu Feng texted McMahon at 6:58 p.m., "**I just got the package eta 7:40 p.m.**" A few hours later, Zhu Feng checked on McMahon's surveillance, asking McMahon, "Do u see the old man" and requesting a picture of him for "Eric." (GX 4010 at 3-5 (emphasis added).)

- In a text message exchange with Eric Gallowitz on April 6, in which McMahon and Gallowitz discussed surveilling Xu Jin, McMahon responded "**lol**" at Gallowitz's suggestion of a possible "**abduction**" by McMahon's co-conspirators. (GX 4019B at 53-56 (emphasis added).)

- That same day, McMahon and Zhu Feng also texted about the "nice trip" to China that McMahon would receive if "**they can get Xu back to China**." (GX 805B at 31-32 (emphasis added).)

- On April 11, Gallowitz texted McMahon a suggestion about how to conduct the surveillance of Xu Jin and his immediate family: "Maybe overt surveillance. In their face. Sit in front of the house. Pictures. Video. **Scare them**." McMahon did not reject the idea or express surprise or dismay at the suggestion. Instead, he responded: "**Yeah possibly**- we did that in little ferry." (GX 4019B at 66-67.) A couple hours later, McMahon proposed the idea to Zhu Feng: "**I think if we harass Xu. Park outside his home and let him know we are there.** I did that before on another case." (GX 805B at 32 (emphasis added).)

- As noted, McMahon later admitted to knowing the purpose of the elderly father's forced visit, explaining in his post-arrest interview that his clients "**were trying to get him to come back to China**" and that Xu Jin's "**father had flown in from I think he said China, to convince the son because of, you know, out of honor for the name**." (GX 701A at 3:55; GX 701B at 4; see also GX 701A at 6:36; GX 701B at 6-7 (Agent: Q. And and when the elderly person was coming in. McMahon: Yeah. Agent: . . . was it discussed that he was coming in for the same reason ?. That's just another method of trying to get . . . .McMahon: To get his son to go back to China.").)

- McMahon also admitted that his suggestion to "harass" someone like McMahon had done previously involved a prior instance in which he "let [a person] know we were outside" their home, and McMahon explained using that tactic against Xu Jin because if he "knows you're sitting outside" then he would be compelled to "turn himself in." (GX 701A; GX 701B at 5.)

- Significantly, in the same interview, McMahon also attempted to cover his tracks with respect to his own criminal intent, claiming implausibly that when he suggested to Zhu Feng that they try "harass[ing] Xu," his use of the word "harass" was a "typo." (GX 701A at 1:00; GX 701B at 2.)

- Finally, McMahon was aware that Zhu Feng and others involved in the operation traveled to the United States from the PRC, and from New York to New Jersey, to further the scheme. (See, e.g., GX 402Y (border crossing data by date for Zhu Feng, Tu Lan, Li Minjun and Xu Cewei); GX 3067 (Hu Ji informing that "his friend" in New York will meet him in person to coordinate operation); GX 4010 at 846 (Zhu Feng and McMahon coordinating meeting with Zhu Feng at Panera Bread in New Jersey); GX 805B at 16 (Zhu Feng asking for McMahon's bank account information instead of driving two hours to meet McMahon in person in New Jersey); id. 31-32 (Zhu Feng and McMahon discussing Zhu Feng's travel to China in furtherance of the scheme).)

A rational jury could infer from the exchanges about an "abduction" and "harass[ment]" above that interstate intimidation and harassment were, from the outset, a part of the plan to get Xu Jin "back to China," and that McMahon knowingly agreed to further that plan.

Similarly, a rational jury could also infer from the above evidence that McMahon knew the April 2017 operation involving Xu Jin's elderly father was designed to cause substantial emotional distress to the victims, because it was only through causing such distress that his co-conspirators could coerce Xu Jin to come back to China. Moreover, McMahon's false statement during his post-arrest interview, claiming that his use of the word "harass" was a "typo," further evidences his state of mind and consciousness of guilt. See, e.g., United States v. Bruce, 75 F. App'x 849, 852 (2d Cir. 2003) (observing that false exculpatory statements "are circumstantial evidence of consciousness of guilt and have independent probative force") (internal citations and quotation marks omitted); Rea, 958 F.2d at 1220 (concluding that jury was entitled to infer a consciousness of guilt from the falsity of the defendant's statements to authorities).

Not only was McMahon aware of the April 2017 operation's ultimate purpose: he acted with intent to help further it, as detailed above. He met with Zhu Feng at a Panera Bread after Zhu Feng traveled from China to discuss the plan. (See GX 4010 at 1-2; GX 103A-F; GX

707A-D.)  He then surveilled Xu Jin's father and Xu Jin.  In doing so, he was able to locate Xu

Jin's home address: a necessary fact for his co-conspirators to further their harassment and

intimidation campaign, including through efforts beyond the April 2017 operation involving

Zheng and others.  McMahon also agreed to continue to provide information to Hu Ji about Xu

Xinzi, who herself became a target of the interstate stalking and harassment campaign.  (See GX

805B at 5 (McMahon text to Zhu Feng with the address of Xu Jin's house, after locating it through

surveillance on April 6, 2017); GX 2002 (McMahon email to Zhu Feng with photos of Xu Jin's

house and Xu Jin in his car, which he took on surveillance on April 6, 2017); GX 3075 (Hu Ji to

McMahon: "Mike: thank you very much for your good work to getting the address of Xujin Now

I need the background information of a girl who related to Xujin's daughter"; McMahon to Hu Ji:

"Ok I will send you her information.  GID I was able to help with Xujin.").)  And, as discussed

herein, McMahon took steps to ensure law enforcement would not interrupt the operation.  (See

GX 4019B at 216-219; Tr. 1831:9-12.)

> 2.    The Victims' Substantial Emotional Distress

As discussed above, the victims' testimony at trial established that these efforts by

McMahon and his co-conspirators caused substantial emotional distress.  With respect to the April

2017 operation specifically, Xu Jin, for example, testified that seeing his elderly father forced to

travel to the United States after previously suffering a "brain hemorrhage" felt "very shocking"

and made him feel "very angry."  (See Tr. 1396:18-1397:4.)  When he witnessed some of the April

2017 surveillance, he also felt panicked and threatened.  (See id. 1393:21-1394:5.)  Xu Jin was

"frightened" that his father's eventual return to China without him would prompt the PRC

government to imprison his sister again.  (See id. 1429:16-19.)  Describing the effect of the years-

long intimidation and harassment campaign, Liu Fang testified that her "life was turned upside

down at 180 degrees overnight," and that she grew so concerned about the safety of her family that

72

she isolated herself from them.  (Tr. 732:18-733:6 (Liu Fang).)  She was particularly worried about her daughter Xinzi Xu's safety, especially after her daughter became the target of harassment.  (Tr. 730:6-20.)  Liu Yan described the significant "mental pain" suffered by her family, especially her sister, Liu Fang: "My sister . . . [was] on the verge of collapsing.  She could not eat, could not sleep and getting thinner and thinner.  Yeah, I was scared that she would not be able to take it anymore."  (Tr. 126:14-17.)  Moreover, the victims also exhibited strong emotional non-verbal reactions when relaying the trauma they experienced, which the jury was able to observe.

### 3.  McMahon's Challenges to the Sufficiency of His Interstate Stalking Convictions Fail as a Matter of Law

McMahon's challenges to his conspiracy and substantive interstate stalking convictions misconstrue the law and the record.

#### a.  McMahon's Challenges to His Conspiracy Conviction

To start, McMahon's argument that he did not enter the interstate stalking conspiracy because he did not know everything about his co-conspirators' activities (McMahon Br. at 55) ignores well-established conspiracy law.  As the Court properly instructed, "to become a member of a conspiracy, a defendant need not have known the identities of every member of the conspiracy, nor need they have been apprised of all of their activities.  A defendant need not have been fully informed of all the details, or the scope, of the conspiracy in order to justify an inference of knowledge on his part."  (Jury Inst. at 25-26.)  See, also, e.g., United States v. Downing, 297 F.3d 52, 57 (2d Cir. 2002).  Instead, to establish a conspiracy, the government only needs to prove that the defendant "participated with knowledge of at least some of the purposes or objectives of the conspiracy."  (See Jury Inst. at 26-27.)  For the reasons explained, and viewing the evidence in the light most favorable to the verdict, sufficient evidence established that McMahon possessed that requisite knowledge.

73

McMahon's similar assertion that he did not agree to the conspiracy because he did not know that bringing Xu Jin's elderly father to the United States was an intimidation and harassment tactic, "as opposed to an appeal to return to China to clear the family name" (McMahon Br. at 57-58), strains credulity. Drawing all reasonable inferences in favor of the verdict, a rational jury could easily have concluded that McMahon knew that forcing an elderly man to travel halfway around the world to "convince" Xu Jin to return to China "out of honor for the [family] name" was intended to harass and intimidate Xu Jin. (GX 701A at 3:55; GX 701B at 4-5.) And as enumerated above, other evidence reflected McMahon's awareness of the overall criminal goal of harassment and intimidation, including McMahon's own words. (See, e.g., GX 805B at 32 ("I think if we harass Xu. Park outside his home and let him know we are there.").) McMahon suggested further harassment to his confederates—rather than suggesting, for example, hiring a process server, lawyer, or debt collector as one would do if this were a simple commercial dispute—because he knew the purpose of his and his conspirators' actions was to harass the victims to the point that they left the United States to return to China.

### b.    McMahon's Challenges to His Substantive Conviction

McMahon's principal argument with respect to his substantive conviction largely hinges on a faulty legal premise: that the analysis of whether there is sufficient evidence that he engaged in interstate stalking should be limited to his own individual conduct, and not that of his co-conspirators or principals. Specifically, he claims that there is no evidence that his actions, as opposed to those of his principals or co-conspirators, put the victims in fear. (See McMahon Br. at 68-69.) Relatedly, he asserts that he cannot be convicted of interstate stalking because his surveillance was not "overt," and therefore none of the victims saw him. (McMahon Br. at 54-55, 66-67.) But these contentions are wrong as a matter of law. McMahon was charged under an aiding and abetting theory of liability. Accordingly, if McMahon knew about the interstate

stalking and harassment and took steps to help make that crime succeed, then he is guilty of aiding and abetting, regardless of whether he personally instilled fear in the victims.  See Huezo, 546 F.3d at 179; United States v. Reifler, 446 F.3d 65, 96 (2d Cir. 2006).[33]  Similarly, as described above, ample evidence established that McMahon took steps to aid and abet the PRC's stalking and harassment campaign, including by gathering sensitive personal information, conducting surveillance of the victims, preventing local law enforcement from interfering with the April 2017 operation and locating Xu Jin's address.  In other words, a rational jury could reasonably conclude from this evidence that McMahon helped the PRC officials' harassment and intimidation plan succeed through his overall course of conduct, even if he himself did not personally instill fear in the victims.[34]

McMahon articulates another flawed argument seeking to distance his own conduct from the stalking campaign, claiming that he did not aid and abet the conspiracy because he did not locate Xu Jin's address (McMahon Br. at 69).  As described above, McMahon did in fact locate Xu Jin's address during his April 2017 surveillance and provide that information to his co-conspirators, Zhu Feng and Hu Ji.  (GX 805B at 5; GX 2002; GX 3075.)  That the address may have been publicly available by searching for "J-Lifetime" is beside the point: linking J-Lifetime with a particular address is different from establishing that the victims themselves lived at the same

---

[33] As also explained at note 32, sufficient evidence could have alternatively supported McMahon's substantive interstate stalking conviction under a Pinkerton theory of liability.  If a jury concluded that he participated in a conspiracy with others (which it did) and co-conspirators committed the substantive crime of interstate stalking, then McMahon is likewise guilty of the substantive offense.

[34] This argument also ignores evidence introduced at trial.  As explained above, a rational jury could infer that McMahon's surveillance was, in fact, overt, because Liu Yan saw him on April 6, 2017.  (See Tr. 98:14-99:20 (testifying she saw a person who was not Chinese following her); GX 4010 at 7; GX 4010A (McMahon texting Zhu Feng a picture of Liu Yan the same day).)

address.  As the conduct of other Defendants and co-conspirators such as Zheng makes clear, the PRC government wanted proof that the victims themselves actually resided at the residence, not merely that it might be owned by some entity possibly related to them.  Indeed, it was only through such proof that the PRC government could continue to harass and stalk the victims.  A rational jury could reasonably conclude that it was McMahon's surveillance, and not some other online research, that unearthed this critical piece of information for the stalking and harassment campaign.  Moreover, finding Xu Jin's address was not the only work McMahon performed to aid and abet the effort.  He also unearthed sensitive information about the victims and their families, conducted surveillance, and impeded disruption by local law enforcement.

McMahon's assertion that the interstate stalking statute does not criminalize all surveillance activities or licensed private investigator work (McMahon Br. at 64) is a red herring.  The government has not argued that lawful private investigator work violates the statute.  But more to the point, McMahon's actions throughout the course of the conspiracy do not amount to lawful private investigator work.  As described above, evidence showed that McMahon's work on behalf of Hu Ji, Zhu Yong, Zhu Feng, Tu Lan and others ran far afield of ordinary private investigator services because it was designed to intimidate and harass the victims, particularly with respect to McMahon's assistance with the forced visit of Xu Jin's father from China in April 2017.[35]

Finally, McMahon's argument that the victims did not actually suffer substantial emotional distress (McMahon Br. at 63-64, 70-71) also misconstrues the law.  As the Court

---

[35] McMahon's related contention, that he did not knowingly harass or intimidate the victims because he believed he was conducting licensed private investigator work rather than assisting the PRC government (McMahon Br. at 61), ignores Rule 29 standards by failing to view the evidence in the light most favorable to the government.  As explained with respect to McMahon's Section 951 conviction above, there was more than sufficient evidence to prove the contrary: that McMahon understood he was acting on behalf of the PRC government to repatriate Xu Jin to China for criminal prosecution.

correctly instructed, and as McMahon himself acknowledges (McMahon Br. at 59), the government did not need to prove actual substantial emotional distress to sustain a conviction for interstate stalking.  It simply had to prove that McMahon had the "**intent to harass or intimidate or place under surveillance with the intent to harass or intimidate**" the victims and that McMahon intended that the scheme "caused, **attempted to cause**, or **reasonably expected to cause** substantial emotional distress" to the victims or their immediate family members.  (Jury Inst. at 37 (emphasis added).)  As detailed above, there is more than sufficient evidence of McMahon's intent to harass and intimidate.   And at minimum, McMahon's and his conspirators' actions were attempts to cause substantial emotional distress.  McMahon was aware that he was participating in an operation to coerce Xu Jin—through the forced visit of Xu Jin's father and other means—to "return to China."  (GX 701A at 3:55, 5:57.)  Betraying this knowledge, McMahon also laughed with Gallowitz about the victims' potential "abduction" as they discussed the April 2017 surveillance.  (GX 4019B at 53-56.)  McMahon even suggested overt surveillance to Zhu Feng to "harass" Xu Jin.  (See GX 4019B at 66-67; GX 805B at 32.)  A rational jury could reasonably infer from this evidence that McMahon had the intent to cause and attempted to cause substantial emotional distress to the victims so that Xu Jin would be coerced to return to China, even if the victims ultimately did not feel substantial emotional distress.   Regardless, the government introduced sufficient evidence that the victims did, in fact, suffer substantial emotional distress, as explained above.[36]

---

[36] The authorities upon which McMahon relies to argue that the victims did not suffer substantial emotional distress (McMahon Br. at 71) do not undermine this conclusion.  In United States v. Petrovic, for example, the court held that the victim's mental breakdown, depression, and estrangement from her family constituted sufficient proof of substantial emotional distress.  701 F.3d 849, 860 (8th Cir. 2012).  And in United States v. Ackell, the court concluded that the victim's consideration of suicide in response to defendant's conduct constituted sufficient proof that the victim suffered substantial emotional distress.  907 F.3d 67, 83 (1st Cir. 2018).  The symptoms of

## II.    The Verdicts Rendered Against Michael McMahon Were Not Inconsistent

Michael McMahon also moves for a judgment of acquittal based on the claim that acquitting him of Count One, conspiracy to act as an agent of a foreign government without prior notification is inconsistent with convicting him of Count Two, the substantive offense of acting as an illegal foreign government agent.[37]  This argument is meritless.

### A.    Michael McMahon Cannot Challenge His Conviction Based on Inconsistent Verdicts

McMahon cannot seek a judgment of acquittal on his substantive Section 951 conviction because of his acquittal on the related conspiracy charge.  A defendant is not permitted to challenge a conviction because it is purportedly inconsistent with the jury's verdict of acquittal on another count.  See United States v. Powell, 469 U.S. 57, 59 (1984) (affirming a rule first enunciated in Dunn v. United States, 284 U.S. 390 (1932) (Holmes, J.)); see also United States v. Chang An-Lo, 851 F.2d 547, 560 (2d Cir. 1988) ("Even assuming that some of the verdicts are inconsistent . . . there is no basis for reversal of the assertedly offensive guilty verdicts."); United States v. Serrano, No. 13-CR-58 (KBF), 2015 WL 81974, at *4 (S.D.N.Y. Jan. 6, 2015), aff'd, 640

---

distress suffered by the victims in these cases were very similar to those experienced by Liu Fang. (See Tr. 126:14-17.)

[37] McMahon refers to the incorrect law when he describes Count One as the "FARA conspiracy" and Count Two as "substantive FARA."  (See McMahon Br. at 59.)  McMahon was charged with a conspiracy to violate, and substantive violation, of Title 18, United States Code, Section 951, which makes it a crime to act in the United States for a foreign government without first providing notice to the Attorney General.  McMahon was not charged with a violation of the Foreign Agent Registration Act (also known as "FARA"), which provides for the regulation of agents of foreign principals (which can be a foreign government or other foreign entity like a foreign business), who engage in certain political, media-based or certain other regulated activities. See 22 U.S.C. § 611 et seq.  FARA is a different statutory regime with different requirements and different criminal (and civil) enforcement provisions.  Id.

F. App'x 94 (2d Cir. 2016) ("Second Circuit law clearly precludes sufficiency challenges based on inconsistent verdicts.") (cleaned up).

This is so for a variety of reasons.  The reasoning behind an inconsistent verdict is inherently speculative.  "Where truly inconsistent verdicts have been reached, the most that can be said is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt."  Powell, 469 U.S. at 64-65 (cleaned up).  And, because the jury's reasoning is not known, it also remains uncertain whether the government or defendant was harmed by an inconsistent verdict:  it is "equally possible" that a jury was convinced of a defendant's guilt of both counts, but "through mistake, compromise, or lenity" rendered differing verdicts.  Id. (noting, given the uncertainty of which party was affected, that it is "hardly satisfactory" to permit a defendant to challenge the conviction while the government is precluded from challenging the acquittal).  Accordingly, the Supreme Court has held that the jury has "the unreviewable power . . . to return a verdict of not guilty for impermissible reasons."  Id. at 63; see also United States v. Acosta, 17 F.3d 538, 545 (2d Cir. 1994) (explaining that, given this uncertainty, a trial court "is not to try to guess which of the inconsistent verdicts is the one the jury 'really meant.'").

McMahon does not attempt to distinguish this controlling precedent, and the few cases that are cited in McMahon's brief only support the government's position.  McMahon relies upon United States v. Zane, (McMahon Br. at 60), but the court in that case declined to overturn a supposedly inconsistent verdict.  See 495 F.2d 683, 692. (2d Cir. 1974).  Consistent with the Supreme Court's precedent, the court in Zane explained that "even plainly inconsistent jury verdicts, simultaneously rendered are the jury's prerogative."  Id. at 690.  The decision speaks directly to the circumstances surrounding a conspiracy acquittal, explaining that there was even

more reason in such cases for the "strong policy against probing [the jury's] logic or reasoning" given the complexity of conspiracy law. See id. (identifying "the further possibility that the jurors, because of the inherently prolix nature of instructions as to the law of conspiracy, which have become increasingly complicated and intricate over the years, may have misapprehended some aspect of that crime").

The portion of Zane that McMahon quotes in his brief (McMahon Br. at 60), regarding the possibility of an acquittal barring conviction on a substantive count, is taken out of context. The Second Circuit was reviewing the principles of res judicata that may apply "when there are separate prosecutions for the two offenses." Zane, 495 F.2d at 691 (emphasis added). But as Zane and countless other decisions have explained, these principles do not apply when the two verdicts arise out of the same trial. See id. at 690 ("It is equally clear that the principle of res judicata recognized in Sealfon v. United States in the setting of separate prosecutions has no application to the inconsistent verdicts on counts tried together under a single indictment."); United States v. Romano, 879 F.2d 1056, 1060 (2d Cir. 1989) ("Res judicata concepts are not applicable to inconsistent verdicts; the jury is free to exercise its historic power of lenity if it believes that a conviction on one count would provide sufficient punishment."). The other case cited by McMahon, United States v. Rigas, is wholly distinguishable, as it involved a challenge to a prosecution in a second trial after the defendant was acquitted of a conspiracy count in an earlier trial. See No. S102-CR-1236, 2004 WL 2434965, at *1 (S.D.N.Y. Nov. 1, 2004). Even there, the Court denied the Rule 29 motion because "it is impossible to determine" the reasoning behind his conspiracy acquittal. Id. at *2.

B.    The Verdicts Against Michael McMahon Are Not Inconsistent

Even if McMahon were permitted to bring this challenge, the argument fails because the two verdicts are not inconsistent. An acquittal on a conspiracy charge is not

necessarily inconsistent with a conviction on a related substantive crime.  See United States v. Davis, 159 F.3d 1348 (2d Cir. 1998) ("the elements of the two crimes are different, and the jury could have found that the Government proved the elements of one crime, but failed to prove the elements of the other") (citing United States v. Giuliano, 348 F.2d 217, 220-21 (2d Cir. 1965)); see also  United States v. Person, No. 15-CR-466 (ILG), 2017 WL 2455072, at *5 (E.D.N.Y. June 6, 2017), aff'd, 745 F. App'x 380 (2d Cir. 2018) ("It is hornbook law that the commission of the substantive offense and the conspiracy to commit it are two separate and distinct crimes.").  Here, the jury could have concluded that the government failed to prove that McMahon "entered an unlawful agreement with two or more persons," an essential element of conspiracy that is not a required element of the substantive Section 951 offense.  (See Jury Inst. at 20, 33.)

McMahon claims it is "logically impossible" to commit a substantive violation of Section 951 and be acquitted of a conspiracy to commit Section 951.  (McMahon Br. at 59, 63.)  But Section 951 does not require proof of an agreement with any particular person, let alone a "particular unlawful agreement" to "accomplish the object of the charged conspiracy" (Jury Inst. at 20), as is required to be convicted of a conspiracy.  Under Section 951, a person is an "agent of a foreign government: if they "operate within the United States subject to the direction or control of a foreign government **or** official."  18 U.S.C. § 951(d) (emphasis added).[38]  Thus, the statute explicitly contemplates finding a person guilty if it can be proven that they worked for a foreign government, even if there is inadequate proof that they worked at the direction of a particular foreign official.  Given this distinction, and the more general principles of conspiracy law, the jury

---

[38] McMahon concedes this, noting that the Court correctly instructed the jury that it could find the defendants guilty of violating Section 951 if they acted as agents of "the Government **or** an official of China."  (See McMahon Br. at 60-61 (emphasis added).)

could have concluded that McMahon did not join a conspiracy with any of the Defendants or specifically alleged co-conspirators, but still knowingly acted at the PRC government's direction.

McMahon argues that there must be some inconsistency because he does not dispute the "fundamental facts of the case" and thus the only element at issue for both counts was McMahon's knowledge. (McMahon Br. at 61-62.) As an initial matter, McMahon disputes many critical facts and inferences. (See, e.g., Tr. 41:1-45:15; McMahon Br. at 15.) More importantly, McMahon strongly disputed, and continues to dispute, the meaning of these facts—not just with respect to McMahon's knowledge, but the separate element of whether he entered an unlawful agreement. (See, e.g., Tr. 1717:10-14 (requesting a charge on multiple conspiracies); Tr. 2005:14-2008:16 (arguing in summation that McMahon did not conspire with the other Defendants).)

Even if knowledge were the only element at issue, as McMahon now claims, that would still not mean the two verdicts are inconsistent. The knowledge elements for the two crimes are different: Count One required proof that McMahon knowingly became a member of the charged conspiracy," while Count Two required proof that McMahon knowingly acted as an agent of a foreign government. (See Jury Inst. at 21, 33.) As discussed above, a jury could have concluded that McMahon knowingly acted for a foreign government but did not knowingly join an unlawful agreement with any of the persons alleged to be co-conspirators. The distinction between the two knowledge elements was heightened here, given the "multiple conspiracy" instruction that directed the jurors to focus on whether the Trial Defendants knowingly participated in the same charged conspiracy. Accordingly, the different verdicts are not only a lawful outcome as a general matter, they are particularly reasonable where the conspiracy alleged by the government was complex and the existence of an unlawful agreement was fiercely contested by the defendants.

Here, too, the cases cited by McMahon do not support his argument.  In <u>Zane</u>, the Court described the alleged inconsistency as "more apparent than real," explaining that a conspiracy acquittal only reflected a finding that "the government had failed to prove the specific conspiracy alleged in Count One."  <u>See</u> 495 F.2d at 691 ("the jury was permitted to reject any version of the conspiracy and still find that the appellants as individuals had committed the substantive offense").  In <u>Rigas</u>, the Court rejected the defendant's attempt to preclude a second trial in part based on reasoning that may have occurred here: "the jury may have acquitted [the defendant] of the conspiracy charge because it concluded that although he possessed the requisite intent to commit [the substantive offense], the government failed to prove he knowingly and willfully joined an agreement to commit securities fraud" and that the defendant "simply engaged in 'similar or parallel conduct' to that of his alleged co-conspirators."  2004 WL 2434965 at *2.

There are many reasons why the jurors may have acquitted Michael McMahon of one count that are both factually and legally consistent with a conviction on a related count.  This is why courts have repeatedly recognized "the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation."  <u>Zane</u>, 495 F.2d at 690.  And it is why the defendant's inconsistent verdict claim should be rejected.[39]

---

[39] McMahon argues, in a footnote, that the allegedly inconsistent verdicts also warrant a new trial pursuant to Rule 33.  As McMahon concedes, the law is clear that even if there were an inconsistent verdict (and there was not), that is an insufficient basis to grant a new trial.  (McMahon Br. at 64 (citing <u>United States v. Mack</u>, No. S11 18 CR. 834 (PAE), 2020 WL 114509, at *5 (S.D.N.Y. Jan. 10, 2020)).  McMahon identifies no case in which a defendant was granted a new trial due to an inconsistent verdict and fails to identify any facts related to the nature of the verdict itself in this case, apart from its purported inconsistency, that would distinguish it from <u>Mack</u> and merit the "extraordinary" and "disfavored" remedy of a new trial.

III.    The Government's Publication of Documentary Evidence Was Proper

McMahon's claim that he is entitled to a new trial under Rule 33 because of the government's use of publication witnesses is without merit.  As a preliminary matter, McMahon raised no objection to the government's publication witnesses at trial.  Accordingly, the objection was waived and it should be denied on this basis alone.  See Quinones, 511 F.3d at 321.  If not waived, then, the plain error standard applies.  Here, McMahon cannot show any error, let alone one that was plain and affected his substantial rights.

Publishing admitted written evidence by reading it aloud verbatim is both permissible (as McMahon himself acknowledges (McMahon Br. at 81)) and a commonly employed process.  Courts that have considered the issue have repeatedly upheld this method of publication.  In United States v. Tragas, 727 F.3d 610 (6th Cir. 2013), for example, the Sixth Circuit rejected a similar argument concerning transcripts of online chat conversations that were published in the same manner as the texts and emails that were published here.  Id. at 614-615.  Like McMahon, the defendant claimed there that "by merely reading the transcripts aloud, the prosecutor and [case agent] essentially play acted the chat conversations, with the prosecutor 'performing' the role of Defendant, and [case agent] playing various co-conspirators."  Id. at 614.  The defendant also argued, like McMahon, that in using this method of publication, the "prosecutor interpreted and characterized the otherwise properly admitted documentary evidence and portrayed Defendant's written communications in a way that telegraphed to the jury that she was guilty."  Id.

The Tragas court rejected those arguments, observing that there was "nothing inherently problematic about reading such evidence to the jury," and reasoning: "[a]s long as the evidence itself is properly admitted pursuant to the Rules of Evidence and does not run afoul of other safeguards like the Confrontation Clause, we do not see how a defendant could be prejudiced

84

if the evidence is read aloud to the jury." Id.; see also United States v. Denton, 944 F.3d 170, 185 (4th Cir. 2019) ("[W]e are unaware of any prohibition against a witness reading aloud from properly admitted evidence."); United States v. Allums, No. 15-CR-153 (VSB), 2018 WL 2128372, at *6 (S.D.N.Y. May 9, 2018) (rejecting argument that defendant was entitled to a new trial because transcript was read into the record with a prosecutor reading the questions and a paralegal reading the answers); cf. Bank of Nova Scotia v. United States, 487 U.S. 250, 262-63 (1988) (concluding that two IRS agents' tandem reading of transcripts in grand jury was "not prejudicial" because "[t]here is no evidence that the agents' reading in tandem enhanced the credibility of the testimony or otherwise allowed the agents to exercise undue influence"); United States v. Baker, 923 F.3d 390, 398 (5th Cir. 2019) (agent's testimony "consist[ing] of reading the contents of exhibits and sorting through the evidence to show how the documents related to each other and to the charges in the indictment" was permissible).

The same result is appropriate here.  Like the defendant in Tragas, McMahon claims that the government went "too far" and departed from traditional trial practice in choosing to publish written evidence in this manner.  (McMahon Br. at 81.)  But McMahon "does not contend that the chat conversations were inadmissible" or identify anything in the record "that would suggest that the prosecutor or [publishing witness] did anything other than read the transcripts aloud."  Id.  McMahon therefore fails to show any error, let alone prejudicial error.  See Allums, 2018 WL 2128372, at *6 ("[The defendant] offers no factual or legal support for his claiming that reading the transcript . . . . to the jury, rather than making it available for the jury to read silently,

caused him any prejudice, let alone unfair prejudice.  Accordingly . . . . there is no ground for a new trial under Rule 33.").[40]

McMahon's related suggestion that the prosecutor improperly "breath[ed] life" into written evidence to make it more persuasive than it would be without a witness (McMahon Br. at 85) also misses the mark.  There is no prejudice in the government choosing to publish portions of evidence—already admitted into the record and made available to the jury—by reading it aloud verbatim.  Cf. Tragas, 727 F.3d at 615 ("This seems to be a different theory to support Defendant's primary argument that, merely by uttering the words from a document aloud, a prosecutor imbues the evidence with some sort of magical power.  However, Defendant fails to identify any comments or statements that could be construed as bolstering or vouching for the evidence, and we find no support for the proposition that admissible documentary evidence somehow becomes more credible if the prosecutor reads it aloud.").[41]

Perhaps aware that there is nothing inherently problematic about reading aloud admitted evidence, McMahon attempts to re-cast the government's use of publication witnesses as

---

[40] McMahon's passing suggestion that reading aloud written evidence violates the "best evidence" rule (McMahon Br. at 85) misconstrues the law.  Federal Rule of Evidence 1002 requires the "original writing . . . in order to prove its content," but does not dictate the specific method of publication once that evidence has already been admitted.  See 1 McCormick on Evid. § 51 (8th ed.) ("When the proponent requests permission to read an exhibit to the jury, the opponent sometimes objects that 'the document itself is the best evidence.' . . . That objection is spurious. . . . The best evidence rule generally required that the proponent produce the original in the courtroom.  However, once the proponent does so, the best evidence rule has spent its force.").

[41] McMahon similarly claims that, in publishing written evidence by reading it aloud, the government was able to "choose what words to place emphasis on" and modify his or her expressions and body mannerisms (McMahon Br. at 82), but fails to point to any examples.  Nor did McMahon object to any supposed verbal emphases or body mannerisms at trial, because none occurred.

improper demonstrative reenactments (McMahon Br. at 82-83.)  The court in <u>Tragas</u> rejected a similar maneuver, observing:

> [T]he prosecutor's conduct in this case cannot possibly be described as a re-enactment.  Although Defendant points to some minor discrepancies between the reading and the written text, none of these discrepancies are material, and the jury had copies of the written transcripts with which to follow along.  Nothing in the record indicates that the prosecutor or [case agent] "performed" a scene in any meaningful sense.  Rather, they merely read aloud from documents that Defendant concedes were properly admitted into evidence.

727 F.3d at 614.  The same reasoning applies here.  In this case, McMahon fails to point to any discrepancies, let alone material ones, between the text read aloud and the admitted evidence.  Nor was there any "perform[ance] . . . in any meaningful sense" by the prosecutor or witness simply reading aloud written evidence.  <u>See id.</u>; <u>see also</u> <u>United States v. Ayala-Vieyra</u>, No. 21-1177, 2022 WL 190756, at *6 (6th Cir. Jan. 21, 2022) ("allowing government personnel to read the stipulated-to transcripts to the jury" is not problematic, though a "staged performance or reenactment" of evidence might be).

McMahon's next tack, claiming error because he could not cross-examine the prosecutors or publication witnesses about co-conspirators' statements (McMahon Br. at 70), also falls flat.  As McMahon acknowledges elsewhere in his brief, the statements by McMahon and the co-conspirators that were read aloud were already admitted into evidence, in many cases by stipulation.  (McMahon Br. at 84.)  McMahon identifies no authority to support the dubious proposition that properly admitted party admissions or co-conspirator statements should be subject to cross-examination when read aloud during trial, but not when they are simply read by the jury silently or by the prosecutor in summation.[42]  <u>See</u> <u>Tragas</u>, 727 F.3d at 615 (defendant's complaint

---

[42] The authorities McMahon cites are inapposite.  None involved reading aloud properly admitted written statements during trial.  In <u>United States v. Bowen</u>, 969 F. Supp. 2d 546, 623

that she could not cross-examine the prosecutor reading aloud chat message transcripts did not present a Confrontation Clause problem because the evidence read aloud was properly admitted); cf. United States v. Orekyeh, 812 F.2d 1402 (4th Cir. 1987) (evidentiary rules do not require that a witness reading aloud properly admitted evidence have personal knowledge of the content).

Finally, McMahon's contention that the Court acknowledged the "inappropriate nature" of the government's use of publication witnesses (McMahon Br. at 81 n.24, 84-85) misconstrues the record. The Court's concern with the use of publication witnesses was that it might be unnecessary and unduly time consuming in light of an unexpected weather event that caused early dismissal of court proceedings. The Court suggested that the government instead read the admitted evidence to the jury in summation, but noted that it was "not going to tell the Government how to put on its case." At no point did it state or suggest that government's use of publication witnesses was improper under the Rules of Evidence or prejudicial to any of the Defendants. (See Tr. 1173:16-1174:19-16; 1175:12-1176:1.) As the Court properly concluded, absent conduct that violates evidentiary rules or other relevant law, the government is entitled to present its case in the manner it believes is most appropriate, given that it has the burden of proof. See, e.g., Old Chief v. United States, 519 U.S. 172, 183-88 (1997) (explaining that a "criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it," based in part on the government's need "for evidentiary richness and narrative integrity in presenting a case"). Particularly where, as here, the evidence

---

(E.D. La. 2013), the government read aloud witness grand jury testimony from transcripts instead of calling the witnesses to testify live at trial. United States v. Tines, 70 F.3d 891, 897 (6th Cir. 1995) and United States v. Kennedy, 46 F. App'x 200, 200-201 (4th Cir. 2002) both concerned the standards governing read backs of witness trial testimony to the jury during deliberations.

involved voluminous written records, the government's decision to read select portions to the jury shortly after admission, rather than as part of an hours-long summation, is entirely proper.

IV.   The Government's Rebuttal Argument Was Appropriate

McMahon seeks a new trial under Rule 33 based on the claim that the government's rebuttal was improper.  He argues that the government improperly raised arguments "never before advanced" and "other arguments which were false," and did so at a time when the defendant "could not respond to them."  (McMahon Br. at 73.)  The Court should reject this argument.

A.   Michael McMahon's Failure to Object During Rebuttal Waives the Argument

The Court need not address the merits of McMahon's claims because, as McMahon concedes, he "neither objected nor sought relief" from any part of the government's rebuttal.  (See McMahon Br. at 76.)  McMahon appears to concede that his decision not to object, or seek some alternative relief, was tactical, stating that it was "understandable under the circumstances." (McMahon Br. at 76.)  Thus, his failure to object to the rebuttal constitutes "true waiver."  See Quinones, 511 F.3d at 321; see also United States v. Frazier, No. S6 15-CR-153 (VSB), 2019 WL 761912, at *13 (S.D.N.Y. Feb. 21, 2019) (failure to object to characterization in rebuttal meant that the "challenge was arguably not preserved."); United States v. Blaszczak, No. S1 17-CR-357 (LAK), 2018 WL 2387353, at *2 (S.D.N.Y. Apr. 30, 2018) ("failure to object to the government's rebuttal argument at the time it was made waived the objection").  Accordingly, because this argument was not preserved, the Court should decline to consider this as a proper basis for a Rule 33 motion.  See Chartier, 2021 WL 3795352, at *42 (finding that defendant "arguably waived this argument because he did not object . . . after the Government rested or at any point in summations" and this "constitutes a waiver of those objections") (internal citation omitted).  In the alternative, the Court should apply the "plain error" standard to any analysis of alleged errors in the government's rebuttal.  See Kenner, 272 F. Supp. 3d at 414-15.

B.    The Government Raised No New Arguments in Rebuttal

McMahon's claims that the Government raised two "new" arguments on rebuttal: that McMahon consciously avoided the fact that he worked for the PRC and that he "used his calls to law enforcement…to actually conceal his purportedly unlawful surveillance activities." (McMahon Br. at 76.)  Both contentions are contrary to the trial record and should be rejected.

1.    The Government Pursued a Conscious Avoidance Theory Throughout Trial

The issue of whether McMahon deliberately closed his eyes to obvious conduct, and therefore could be found to have knowledge of the unlawful conduct, was a central dispute that the government explicitly raised throughout trial, and which McMahon vigorously contested. A month before trial, the government requested a "conscious avoidance" instruction applicable to all Trial Defendants, which was included in the Court's instructions prior to closing arguments. (See ECF No. 193 at 22 (Gov't Proposed Instructions); ECF No. 256 (Court's Final Instructions).)[43]  At the beginning of trial, the government introduced the concept of conscious avoidance, conceding in its opening statement that McMahon was initially told a false story by other participants about the purpose of the scheme, and expressly arguing that McMahon "looked the other way as the story . . . kept changing."  (Tr. 29:20-30:10.)  The government then pursued that theory throughout trial, introducing the evidence of red flags discussed above.  See United States v. Miller, No. 17-CR-415 (MKB), 2019 WL 2232124, at *8-9 (E.D.N.Y. May 23, 2019) (concluding that government "did not shift its theory of criminal liability during summations" because "the government's theory of criminal liability was consistent throughout the trial"); United

---

[43] McMahon objected to the government's request that contained the conscious avoidance instruction at the time it was made (without specifying the basis for his objection), which demonstrates his awareness that this would be an issue at trial.  (See ECF No. 194.)  McMahon did not renew and expand upon this objection at the Charging Conference when the conscious avoidance instruction was considered for inclusion by the Court.  (See Tr. 1880:20-1883:4.)

<u>States v. Faisal</u>, 282 F. App'x 849, 851 (2d Cir. 2008) (concluding argument about inadequate alibi witness evidence was not new because the witness's presence was "central to the case").

The government returned to conscious avoidance during its summation.  While the government focused much of its attention on arguing that McMahon in fact knew that he was acting on behalf of the PRC government, it again argued that the information he received should have been a "red flag to anybody and certainly to a private investigator with McMahon's lengthy law enforcement history."  (Tr. 1975:7-9.)  And much of the government's summation was geared towards highlighting particular facts—the suspicious and evolving nature of the supposed client (Tr. 1974:22-1975:6), the research that revealed the victims were PRC government targets (Tr. 1975:14-1976:5), the unusual type of information about the victims that was provided to and requested from McMahon (Tr. 1976:9-13)—that McMahon knew but disregarded.  A discussion of "red flags" and strange facts that were known but ignored is a paradigmatic example of a "conscious avoidance" argument, whether or not the words "conscious avoidance" were specifically uttered.[44]  A rebuttal argument is not new when it has been referenced, even briefly, in the government's opening summation.  <u>See</u> <u>United States v. Coplan</u>, 703 F.3d 46, 86 (2d Cir. 2012) (rejecting claim that rebuttal included "surprise" argument because the argument "was briefly discussed in the Government's opening summation" and finding no error to expand upon an argument in rebuttal that was previously "noted—although not emphasized").  The government's arguments in its opening statement and summation, coupled with the fact that McMahon knew of the conscious avoidance jury instruction, left the defendant with little doubt as

---

[44] As McMahon notes, the government did expressly reference "conscious avoidance" when discussing defendant Zheng Congying.  (McMahon Br. at 77.)  The government did not state that this basis for proving knowledge was limited to Zheng, only that it was "particularly relevant" to that defendant.

to the "arguments actually made by the prosecution…before the defendant is faced with the decision whether to reply and what to reply." See Adv. Comm. Note to Fed. R. Crim. P. 29.1.

McMahon's own summation demonstrates that he knew the government was pursuing a conscious avoidance theory. Counsel for McMahon expressly and repeatedly acknowledged the government's conscious avoidance theory, stating "the Government insinuates that [McMahon] **should have known** that he was working for the Chinese government . . . ." (Tr. 2020:12-13 (emphasis added)) and later saying "the Government's argument is that just looking at this, Mr. McMahon **should have known that he was involved** in some criminal case (Tr. 2022:16-19 (emphasis added).) Counsel replied directly to the factual predicates of the conscious avoidance argument advanced by the government, responding to the issue of the "shifting clients" (Tr. 1993:4-13), disputing that McMahon "asked no questions" (Tr. 2000:22-23), noting that the government believed the China Daily article was "a critical piece of evidence" because "it should have caused him to know that he was working for China" (Tr. 2020:6-7); and rejecting the claim that the method of PRC payments to him reflected guilty knowledge (Tr. 2027:22-24.)

In any event, the rebuttal's discussion of conscious avoidance was independently proper because it responded directly to these points made by McMahon on summation. See United States v. Moncada, 101 F.3d 681 at *3 (2d Cir. 1996) (summary order) (explaining that an allegedly "new line of argument" is not clearly improper "since defense counsel's summation had invited the government to explain" the issue); United States v. Rubinson, 543 F.2d 951, 966 (2d Cir. 1976) (explaining that "the prosecution in rebuttal may explain why it has not proven certain facts or respond to the interpretation which the defense has placed on its failure to present evidence"); United States v. Rivera, 971 F.2d 876, 885 (2d Cir. 1992) (holding that rebuttal was proper because

"[a]lthough . . . the prosecution somewhat misconceived the defense argument to which the rebuttal summation responded, the summation was nonetheless essentially responsive").

> 2.  The Explanation for McMahon's Calls to Law Enforcement Were Developed During Trial

McMahon also claims that he was first put on notice of the government's inculpatory explanation for McMahon's outreach to local law enforcement during rebuttal (McMahon Br. at 78.)  Again, this is not accurate.  The government unambiguously developed this argument through witness testimony and documentary evidence.  Eric Gallowitz testified on cross-examination by the government that Gallowitz texted McMahon during surveillance to confirm that McMahon would not tell local police "why we are there," and also admitted that calling the local police made it less likely that they would show up and inquire about Gallowitz and McMahon's conduct.  (Tr. 1831:9:12; GX EG-3.)

Even if this argument had not been highlighted by the government through testimony and documentary evidence, the government was entitled to raise it because it was a direct response to arguments made in McMahon's summation.  McMahon's counsel expounded at length on the supposedly exculpatory nature of McMahon's calls to local police, arguing that McMahon "reported this matter…to local police" (Tr. 2017:17-18) and suggesting that the conduct was exculpatory through rhetorical questions (e.g., Tr. 2014:21-22; Tr. 2015:16-17).  Where, as here, the defendant explicitly challenges an evidentiary issue, the government is permitted to respond on rebuttal.  See Moncada, 101 F.3d at *3; Rubinson, 543 F.2d at 966; Rivera, 971 F.2d at 885.

> C.  The Government Did Not Make Any False Representations on Rebuttal

McMahon also claims the government made "false or unsupported" statements during its rebuttal.  (McMahon Br. at 80-85.)  The defendant again misconstrues the record.

McMahon asserts that "there was absolutely no evidence presented at trial that Mr. McMahon was the individual who followed Liu Yan to the Livingston Mall." (McMahon Br. at 82.) Yet, as discussed above, the government presented evidence establishing that (1) Liu Yan drove her elderly father to the Livingston Mall the morning of April 6, 2017; (2) Yan observed a non-Chinese person following her when she drove her elderly relative to meet with Xu Jin; (3) McMahon was conducting surveillance that morning for Zhu Feng as part of the operation involving the elderly father; and (4) McMahon sent surveillance photographs of Liu Yan to Zhu Feng the same morning as when Yan drove to the mall with the elderly relative. (Tr. 99:2-20; GX 4010 at 852; GX 4010-A; Tr. 108-109.) A fair inference that the government drew from these facts was that the person Liu Yan saw was Michael McMahon.[45]

McMahon next argues that the government's statement that the China Daily article "said 'Operation Skynet is an operation to get people back to China'" is false. (McMahon Br. at 84.) But, as McMahon himself concedes, the article describes "Operation Sky Net" as a "global dragnet" for "Chinese fugitives" that was being carried out by "Interpol China." (GX 434.) Characterizing the article about a fugitive dragnet as an operation to get people back to China is neither "false" nor a "misrepresentation" of any sort. McMahon's description of the article as something that "describes a lawful process of proceeding" may be an alternative reading of the document, but it was one the jury was free to reject.

---

[45] McMahon claims that, if given further opportunity to respond, he would have argued that the photos were from a separate incident when Liu Yan "came or went from her gym." (McMahon Br. at 83 (citing GX 3034).) The report McMahon relies upon for this argument is from six months earlier, in October 2016, while the picture of Liu Yan was circulated by McMahon to Zhu Feng on April 6, 2017, the same date that Yan brought her father to the mall and McMahon was conducting surveillance for Zhu. (See GX 4010 at 852.)

Finally, McMahon's claim that the government "falsely argued" that "McMahon changed how he received payments…once he saw the China Daily article" is also incorrect.  As discussed above, and as McMahon himself concedes, the defendant only accepted payment through his business bank account on one occasion, in October 2016 before he saw the China Daily article.  (GX 403B; GX 403E; GX 404B.)   The remaining payments, which were made in December 2016 and April 2017, went to a joint personal account, his son's bank account, or were never put into a bank account and apparently held in cash.  (GX 403A; GX 403K; GX 403L; GX 3072-GX 3073; GX 805B at 16-17; GX 403F-I.)  A fair inference is that, after McMahon learned about the Chinese government's involvement from his own research, and as the story about his client changed, McMahon changed the way he collected and kept his payments because he knew that he was involved in illegal activity.

In each of these instances, the government made fair and reasonable inferences about the meaning of a collection of facts, which it was entitled to do.  See United States v. Roldan-Zapata, 916 F.2d 795, 807 (2d Cir. 1990) (holding that "[i]n summation, counsel are free to make arguments which may be reasonably inferred from the evidence presented").  When stripped of the rhetoric about "false" and "fabricated" information, McMahon's argument amounts to a claim that the jury should have drawn a different inference based on the facts in the record.  That is not a valid basis to seek a motion for a new trial.

D.    There Was No Substantial Prejudice

McMahon's motion must also be denied because he cannot show "substantial prejudice," particularly as it must be considered under the "plain error" standard of review.  New trial motions predicated on prosecutorial misconduct are reserved only for extreme cases in which the misconduct caused the defendant "'substantial prejudice' by 'so infecting the trial with unfairness as to make the resulting conviction a denial of due process.'"  See United States v.

95

Shareef, 190 F.3d 71, 78 (2d Cir. 1999) (internal citations omitted).  The Second Circuit has repeatedly held that a conviction "is not to be lightly overturned on the basis of a prosecutor's comments standing alone in an otherwise fair proceeding."  Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir. 1991) (quoting United States v. Young, 470 U.S. 1, 11 (1985)).  For that reason, a defendant seeking a new trial on this basis "faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial."  Coplan, 703 F.3d at 86 (citation and internal quotation marks omitted). When a remark is found to be improper in summation, it still "must cause substantial prejudice to result in a new trial."  United States v. Banki, 685 F.3d 99, 120 (2d Cir. 2011).

When evaluating claims related to an improper summation, the court must evaluate substantial prejudice "in the context of the entire trial."  United States v. Thomas, 377 F.3d 232, 244 (2d Cir. 2004) (internal quotation marks omitted); see also United States v. Espinal, 981 F.2d 664, 666 (2d Cir. 1992).  In determining whether the defendant has suffered substantial prejudice, the court must consider: (1) the severity of the misconduct; (2) measures taken to cure the misconduct; and (3) the certainty of conviction absent the misconduct.  United States v. Banki, 733 F. Supp. 2d 404, 411 (E.D.N.Y. 2010) (citing United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002)).  It is a "rare case" in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required.  United States v. Rodriguez, 968 F.2d 130, 142 (2d Cir. 1992) (citation omitted).

Each of the factors described above cut against a finding of substantial prejudice. First, any purported misconduct was not severe.  The claimed errors largely relate to discrete factual issues, such as two phone calls to local police and the timing and placement of payments to McMahon.  While these facts were relevant and tended to help prove McMahon's guilt, they

96

were relatively small parts of a much larger case, involving substantially more conduct over the course of nearly a year, that was presented through numerous witnesses and hundreds of exhibits.

Second, while the defendant did not object and give the court an opportunity to directly cure any purported misconduct, the Court repeatedly instructed the jury, before and during closing statements, that statements made on summation were merely argument.  (See, e.g., Tr. 1966:4-8, 1967:6-7.)  Such instructions were sufficient to remedy any potential prejudice that may have arisen.  See, e.g., Faisal, 282 F. App'x at 851 (finding no prejudice in part because instruction that "the parties' summations were not evidence"); United States v. Tocco, 135 F.3d 116, 130 (2d Cir. 1998) (finding no prejudice in part because the jury was "told repeatedly that it should only consider the evidence presented at the trial").

Third, as the summary of the trial evidence above demonstrates, there is little doubt that McMahon would still be convicted even absent these specific remarks.  The jury convicted McMahon of three out of four charges.  They did so based on other admissible evidence, such as McMahon's post-arrest admissions about the goal of the scheme, and his own inculpatory communications with others where he discussed "harassing" the victims and helping to get the victims "back to China."  McMahon has failed to meet the high burden of showing substantial prejudice, and his claim should be denied.

V.    Exhibit 704A Was Properly Admitted at Trial Pursuant to Rule 801(d)(2)(E)

In his brief, McMahon argues that he is entitled to a new trial because certain evidence was improperly admitted pursuant to Federal Rule of Evidence 801(d)(2).  (See McMahon Br. at 86-93.)  Specifically, he contends that Exhibit 704A, the audio recording of a conversation between Zhu Feng, Tu Lan, and Hongru Jin on April 3, 2017, should not have been admitted because the government did not establish by a preponderance of the evidence that

McMahon was a member of a conspiracy to act as an agent of the PRC government or to commit interstate stalking. (See id. at 87-93.) This argument should be rejected.

A.    Michael McMahon Waived Any Objection to Exhibit 704A or Is Subject to Plain Error Review

As a threshold matter, McMahon never objected to this exhibit before or during trial. In its motions in limine, the government specifically identified the recording in Exhibit 704A as evidence that it anticipated admitting at trial pursuant to Rule 801(d)(2)(E). (See Gov't Mot. in Limine at 24-25.) In his response to the government's motion, McMahon did not challenge the admissibility of the recording, stating only he did "not object, as a general matter, to the admissibility of co-conspirator statements that satisfy the requisites of Federal Rule of Evidence 801(d)(2)(E)," and noting that he had not yet received the government's pre-marked exhibits and accordingly reserved his right to object to such statements. (See McMahon Opp. to Gov't Mot. in Limine at 8-9.) McMahon, however, never objected to the admission of Exhibit 704A.

At the pretrial conference, in response to an objection raised by Trial Defendant Zheng in his opposition to the government's motions in limine, based on an argument that there were multiple conspiracies rather than a single conspiracy, the Court found the government had met its evidentiary obligation to make a showing of the existence of a conspiracy. See Pretrial Conf. (May 30, 2023) Tr. 51:16-52:3, 53:1-6. In the course of this exchange, McMahon sought clarification regarding the treatment of the type of conspiracy, but never objected to the admission of any statements pursuant to Rule 801(d)(2)(E). At trial, when Exhibit 704A was introduced, McMahon objected on authenticity grounds, but once again did not object to introduction of the exhibit pursuant to Rule 801(d)(2)(E). Accordingly, McMahon's objection is not preserved and is either waived or otherwise must be analyzed under the plain error standard. Analyzed under such a standard, McMahon's argument fails.

98

B.     Exhibits 704A Was Properly Admitted as Co-conspirator Statements

The Court correctly found by a preponderance of the evidence that Exhibit 704A was admissible pursuant to Rule 801(d)(2)(E).  Notably, in evaluating the admissibility of Exhibit 704A, the Court was permitted to consider whether a conspiracy existed between McMahon and the declarant with respect to both the Section 951 Conspiracy and the interstate stalking conspiracy (the "Interstate Stalking Conspiracy"), as Exhibit 704A related to both conspiracies.  As described above, there was significant evidence from which a reasonable jury could have inferred that McMahon conspired to commit interstate stalking, and that Zhu Feng, Tu Lan, and Hongru Jin were co-conspirators.  See Parts II.C. (Factual Background), I.B (McMahon).  In light of that evidence, there was more than sufficient evidence for the Court to make such a finding by a preponderance of evidence.  That alone was a sufficient basis for the Court to admit Exhibit 704A.

Even assuming no interstate stalking conspiracy conviction, McMahon's challenges still fails.  It is of no moment that McMahon was acquitted of the Section 951 Conspiracy (see McMahon Br. at 88-89): the Court was required to find that McMahon participated in a conspiracy with the declarant only by a preponderance of the evidence—a lower standard than required for conviction.  The Second Circuit has long held that "[t]he fact that the defendants were acquitted on the conspiracy count does not destroy the admissibility of [hearsay statements] of co-conspirators on the substantive charge."  United States v. Clark, 613 F.2d 391, 403 (2d Cir. 1979).  As Judge Friendly explained, "A judge may thus consistently find that the evidence (even including admissible hearsay declarations) did not meet the higher test (guilt beyond a reasonable doubt) required for submission of a conspiracy count to a jury, although the independent evidence did meet the lower (preponderance) test required for admission of the declaration."  United States v. Stanchich, 550 F.2d 1294, 1299 (2d Cir. 1977).

Here, the Court could have found by a preponderance of the evidence that McMahon conspired to act as an agent of the PRC government. As explained in greater detail above, the government offered evidence that McMahon knowingly joined the conspiracy in October 2016, when he learned that Xu Jin was wanted on criminal charges by the PRC government and received detailed and suspicious information about Xu Jin and his family. As noted, he also met with Hu Ji and Zhu Yong twice in person shortly thereafter and agreed to pass along information about the victims that was plainly irrelevant to a debt collection effort, including sensitive government database information. The following April, he agreed at Hu Ji's request to surveil Xu Jin when his elderly father was forced to visit from China. McMahon met with Zhu Feng, conducted surveillance, and ultimately located Xu Jin's address. He then admitted to knowing that the ultimate goal of his work was to get Xu Jin "back to China" in order to "prosecute" him.

McMahon suggests that the preponderance of the evidence did not demonstrate that McMahon joined the conspiracy at the time the recording was made. Even assuming, arguendo, that McMahon had not joined the conspiracy by that time, co-conspirator statements are admissible pursuant to Rule 801(d)(2)(E) even prior to a particular conspirator's entry into the criminal scheme. See United States v. U.S. Gypsum Co., 333 U.S. 364, 393 (1948) ("[W]ith the conspiracy . . . fully established, the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy."); United States v. Farhane, 634 F.3d 127, 161 n.35 (2d Cir. 2011) ("Where statements are made in the course of an existing conspiracy in which the defendant later joins, those statements may be admitted against him, even though he was not a member of the conspiracy at the time the statements were made."). The cases McMahon cites to

100

support his argument that the government did not demonstrate that McMahon was part of the conspiracies at the time of the recording are inapposite.  (See McMahon Br. at 91 (citing Anderson v. United States, 417 U.S. 211 (1974); United States v. Saneaux, 365 F. Supp. 2d 493, 499 (S.D.N.Y. 2005)).)  Those cases stand for the proposition that Rule 801(d)(2)(E) applies only where the conspiracy was in progress, not for the proposition that the defendant must have been a member of the conspiracy at the time of the co-conspirator statement.  And there can be no serious dispute that both the Section 951 Conspiracy and the Interstate Stalking Conspiracy were in progress at the time the recording was made.

The other cases on which McMahon relies do not demonstrate that Exhibit 704A was improperly admitted (McMahon Br. at 92-93), but rather stand for the unremarkable proposition that co-conspirator statements may only be admitted where the requirements of Rule 801(d)(2) are satisfied.[46]  These cases all are distinguishable because, for the reasons above, there was at minimum a preponderance of the evidence that McMahon was a member of both the

---

[46] See, e.g., United States v. Al-Moayad, 545 F.3d 139, 173 (2d Cir. 2008) (record did not demonstrate defendant's participation in the conspiracy, or that defendant even knew the co-conspirator's statement that was admitted against him); United States v. Vizcarra-Millan, 15 F.4th 473, 513 (7th Cir. 2021), cert. denied sub nom.; Grundy v. United States, 142 S. Ct. 838, 211 L. Ed. 2d 518 (2022) (defendant was not shown to have been a member of the conspiracy); United States v. Jackson, 636 F.3d 687, 694 (5th Cir. 2011) (evidence insufficient to authenticate that statements were made during course of conspiracy); United States v. Solorio-Soto, 300 F. App'x 487, 490 (9th Cir. 2008) (government did not prove defendant was member of conspiracy); United States v. Conrad, 507 F.3d 424, 430 (6th Cir. 2007) (lack of findings regarding whether statement was made after the conspiracy ended); United States v. Bland, 237 F. App'x 268, 270 (9th Cir. 2007) (government's evidence did not establish defendant was member of the conspiracy); United States v. Magluta, 418 F.3d 1166, 1179 (11th Cir. 2005) (finding statements were made after conspiracy ended); see also United States v. Persing, 436 F. App'x 13, 21 (2d Cir. 2011) (finding it was difficult on the record presented to evaluate the basis for the district court's conspiracy finding, and remanding for the district court to make explicit findings).

interstate stalking and Section 951 conspiracies, and there is no dispute that the statements

recorded in Exhibit 704A were made in furtherance of both conspiracies.[47]

VI.    The Government Did Not Make False Representations Regarding McMahon's Access to
       Government Databases or His Underreported Income Tax Records

McMahon's final basis for a new trial under Rule 33 is that the government secured

the admission of evidence through false representations to the Court.  The defendant's argument

appears to be based on the theory that, because certain evidence offered by the government differed

in some way from the proffer given to the Court as part of its motion in limine to admit that

evidence, their subsequent admission constitutes a "manifest injustice."  (See McMahon Br. at 94.)

The Court should deny this argument as factually and legally unfounded.

A.    The Government Did Not Make Any Misrepresentations

McMahon argues that the government made misrepresentations regarding

McMahon's (1) handling of information obtained from the NJMVC; (2) access to DHS database

records; and (3) underreporting of income in his tax returns.  That is wrong.

With respect to the NJMVC information, McMahon claims that the government

"failed to show that Mr. McMahon violated the [NJMVC] rules and regulations" and therefore

claims made in the motion in limine and on summation were therefore false.  (McMahon Br. at

95.)  As discussed above, McMahon signed an agreement indicating he understood that the

NJMVC "prohibits using records to conduct surveillance or to investigate or locate an individual

---

[47] In a footnote, McMahon requests that the Court inquire regarding the circumstances surrounding the recording of Exhibit 704A, including whether Zhu Feng was a "government informant."  (See McMahon Br. 93 n. 29).  The government respectfully submits that no such inquiry is warranted.  As the government advised McMahon in response to his post-trial inquiry on this subject, the government is aware of its discovery obligations and has complied with those obligations.  The defendant cites no legal basis for such a request, nor any basis to allege that the government failed to meet its obligations.

for reasons not specifically related to motor vehicle activity." (GX 408A.) Nevertheless, he conducted a search of NJMVC records, at the request of Zhu Feng, for information related to the victim and his family, and then provided Zhu Feng with the results. (GX 805B at 8-9; GX 408H.) Other evidence, such as McMahon's post-arrest admissions, established that McMahon knew that the purpose of his surveillance was to locate the victim and help others coerce the victim to return to China. Accordingly, it was both accurate and appropriate for the government to urge the inference that McMahon's conduct amounted to "surveillance or to investigate or locate an individual" unrelated to "motor vehicle activity," and therefore constituted a direct violation of NJMVC rules and regulations.[48] McMahon asserts that his use was lawful because surveillance "is what private investigators do" and because he claims that the purpose was in fact related to "motor vehicle activity." Whatever the merits of these claims, they are merely alternative inferences which the jury was free to reject, not proof that the government's inferences were false.

McMahon next argues that the government failed to prove that he did anything improper related to DHS records, because the government (1) did not establish any connection between McMahon and the records and (2) did not demonstrate he had done anything wrong when he secured these records. As to the first argument, the evidence at trial established:

- McMahon was in contact with DEA agent Greg Finning by both telephone and text message and provided him with personally identifiable information about the victims;

- McMahon repeatedly requested updates on when he would receive information from Finning to share with his clients;

---

[48] McMahon references an NJMVC audit, his response to that audit, and the fact that he kept his access to the database in an apparent attempt to show that he was not in violation of NJMVC regulations. But as elicited at trial, NJMVC does not have the resources to audit all conduct, and the particular audit in question was for queries entirely unrelated to this case. (Tr. 1449:13-1551:19.)

- Finning advised McMahon that his contact with HSI was working on getting that information;

- HSI Agent Habeeb queried information about the two victims during the time period, knew it was unrelated to her own work, and recalled it was connected to Greg Finning;

- The same international travel information that Agent Habeeb queried from DHS databases was sent by McMahon back to PRC police officer Hu Ji one shortly after McMahon spoke to Finning by phone.

This evidence is more than sufficient to support the inference that McMahon obtained information from the DHS records from Finning.

As to the claim that the government failed to prove McMahon "had done anything wrong, let alone knew he was doing anything wrong in receiving Xu Jin and Fang Liu's travel information," (McMahon Br. at 104), the evidence at trial established that, in addition to the above:

- McMahon was a former police officer and private investigator with federal law enforcement contacts;

- McMahon knew how to conduct research using commercially available databases;

- HSI and DEA agents are not permitted to share government database information of this sort with third parties outside of law enforcement;

- HSI agents would face consequences if they improperly shared data;

- Emails associated with the database queries contained warning banners expressly warning against the improper dissemination of the data;

- McMahon knew, at a minimum, that Hu Ji was a foreign national;

- Hu Ji traveled from China to have an in-person meeting with McMahon to request that he acquire international travel information, among other things;

- McMahon relied upon phone calls with Finning, rather than text messages, indicating that he did not want to put his specific request into writing;

- McMahon admitted he knew the goal of the scheme was "to get [the victim] back to China . . . so they could prosecute him"

This evidence is more than sufficient to support the inferences that McMahon was doing something "wrong" or "improper" when he secured federal government information about a person's foreign

travel from his DEA contact and shared it with a foreign national; that McMahon knew it was wrong; and that he did so because he knew his larger involvement in this scheme was illegal.

Lastly, McMahon argues that the government "broke its promise" that it would show that McMahon "did not report the over $13,000 receives for his work surveilling the Victims as income in 2016 and 2017." (McMahon Br. at 107.) Again, the evidence at trial shows no broken promises, and included the following:

- McMahon earned more than $19,000 from his work targeting the victims, earning nearly $11,000 in 2016 and $8,200 in 2017;

- McMahon reported gross income in 2016 of $40,724, but held a business account that had more than $56,001 deposits in 2016;

- McMahon's business account itself underrepresents his income, as $5,495 of the money he earned in 2016 on this scheme was kept in a separate personal account;

- McMahon's reported gross income in 2017 was $46,898;

- While McMahon's business deposits in 2017 were slightly less than his reported income, none of the $8,200 McMahon made in 2017 for this scheme was ever deposited in that account;

McMahon's primary response to this evidence is that the government got its math wrong because it did not factor in business expenses. (See McMahon Br. at 107-08.) But the amount of income he received cannot be attributed to expenses, as McMahon claims, because the figures at issue in McMahon's tax return reflect underreported gross income, before expenses are calculated, not his net income after expenses.[49] McMahon additionally claims that the government failed to directly trace his underreported income to the specific money he received in this matter. (See McMahon Br. at 108.) There is no requirement that the government had to prove that every dollar McMahon underreported came from the money he earned in this case. The jury was

---

[49] Even if McMahon's theory were accurate, and you factored in the alleged $8,000 in expenses in this case, his income was still substantially underreported.

permitted to conclude, based on reasonable inferences from these facts, that McMahon's substantial underreporting during the two years in which he worked on this matter meant that he was trying to hide or obscure his earnings from an illegal scheme. This inference is even more appropriate given the evidence that, at the same time, McMahon engaged in other suspicious financial activity, as detailed further above.

B.    McMahon's Claim is Legally Flawed

Even assuming, arguendo, that there was some material difference in what the government expected the evidence to prove and what the evidence in fact showed at trial, the defendant provides no legal basis for why such an issue warrants a new trial under the Rule 33 legal standard. McMahon never explains why, absent some proof of bad faith or deliberate misrepresentations (which are not alleged and do not exist here), a difference between what the government advised the Court it expected to prove and what it in fact proved could somehow impact the verdict to such a degree that a new trial is warranted. The jury was not advised of the government's expected proof contained in its motions in limine and therefore was not "tainted" by some unkept promise. And, notably, at no point in the trial did McMahon ask the court to reconsider its rulings of admissibility or seek some other curative instruction.

The defendant cites only three cases, and none support his novel legal theory. In United States v. Figueroa, the court found that, following a defendant's conviction for a drug conspiracy, the government at sentencing "unequivocally acknowledge[d]" the one of the purported conspirators actually "acted independently as a drug seller and never functioned at the behest of another." No. 08 CR 749 (ARR), 2010 WL 11463852, at *21 (E.D.N.Y. Mar. 2, 2010), aff'd, 464 F. App'x 35 (2d Cir. 2012) (finding that the government's "repudat[ion]" of the theory that this person was a co-conspirator meant that the guilty verdict for the conspiracy was "tainted by argument that the government now views as inaccurate"). Here, unlike the defective conspiracy

in Figueroa, there is no argument that the government "repudiated" or "unequivocally acknowledged" a fact at trial that fundamentally undermines one or more of the convictions.

In United States v. Forlorma, the prosecutor made claims at trial that were demonstrably factually incorrect, and directly related to the defendant's guilt, leading to the jury convicting the defendant on false information.  See 94 F.3d 91, 95 (2d Cir. 1996).  Finally, the third case cited by the defendant, United States v. Eldridge, tends to support the government's position.  See 860 F. App'x 773 (2d Cir. 2021).  There, even though the government had discussed allegedly inculpatory evidence in its opening statement that it ultimately never admitted into evidence, the Court denied the Rule 33 motion because the statement was made in good faith and was not revisited by the government, the defendant argued in summation that the government failed to put on proof of the inculpatory evidence, and the court issued limiting instructions concerning opening and closing statements.  Id. at 779.  Unlike Forloma, or even Eldridge, the defendant does not argue here that the government made demonstrably incorrect statements at trial or made arguments based on evidence that was never admitted, only that the evidence that was admitted differed from the proffer to the Court.

Accordingly, the Court should deny the defendant's motion for a new trial based on this claim.

<u>RESPONSE TO ARGUMENTS BY DEFENDANT ZHENG CONGYING</u>

Zheng Congying moves for a judgment of acquittal pursuant to Rule 29 and a new trial pursuant to Rule 33 based on a variety of claims.  The Court should deny both motions.

I.    <u>There Was Sufficient Evidence to Convict Zheng Congying of Interstate Stalking (Count Three)</u>

A.    <u>The Evidence of Interstate Stalking Was Sufficient</u>

Zheng contends that the evidence was "insufficient as a matter of law" to have proven Zheng guilty of the interstate stalking conspiracy, and he must be acquitted of this charge.[50] This is wrong.  As discussed in more detail above (<u>see</u> Part II.D (Factual Background), the evidence included:

- Both victims' testimony that, on September 4, 2018, two strangers came to their home, banged on their door, entered their backyard, peered into their windows, and then taped a note to the door which stated that, if Xu Jin returned to China and spent 10 years in jail, his family would be safe and "that will be the end of it."  (Tr. 701:6-705:2, 714:1-716:15, 1397:5-1398:12, 1399:19-1400:16.)

- The testimony of co-conspirator Kuang Zebin, who described planning and executing on the conspiracy along with Zheng Congying.  Kuang's testimony established, among other things, that: (i) both Zheng and Kuang spoke with another person (Chen Chaohong) who instructed them about determining if the victim lived at the residence and leaving the threatening note; (ii) Zheng was given Xu Jin's address, which Kuang did not know, and drove the two from New York to New Jersey; (iii) Zheng saw the threatening notes that had been written before they were posted;(iv) Zheng himself was the person who posted the threatening notes using a tape dispenser that he brought; (v) the two took directions from several other individuals who were on the phone while they were at the victims' residence; (vi) Kuang knew that the Chinese government was trying to get people to return to China; and (vii) Kuang knew that "mainland" as referenced in the notes, was a reference to China, and that "prisons" in China were

---

[50] Zheng does not appear to challenge his conviction for substantive interstate stalking (Count Four), only his conviction for the stalking conspiracy.  (<u>See</u>, <u>e.g.</u>, Zheng Br. at 8 ("there was insufficient evidence…to support the conviction of the single stalking conspiracy"); <u>id.</u> at 13-14 (challenging under Rule 33 "the conviction" that is referenced in the Rule 29 section); <u>id.</u> at 17-18 (challenging conspiracy conviction based on multiple conspiracies theory).)  The government, accordingly, does not specifically address that charge.  In any event, much of the same evidence for the stalking conspiracy demonstrates the sufficiency of the evidence for the jury to return a conviction for the substantive stalking offense.

operated by the PRC government.  (See Tr. 1243:5-1244:30, 1246:14-17, 1248:15-22, 1287:19-24, 1290:6-8.)

- Cell site location data, which further established that Zheng Congying and Kuang Zebin traveled to the same residence in 2018 that was located by Michael McMahon in 2017. (GX 442 at 17.)

- Physical evidence proved Zheng's involvement in the scheme and corroborated the testimony.  Zheng Congying and Kuang Zebin are seen on surveillance video at the residence taping notes to the front door, speaking on the phone, and walking into the backyard to peer inside the house.  (GX 108; GX 709A-L; GX 710; GX 710A-H.)  The threatening notes themselves were admitted, and forensic analysis shows that Zheng's fingerprints were on the threatening notes, and his DNA was on a cigarette found at the crime scene.  (GX 505; GX 505A-C; GX 505-2; GX 503A; Tr. 727:10-22, 1521:17-24, 1629:1-6, 1638:1-15.)

- Zheng admitted, after his arrest, to being involved in the conduct, including: knowing Chen Chaohong, driving Kuang from New York to the residence, observing the threatening notes, bringing the tape dispenser and ringing the victims' doorbell.  (GX 702A; GX 702C.)

Taken together, this evidence was more than sufficient to permit the jury to conclude that Zheng conspired with Kuang and several others to travel in interstate or foreign commerce with the intent to harass and intimidate the victims.  See 18 U.S.C. §§ 371, 2261A(1)(B).

B.    Zheng's Challenges to His Conspiracy Conviction Should Be Denied

Zheng first challenges his stalking conspiracy conviction claiming that the evidence "does not support the jury's finding a single conspiracy to engage in interstate stalking."  (Zheng Br. at 9.)  This claim is without merit.

As Zheng concedes (Zheng Br. at 9), "[w]hether the government has proved a single or multiple . . . conspiracies is a question of fact for a properly instructed jury."  United States v. Khalupsky, 5 F.4th 279, 288 (2d Cir. 2021).  As an initial matter, the jury was fully aware that it could acquit Zheng Congying if it concluded the evidence support a different conspiracy than the one charged in the Indictment.  The Court instructed the jury on multiple conspiracies—a charge that Zheng does not challenge as defective—and Zheng's counsel argued a multiple conspiracies

theory in his summation as a basis for acquittal.  (See Jury Inst. at 29-30 (multiple conspiracies instruction); Tr. 2062:24-2063:20 (urging the jury to listen carefully to the court's charge, "[b]ecause if there are more than one conspiracy to find in the indictment, then the jury must acquit even if they believe certain crimes were committed" and arguing that "if you believe that there are two separate conspiracies in this case, which I think there is substantial evidence of, you listen to the Judge's charge").

Instead, Zheng asks that the Court overturn the jury's well-considered determination and find that the government proved multiple conspiracies, not a single conspiracy as charged in the Indictment.  (See Zheng Br. at 9.)  To merit the granting of judgment of acquittal based on an alleged variance between the charged conspiracy and proof at trial, a "variance must have caused the defendant 'substantial prejudice' at trial," meaning that the evidence proving the conspiracies in which the defendant did not participate prejudiced the case against him in the conspiracy to which he was a party.  United States v. McDermott, 277 F.3d 240, 242 (2d Cir. 2002) (internal citations omitted).[51]  There was no error or variance here, and certainly none that rises to the level of one that caused substantial prejudice.

The government alleged that Zheng and his co-conspirators engaged in one part of a "hub-and-spoke" conspiracy.  "In a hub-and-spoke (or 'wheel') conspiracy, one person typically acts as a central point while others act as 'spokes' by virtue of their agreement with the central actor."  Chartier, 2021 WL 3795352, at *37 (quoting United States v. Ulbricht, 31 F. Supp. 3d 540,

---

[51] Zheng also claims that because no single conspiracy was proved, evidence of the conspiracy against the other Trial Defendants prejudiced him, including a video sent to the victims (GX 506A; GX 506G), and as a result a new trial is warranted.  (Zheng Br. at 17-18.)  Because the government proved a single conspiracy as to Zheng, no alleged "spillover" of evidence prejudiced Zheng.  Rather, the evidence was properly admitted to him as a co-conspirator of the interstate stalking conspiracy.

554 (S.D.N.Y. 2014).  "In such conspiracies, whether the spoke participants may be found to be members along with the core conspirators depends on whether or not the 'spokes' knew or had reason to know of the existence, but not necessarily the identity, of one or more of the other spoke participants. . . ."  United States v. Manarite, 448 F.2d 583, 589 (2d Cir. 1971); see also United States v. Sureff, 15 F.3d 225, 230 (2d Cir. 1994) ("[A] single conspiracy may encompass members who neither know one another's identities, . . . nor specifically know of one another's involvement.").  Although there must be a "hub" or core to the conspiracy, there is no requirement that co-conspirators must know a common leader of the conspiracy.  See Blumenthal v. United States, 332 U.S. 539, 557 (1947) (finding a single conspiracy existed when the ultimate aim was the same: "to aid the owner, . . . to sell the whiskey unlawfully, though the two groups of defendants differed on the proof in knowledge and belief concerning the owner's identity").  There is no requirement that the evidence show that the conspirators "agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan," United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990) (internal citations omitted).

  At trial, the evidence established that Zheng participated in single, hub-and-spoke conspiracy to harass and stalk the victims.  This conspiracy was carried out in several stages.  First, in 2016, Zhu Yong and other co-conspirators engaged in gathering detailed personal information about Xu Jin and his family to use as leverage against them and to further their stalking scheme.  See Parts II (Factual Background), I.B (Zhu), I.B (McMahon).  Second, in April 2017, Hu Ji, Tu Lan, Zhu Feng, Michael McMahon and others engaged in an orchestrated scheme using Xu Jin's father to again harass Xu Jin into returning to China and to locate Xu Jin's home address.  See Part id.  Third, in September 2018, Zheng and Kuang Zebin used the information gathered by their co-

conspirators to go directly to the victims' home to confront and threaten the safety of Xu Jin's family if he did not return to China.  See id.

Zheng identifies certain "factors" that he argues "are illustrative that multiple conspiracies" not a single conspiracy, but these amount to alternative inferences which are not a valid basis to overturn the jury's conclusion that a single conspiracy was proven.  Zheng claims there was no common goal to intimidate or harass the victims because McMahon and Zhu did not "intend[] to perform anything beyond covert surveillance."  (Zheng Br. at 10.)  But as the jury concluded when it convicted both McMahon and Zhu of stalking and stalking conspiracy, substantial evidence established that both of defendants agreed to intimidate and harass Xu and his family.  See Parts II (Factual Background), I.B (Zhu), I.B (McMahon) (describing evidence in support of McMahon and Zhu's stalking and stalking conspiracy convictions).  Indeed, the supposedly "covert" aspects of their work was consistent with the overarching aim to threaten and harass the victims—that information was used, by Zheng and others, to threaten and harass the victims.  See Chartier, 2021 WL 3795352, at *38 (finding that  "[c]o-conspirators' goals need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes." (internal citations and quotation omitted))).

Next, Zheng argues no single conspiracy was established because "[t]he schemes between co-defendants Michael McMahon and Yong Zhu were led by a completely different core group of leaders and unindicted co-conspirators."  (Zheng Br. at 10.)  But the government presented substantial evidence that Zheng was participating in the same conspiracy led by the same group.  Most obviously, Zheng's role in the scheme—depositing a note at the residence of the victims that threatened the family's safety if Xu Jin did not return to China and spend time in prison—is entirely consistent with the goal of the scheme and work of the other conspirators who

came before and after.  See In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 93, 113 (2d Cir. 2008) (explaining that "the evidence necessary to link a particular defendant to a criminal scheme may be circumstantial in nature" and "may be inferred from her presence at critical stages of the conspiracy that could not be explained by happenstance . . . .") (cleaned up). Additional evidence permitted the jury to infer that Zheng was aware of the existence of the other co-conspirators.  For example, Kuang testified that both he and Zheng were aware that the individuals who directed their actions knew that others had previously been to Xu's home, which the jury could infer was in furtherance of the same overall scheme to intimidate the victims.  (See Tr. 1266:11-19 (testifying that "Chen Chaohong . . . told me that maybe previously there were other people who had been there and left [packages for the victims]").)  Zheng's claim that the conduct was "led by a completely different core group of leaders" is an inference that the jury could (and did) appropriately reject, given this and other evidence of the consistency, commonality, and relationship between the different conduct alleged to make up the conspiracy. Even if Zheng himself truly believed that his conspiracy was with some other group of leaders, that is legally irrelevant.  Blumenthal, 332 U.S. at 556-57.

Zheng next claims that "[t]here are no common participants between McMahon and Zhu and Zheng" or "evidence of a change in membership." (Zheng Br. at 10.)  But "a single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations."  United States v. Cambindo Valencia, 609 F.2d 603, 625 (2d Cir. 1979).  Even if there are "two or more phases or spheres of operation," a single conspiracy can be established "so long as there is sufficient proof of mutual dependence and assistance."  United States v. Payne, 591 F.3d 46, 61 (2d Cir. 2010) (quoting United States v. Geibel, 369 F.3d 682, 689 (2d Cir. 2004)).  Whether or not the conspiracy was carried out in

different phases and with different members does not alter the overarching goal that pervaded each conspirator's actions: to threaten and harass Xu Jin and his family so Xu Jin would return to China. The evidence established that each stage of the conspiracy built upon and assisted the next: Zhu Yong's hiring of McMahon led to McMahon's surveillance of the victims and discovery of Xu Jin's residence, which led to Zheng's drive to that residence to confront Xu Jin with the threatening note. Conspiracies can "mature by successive stages" where "not all of those joining in the earlier ones make known their participation to others late coming in." Blumenthal, 332 U.S. at 556-57.

Lastly, Zheng argues that "[t]here is no evidence that Zheng relied upon the activities of McMahon and Zhu." (Zheng Br. at 10.) But the evidence established that McMahon's April 2017 surveillance of Xu Jin and his family led to the location of Xu Jin's home address. The jury was permitted to conclude that McMahon's successful identification and passage of the address to co-conspirators Zhu Feng and Hu Ji in turn allowed the leaders of the conspiracy to give that address to Zheng so he could carry out his part of the conspiracy.[52] United States v. Tejada, 956 F.2d 1256, 1265 (2d Cir. 1992) ("once a conspiracy is shown, only slight evidence is needed to link another defendant with it."). The jury's verdict reflects its reasonable belief, based on the evidence, that McMahon's work in surveilling and locating Zu Jin's home that permitted Zheng and Kuang to continue the escalating harassment of Xu Jin and his family in September 2018. See Chartier, 2021 WL 3795352, at *38 ("[A]lthough largely circumstantial, the evidence was

---

[52] Though Zheng and his co-defendants suggested that Xu Jin's address was publicly available through other sources, the evidence at trial shows the opposite. The jury properly inferred that the co-conspirators had finally gleaned a critical piece of information about Xu Jin's whereabouts from the response that Hu Ji sent McMahon after McMahon relayed Xu Jin's home address: "Mike: thank you very much for your good work to getting the address of Xujin." (GX 3075.)

sufficient for the jury to conclude that Defendants were a part of a large conspiracy with Matz (and the Boiler Room) at the center").

      C.     <u>Zheng's Conviction for Interstate Stalking Conspiracy Is Consistent with the Acquittal on Section 951 Charges</u>

          Though mentioned only briefly in his motion, Zheng appears to argues that the conspiracy verdicts are inconsistent, and thus acquittal of the stalking conspiracy charge is warranted, because "the memberships of the conspiracies in both Counts One and Three are identical" and Zheng was acquitted of the former.  (<u>See</u> Zheng Br. at 10-11.)  This argument is similar to the "inconsistent verdict" argument raised by McMahon, and fails for largely the same reasons.  First, as a factual matter, the verdicts are not inconsistent.  While the participants are alleged to be the same, the two conspiracies alleged different objects—Count One alleges a conspiracy to act as agents of the PRC government and Count Four alleges a conspiracy to stalk the victims.  While some of the proof of those two conspiracies are the same (the actions taken to stalk and harass the victims) some of the proof differed (knowledge that the direction they were taking was ultimately from the PRC government).  Counsel for Zheng himself pointed out that the elements and proof of the two conspiracies were different.  (<u>See</u>, <u>e.g.</u>, Tr. 2067:4-12 (arguing that "there is zero evidence that my client knew or thought that he was acting on behalf of the Chinese government" and therefore "the only count that you really have to be concerned about with my client is the question of the interstate stalking").)  It is entirely reasonable and consistent with the evidence for the jury to conclude that Zheng knowingly participated in a conspiracy to stalk and harass the victims, but did not have sufficient knowledge to participate in the related conspiracy of acting at the direction of the PRC government.

Even if the two verdicts were actually inconsistent, the law is clear that they must be permitted to stand as part of the valid and unreviewable power of the jury to render inconsistent verdicts. See Part II (McMahon); see also Powell, 469 U.S. at 64-65.

II.    A New Trial on Zheng Congying's Interstate Stalking Conviction Is Not Warranted

Zheng moves for a new trial, pursuant to Rule 33, on three grounds: (1) that the evidence was so insufficient as to constitute a manifest injustice; (2) the government proved multiple conspiracies and not a single conspiracy, and (3) because the Court improperly curtailed cross-examination of the victims.  (See Zheng Br. at 12-18.)

A.    A New Trial Is Not Warranted Based on Sufficiency of the Evidence or Because of Purported Multiple Conspiracies

The first two claims for a new trial were also raised in support of the defendant's Rule 29 motion.  For the same reasons as explained above, the government submits that neither claim is valid and, in any event, are insufficient to meet extraordinary "manifest injustice" standard for a Rule 33 claim.

B.    A New Trial Is Not Warranted as the Court Properly Limited Zheng's Cross-Examinations of the Victims

Zheng argues that a new trial is also warranted because the Court  limited his cross-examination of the victims with respect to (1) the conduct underlying the PRC government's criminal allegations against Xu Jin and Liu Fang, (2) Xu Jin's and Liu Fang's wealth, (3) "the existence of a New Jersey civil lawsuit against [Xu Jin] involving relevant Chinese entities," and (4) Xu Jin's purported "disputes with construction companies located in Hong Kong and Macau." (See Zheng Br. at 14-16.).  The Court should reject this argument.

1.    Zheng Waived His Arguments for Admitting Proposed Cross-Examination By Failing to Raise Them At Trial

As an initial matter, the Court need not address Zheng's arguments for admission of certain evidence through cross-examination because he failed to present them at trial.  The Second Circuit has explained "unless the basis for proposed admission is obvious, it is the burden of counsel who seeks admission to alert the court to the legal basis for his proffer."  United States v. Pugliese, 712 F.2d 1574, 1580 (2d Cir. 1983).  Where the defendant fails to meet its burden of alerting the district court to the bases for admissibility at trial, they are waived.  See United States v. Cruz, 894 F.2d 41, 44 (2d Cir. 1990) ("Since the bases for admissibility [the defendant] now urges are not obvious from the record, and the burden of alerting the district court was not met, the contentions raised here for the first time have been waived.").

At and before trial, the Court made repeated attempts to understand the basis under which evidence underlying the criminal allegations against the victims and the victim's wealth would be admissible.  (See, e.g., Tr. 149:14-22; 150:3-15 (asking specifically "what is the purpose of asking those questions, how much wealth he has here?," "why is that relevant?" and "Tell me how it is relevant to the charges here.").)  Counsel never articulated the reasons it now claims makes this evidence admissible.  (See id. (stating that the reasons for admissibility were "[t]o find out what he's doing here and why he's able to -- to be able to live the style that he lives in the United States," "it's part of the case", "his background is relevant"  and that "[i]t may well be that he is doing something illegal. I don't know until he answers the questions or she answers the question").)  This is vastly different than Zheng's current argument that the victims' wealth "is relevant to his credibility because it concerns the lengths to which [he would be] [sic] willing to lie to protect his wealth."  (Zheng Br. at 16.)  Likewise, though counsel now argues that evidence showing the existence of a civil lawsuit against Xu Jin would have supported Zheng's defense that

117

multiple conspiracies existed, (see Zheng Br. at 16), counsel failed to argue this ground for admissibility at the lengthy discussion on this issue at the Pretrial Conference about the admissibility of this evidence (see Pretrial Conference Tr. 23:15-41:2).

By failing to raise these bases for admission at or before trial, Zheng waived these arguments, and on this basis alone, the Court should deny this challenge to his convictions.

2.    The Court Properly Precluded Cross-Examination Concerning Certain Topics As Prejudicial and Irrelevant

In any event, the Court properly limited cross-examination on these topics because the topics were not relevant to whether Zheng and the other defendants engaged in interstate stalking or acted on behalf of the PRC government, and were otherwise unduly prejudicial and confusing to the jury.

"Federal Rule of Evidence 611(a) permits the trial court to 'exercise reasonable control over the mode and order of interrogating witnesses' in order to 'make the interrogation . . . effective for the ascertainment of the truth (and to) avoid needless consumption of time . . . .'" United States v. Coven, 662 F.2d 162, 170 (2d Cir. 1981). "Trial judges retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." United States v. Raniere, No. 18-CR-204 (NGG), 2023 WL 3092991, at *4 (E.D.N.Y. Apr. 26, 2023) (internal citations omitted). "The scope and extent of cross-examination are generally within the sound discretion of the trial court, and the decision to restrict cross-examination will not be reversed absent an abuse of discretion." United States v. Lawes, 292 F.3d 123, 131 (2d Cir. 2002) (internal citation omitted). While the defendant has a right to cross-examination protected by the Confrontation Clause to the Sixth Amendment , it does not "prevent[] a trial judge from imposing . . . limits on defense counsel's cross-examination of

118

government witnesses.'" United States v. Pettway, No. 20-63, 2021 WL 4188716, at *3 (2d Cir. Sept. 15, 2021).

A trial court's curtailment of cross-examination is reasonable where it finds "that the risk of distraction resulting from [the defendant's] intended interrogation substantially outweighed any probative value of the evidence" given that "[t]he proposed cross-examination was of little, if any, plausible relevance to [the witness]'s credibility"). Lawes, 292 F.3d at 131. It is a "reasonable limit" on cross-examination to preclude questioning "based on the court's concerns about the potentially irrelevant and prejudicial nature of such questioning." United States v. Hamlett, No. 19-3069, 2021 WL 5105861, at *3 (2d Cir. Nov. 3, 2021) (internal citation omitted). Factors relevant to whether the trial court abused its discretion in limiting cross-examination include "'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case.'" United States v. McCain, No. 21-2982, 2023 WL 2335332, at *4 (2d Cir. Mar. 3, 2023) (quoting United States v. Atilla, 966 F.3d 118, 131 (2d Cir. 2020)).

Zheng first argues that the Court improperly precluded Xu Jin's purported criminal conduct in the PRC because it "created a one-sided narrative that [Xu Jin] did not commit any crimes in the PRC," but still does not explain the relevance of the victims' alleged criminal conduct in PRC to whether Zheng committed the crimes charged in the Indictment. (Zheng Br. at 15.)[53]

---

[53] Contrary to counsel's representations, the government did not offer evidence supporting a theory that Xu Jin "was a dissident, rather than a fugitive." (Zheng Br. at 15.) The sole testimony Zheng cites concerning any alleged theory that the victims were political dissidents was elicited during the cross-examination by Zheng's co-defendant Zhu Yong, not the government's direct examination. (See Zheng Br. at 15, n.2 (citing Tr. 796:7-14).)

119

Zheng's counsel attempted to introduce evidence of the substance of the criminal allegations made by the PRC government on a sole occasion during the cross-examination of Xu Jin's sister-in-law, Liu Yan. (Tr. 139:21-23.) The Court properly limited that inquiry on two bases: first, that any testimony would be impermissible hearsay and second, because Xu Jin's guilt of any criminal allegation in China is irrelevant. (Tr. 142:17-25.) The Court also held that such evidence is "unduly prejudicial" and "confusing to the jury" because whether the victim did or did not commit a crime in China were unrelated to the criminal charges in this case. (Tr. 142:1-5.)

The Court's ruling is consistent with Second Circuit precedent. In United States v. McCain, for example, the Circuit upheld a trial court's determination that a victim-witness could not be cross-examined concerning his alleged drug dealing conviction. 2023 WL 2335332, at *4 (explaining that narcotics distribution is "not a crime of dishonesty and therefore is not necessarily probative of [the witness's] credibility."); see Flaharty, 295 F.3d at 191 (holding that past murder conviction not probative of truthfulness). Similar to the reasoning in this case, the Circuit affirmed the district court's conclusion that the victim-witness's conviction "was of very limited probative value to the element the government needed to prove: that 'a reasonable person hearing or reading the statement and familiar with its context would understand it as a serious expression of an intent to inflict an injury.'" McCain, 2023 WL 2335332, at *4 (quoting United States v. Turner, 720 F.3d 411, 426 (2d Cir. 2013)); see also United States v. Guzman Loera, 24 F.4th 144, 159 (2d Cir. 2022) (rejecting defendant's challenges to the trial court's preclusion of cross-examination of a cooperating witness regarding the witness's alleged acts of drugging fellow prison inmates). Here, where there was not even a conviction to speak of, only allegations of misconduct, the Court properly precluded cross-examination exploring the PRC's criminal allegations against the victims.

Second, Zheng also challenges the Court's decision to limit cross-examination into the victims' wealth claiming that it is relevant to Xu Jin's credibility and whether he would "lie to protect his wealth." (Zheng Br. at 16.)  Counsel's conclusory statement fails to explain how the purported wealth of the victims would be tied to the outcome of the criminal case against Zheng and his co-conspirators such that it would be relevant to the victim-witnesses' bias or credibility. See Hamlett, 2021 WL 5105861, at *2 (upholding curtailment of cross-examination given "the questionable relevance and potentially prejudicial nature of the proposed evidence," and "the absence of a clear link between [proposed evidence] and a witness's credibility").

The Court's ruling that evidence of the victims' wealth was irrelevant and hearsay, given that counsel attempted to inquire about Xu Jin's wealth through his sister-in-law (see Tr. 150:15-16; 159:11-17), was proper.  When asked by the Court why such evidence would be relevant, counsel only responded that the victims' "background" was relevant, but could not articulate why this evidence would make more or less probable any fact at issue in the criminal case.  See United States v. Griffith, 284 F.3d 338, 351-52 (2d Cir. 2002) (upholding district court's limitation of cross-examination where the "subjects would not have been relevant because it would not have tended to make more or less probable any fact at issue in the case" (citing Fed. R. Evid. 401)).  The Court's limitation on cross-examination about the victims' wealth was proper to exclude irrelevant evidence that would have unduly prejudicial and confusing evidence.  United States v. Nosov, 221 F. Supp. 2d 445, 451 (S.D.N.Y. 2002), aff'd, 119 F. App'x 311 (2d Cir. 2004). (denying Rule 33 motion, finding that limitation of cross-examination "did not deny defendants the opportunity to shed light on [the witness's] truthfulness, but "prevented the introduction of irrelevant testimony with its potential for creating confusion and causing a waste of time, and was well within the parameters of the discretion the court").

Third, counsel argues that the Court should not have precluded cross-examination on "the existence of a New Jersey civil lawsuit against [Xu Jin] involving relevant Chinese entities," because that evidence would have allowed the jury to infer that Zheng obtained the victims' home address from a public source instead of the work conducted by his co-conspirators. (Zheng Br. at 16.)  No evidence is cited or proffered that the "lawsuit demonstrates that [Xu Jin] was served with legal process and that his residence was known to other individuals," as Zheng claims. (Zheng Br. at 16.)  And, even if there were some such evidence available, Zheng's posttrial argument highlights the propriety of the Court's ruling that such evidence is irrelevant because the defendants could not establish that the "lawsuit is somehow connected to the work that" the defendants engaged in.  (Pretrial Conference Tr. 21:1-22.)  Even so, the Court left open the possible admissibility of evidence of the civil lawsuit if the defendants could establish such a connection. (See Pretrial Conference Tr. 34:10-14.)  But the defendants were unable to proffer any such connection.  Accordingly, cross-examination on this topic was properly foreclosed as irrelevant.

Lastly, Zheng argues that he was "improperly foreclosed" from cross-examining witnesses concerning Xu Jin's "disputes with construction companies located in Hong Kong and Macau." Zheng Br. at 15.  Zheng never sought to introduce any evidence of these alleged disputes either before or at trial.  Even if he had, like the topics discussed above, any such business disputes are irrelevant to any element of the charged crimes or the witness' credibility.  This evidence offered no probative value and was plainly meant to harass the victims and confuse the jury; it was, therefore, properly not introduced at trial. [54]

---

[54] Zheng cites United States v. White, 692 F.3d 235 (2d Cir. 2012), in support of his claim that the jury was denied "sufficient information" of the victims' "possible motives for testifying falsely" (see Zheng Br. at 14), but that case is factually inapposite.  In White, the Second Circuit held that the district court erred in precluding cross-examination of "a prior adverse credibility finding" by another federal district court judge against a testifying law enforcement officer.  692

### 3. Any Error Related to Limits on Cross-Examination Was Harmless

Even if the Court finds that cross-examination was improperly curtailed—which it was not—any error is harmless. Jones v. Berry, 880 F.2d 670, 673-74 (2d Cir. 1989). "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt."). As discussed above, the evidence introduced at trial overwhelmingly established that Zheng crossed state lines in order to threaten Xu Jin and his family by leaving a note taped to the door of their family home threatening the safety of Liu Fang and Sabrina Xu. See Parts II.D (Factual Background), Part I (Zheng).

The Court properly limited cross-examination at trial, and Zheng's motion for a new trial on this ground must fail.

---

F.3d at 249-50. Here, the evidence of the victims' wealth and the PRC criminal allegations are untethered to motives to lie, particularly where their testimony was in large part corroborated by undisputed video surveillance evidence of the September 2018 note incident and flight and other records evidencing the forced visit of Xu Jin's father in April 2017.

CONCLUSION

For the reasons above, the government respectfully requests that the Court deny the

motions for judgments of acquittal and new trials filed by Trial Defendants Michael McMahon,

Zheng Congying and Zhu Yong.

Dated:        Brooklyn, New York
              October 5, 2023

                                        BREON PEACE
                                        United States Attorney
                                        Eastern District of New York

                              By:        /s/
                                        Craig R. Heeren
                                        Meredith A. Arfa
                                        Irisa Chen
                                        Assistant U.S. Attorneys
                                        (718) 254-7000

                                        MATTHEW G. OLSEN
                                        Assistant Attorney General
                                        Department of Justice
                                        National Security Division

                              By:        /s/
                                        Christine Bonomo
                                        Trial Attorney