

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:MAA/IC/CB
F. #2017R00906

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 10, 2025

<u>By ECF</u>

The Honorable Pamela K. Chen
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     United States v. Zhu Yong
        <u>Criminal Docket No. 21-265 (S-1) (PKC)</u>

Dear Judge Chen:

The government respectfully submits this letter in advance of the defendant's sentencing, which is scheduled for January 15, 2025, and in response to the defendant's sentencing memorandum, which was filed on January 3, 2025 (ECF No. 326). On June 16, 2023, following a 13-day trial, the defendant was convicted on all counts of a superseding indictment charging him with conspiring to act as an agent of the government of the People's Republic of China ("PRC" or "China") without prior notification to the Attorney General, in violation of 18 U.S.C. § 371 (Count One), acting as an agent of the PRC government without prior notification to the Attorney General, in violation of 18 U.S.C. § 951 (Count Two), conspiracy to engage in interstate stalking, in violation of 18 U.S.C. § 371 (Count Three), and interstate stalking, in violation of 18 U.S.C. 2261A(1)(B) (Count Four). For the reasons below, the government respectfully submits that a sentence of 71 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. Such a sentence would constitute just punishment, reflect the severity of the defendant's offense, promote respect for the law, and provide the specific and general deterrent effect called for by the defendant's offenses.

I.      <u>Factual Background</u>[1]

The defendant participated in an international campaign to threaten, harass, surveil, and intimidate Xu Jin, Liu Fang, and their adult daughter, Xu Xinzi (also known as "Sabrina Xu"),

---

[1]     The information below is taken from the Court's March 1, 2024 memorandum and order denying the defendant's motion to vacate the guilty verdicts rendered against him and for a new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33, respectively (ECF No. 294); the Presentence Investigation Report ("PSR") provided to the parties by the United States Probation Department ("Probation") on October 11, 2024; the Addendum to the PSR ("PSR Addendum") provided to the parties by Probation on January 7, 2024; the documentary and

with the goal of forcing Xu Jin and Liu Fang to return from the United States to the PRC, as part of transnational repression programs known as "Operation Fox Hunt" and "Operation Sky Net."[2] As the defendant knew, his participation in this illegal repatriation scheme was directed by the PRC government and its officials. (ECF No. 326 at 5.) The defendant played a central role in that scheme, facilitating efforts – which ultimately succeeded – to locate Xu Jin and harass his family members in the United States.

A.    The Victims Were Targeted as Part of Operations Fox Hunt and Sky Net

Operation Fox Hunt was an operation designed to repatriate individuals who have moved overseas who the Chinese government alleged have committed criminal offenses; Sky Net was an expansion of that program. (PSR ¶¶ 15-16.) The PRC government carried out these programs through, among other things, pressuring and harassing the wanted individual to return to the PRC, pressuring and harassing family members to coerce the individual to return to the PRC, and instilling fear that the individual's failure to return would place the individual's family in danger. (*Id.* ¶ 18.) Several of the defendant's co-conspirators were PRC government officials who worked for the entities responsible for Fox Hunt and Sky Net actions, such as the Ministry of Public Security ("MPS"), a rough equivalent to the Federal Bureau of Investigation in the United States. (*Id.* ¶ 17.) For example, co-defendant Hu Ji was a policeman with the Wuhan Public Security Bureau under the MPS and co-defendant Tu Lan was a prosecutor in a local procuratorate. (*Id.* ¶¶ 24-25.)

Two of the victims in this case, Xu Jin and Liu Fang, were targeted for repatriation as part of these PRC government programs. (*Id.* ¶¶ 12, 19, 38.) Xu Jin and Liu Fang, as well as their adult daughter Xinzi Xu and other family members, were pursued by the PRC government in an effort to intimidate Xu Jin and Liu Fang into returning to the PRC to face alleged crimes committed there. (*Id.* ¶ 38.) Beginning in 2016, the defendant and his co-conspirators acted for and with PRC government officials and others in the United States to harass and intimidate Xu Jin and Liu Fang into repatriating to the PRC.

---

testimonial evidence admitted at the defendant's trial; and other evidence gathered as part of the investigation and prosecution of the defendant.

[2]    The National Security Division of the U.S. Department of Justice has explained that transnational repression "refers to a range of tactics that foreign governments employ to reach beyond their borders to harm, intimidate, threaten, harass, or coerce individuals." *See* National Security Division, U.S. Dep't of Justice, "Transnational Repression (TNR)," https://www.justice.gov/nsd/transnational-repression-tnr (last visited Jan. 10, 2025). As the National Security Division has highlighted, "[t]ransnational repression represents a threat not only to those who seek to exercise their basic rights and freedoms in the United States and abroad, but also to United States' sovereignty and democracy." *Id.*

B.     The Defendant Hired U.S.-Based Private Investigator McMahon to Locate and Target the Victims for the PRC Government

The evidence at trial established that the defendant knowingly agreed to work for the PRC government to locate Xu Jin and Liu Fang so that they could be forced to return to the PRC. (PSR ¶ 40.) In August 2016, after returning to the United States from a trip to the PRC, the defendant contacted an attorney in New York in order to identify a New Jersey private investigator who could locate the victims; the attorney, in turn, recommended co-defendant Michael McMahon. (*Id.*) The attorney provided a draft retainer agreement, which the defendant forwarded to an email account belonging to Sun Hui, a "political commissar" at the Wuhan Public Security Bureau, a police agency under the Ministry of Public Security – the same entity where co-defendant police officer Hu was employed. (*Id.* ¶ 40.)

The defendant subsequently traveled back to the PRC in September 2016. (*Id.* ¶ 41.) While there, the defendant reached out to a Queens-based translator, whom he used to contact and hire McMahon. (*Id.* ¶ 41.) The defendant requested that McMahon be hired "as soon as possible."[3] (*Id.*) In additional messages, the defendant – who was listed in the translator's phone as "Middleman" – made clear that he was working on behalf of a group or organization. (*Id.*) When the translator advised the defendant that McMahon requested certain information, the defendant demanded that the translator "leave these information blank in the contract," emphasizing the need to sign the contract as quickly as possible. (*Id.*) The defendant eventually received a contract and request for a $5,000 deposit to hire McMahon, as well as wire transfer information to send the deposit to McMahon. (*Id.*) On September 29, 2016, the defendant signed the contract; he identified "Xu, Jin" as the target of the work for which he was retaining McMahon, and provided a social security number, green card number, New Jersey driver's license number, and date of birth for Xu Jin. (*Id.*)

C.     The Defendant Provided Direction to McMahon and Met with McMahon and PRC Police Officer Hu

After hiring McMahon, the defendant provided additional sensitive information about the victims to be shared with McMahon and directed McMahon to gather intelligence on Xu Jin and his family. (PSR ¶ 48.) For example, the defendant again passed along purported driver's license and social security numbers for Xu Jin, as well as for Liu Fang and Xinzi Xu, and address information for their relatives, Liu Yan (Liu Fang's sister) and her husband. (*Id.* ¶ 41.) The defendant also disseminated purported Chinese government identification information for Xu Jin. (*Id.*) The defendant directed the translator to tell McMahon that "what we need is to locate the person" and to "look into more details, where do they work, which company, living conditions, etc." (*Id.*) On October 5, 2016, the translator told McMahon that the defendant had called and advised that Xu Jin's parents were going to Newark International Airport, and that the defendant directed McMahon to conduct surveillance because "[m]aybe this a lead to find Mr. Jin Xu." (*Id.*) The defendant received intelligence and surveillance reports and photographs from McMahon and provided feedback in response. (*Id.*) For example, after being asked about the identity of a

---

[3]     Unless otherwise indicated, all spelling and grammar in quoted materials is as it appears in the original document.

particular woman in a photograph, the defendant responded (through the translator) that "the female . . . at one of the houses was Yan Liu, she is our subject's sister-in-law." (*Id.*)

The defendant next set up multiple in-person meetings between himself, McMahon, and PRC police officer Hu to further the operation. (*Id.* ¶ 50.) On October 27, 2016, the translator told McMahon that the defendant wanted to meet in person "ASAP" to "discuss Jin Xu's case," and that the defendant would meet "anywhere . . . because he seemed like he really need to talk in person." (*Id.*) McMahon proposed that they meet at a Panera Bread restaurant in New Jersey. (*Id.*) That same day, the defendant, McMahon, and Hu met at the Panera Bread, as documented in a photograph found in the defendant's Apple iCloud account. (*Id.*) Additionally, phone records establish that the defendant was in contact with both Hu and McMahon shortly before and after this meeting. (GX 316 at 2-3.) The defendant secured additional information after the meeting from McMahon, this time focused on the victims' daughter, Xinzi Xu, as well as Xu Jin's banking information. (PSR ¶ 50.)

A few days later, the defendant requested another meeting with McMahon, which occurred on November 1, 2016, at an office in Hackensack, New Jersey; Hu attended this meeting, as well. (*Id.* ¶ 51.) The day before the meeting, McMahon told his friend at the Drug Enforcement Administration that he needed certain U.S. government information McMahon had requested from his friend about the victims because "[m]y clients flew in from China and I'm meeting them this eve." (*Id.* ¶ 50.) At the same time, the defendant confirmed he was coming with others, advising that "we want to discuss the next step plan.with you." (*Id.*) Border records establish that Hu was in the United States, where he remained until November 5, 2016. (*Id.*)

After meeting with McMahon and PRC police officer Hu, the defendant contacted McMahon directly to advise McMahon of a transition in McMahon's handler from the defendant to another individual. (*Id.* ¶ 52.) On November 8, 2016, the defendant told McMahon that the defendant had "given the person who's looking for Jin Xu-our subject your email address" and directed that any future correspondence continue to be routed through the translator. (*Id.*)

D.    McMahon Engaged in the Scheme to Use Xu Jin's Elderly Father to Locate and <u>Harass Xu Jin</u>

Several months later, in March 2017, Hu (who also went by "Eric Yan") contacted McMahon directly and requested that he participate in a scheme involving the victim's elderly father. (PSR ¶ 55.) On March 27, 2017, Hu told McMahon that Xu Jin's father would visit him from the PRC that Saturday, that they wanted McMahon to "trace" him to find Xu Jin's address. (*Id.*) McMahon agreed to partake and began coordinating the planned surveillance with others. On April 3, 2017, in a hotel in New Jersey, PRC prosecutor Tu Lan, and two other conspirators, Zhu Feng and Hongru Jin, discussed, among other things, that after Xu Jin's father arrived accompanied by a doctor, they would bring the father to Liu Yan's home, where Hongru Jin and the private investigator would conduct surveillance in the hopes of locating Xu Jin's residence. (*Id.* ¶ 58.) The next day, April 4, 2017, Zhu Feng and Hongru Jin met for just under an hour with McMahon at the same Panera Bread where McMahon previously met with Zhu Yong and Hu. (*Id.* ¶ 59.)

On April 5, 2017, Xu Jin's elderly father and a PRC doctor arrived at Newark International Airport on a flight from the PRC. (*Id.* ¶ 60.) Zhu Feng then texted McMahon that Zhu "just got the package," an apparent reference to Xu Jin's father, and that their "eta" was "7:40pm." (*Id.*) McMahon conducted surveillance for the scheme on April 5, 2017, and observed Xu Jin's father arrive at Liu Yan's home that evening. (*Id.* ¶ 62.)

On the morning of April 6, 2017, Liu Yan drove her father-in-law to Livingston Mall to meet Xu Jin; during that trip, Liu Yan noticed someone who she thought might be following her. (*Id.* ¶ 63.) During the meeting at the mall, Xu Jin's father told Xu Jin that he was forced to come to the United States to convince Xu Jin to return to the PRC, explaining that PRC officials told the father that if he refused, they would put his daughter (Xu Jin's sister) in jail. (*Id.* ¶ 64.) Later that same day, McMahon finally located Xu Jin and Liu Fang's home in New Jersey, and passed the address along to Zhu Feng. (*Id.* ¶ 67.)

E.    Zheng Delivered a Threatening Note to Xu Jin and Liu Fang at Their Home

On September 4, 2018, co-defendant Congying Zheng and co-conspirator Kuang Zebin continued the conspiracy to harass and stalk Xu Jin and Liu Fang at the couple's home in New Jersey, which – through McMahon's efforts – had finally been discovered by the PRC government. The two men acted at the direction of a friend, Chen Chaohong, who directed Kuang to write three notes that stated, in substance, "if you are willing to go back to China to serve a ten years prison . . . sentence, you wife and your children will be okay. That's the end of the matter." (*Id.* ¶ 91.) Zheng was provided the address of Xu Jin and Liu Fang's home, which McMahon had discovered, and was to drive there to post the threatening notes at the home. (*Id.*)

Zheng drove the two men to the victims' New Jersey home, and during the ride, the two men talked about what they were supposed to do that day. (*Id.* ¶ 92.) Zheng then walked to the front door of the house, knocked on the door, rang the doorbell and tried to turn the door handle. (*Id.*) As captured on surveillance footage, Zheng used a tape gun to post three notes on the door. (*Id.*) Then, Zheng and Kuang went around to the back of the house, walked onto the deck, and looked into the house through the back glass doors. (*Id.*) Zheng observed a lot of dust in the house, giving him the impression that no one had occupied the home in some time. (*Id.*) After looking into the home, Zheng and Kuang returned to the front of the house, and Zheng ripped down two of the three posted notes because Chen believed it would draw too much attention to the house to have all three notes taped to the door. (*Id.*) Zheng threw the two notes he tore down into the bushes in Xu Jin's and Liu Fang's front yard. (*Id.*)

Though Zheng did not know it, Xu Jin and Liu Fang were inside their home when they heard what sounded like someone – Zheng – banging on their front door and trying to enter their home. (*Id.* ¶ 94.) They were frightened, did not answer the door, called the FBI and watched their home security camera system. (*Id.*) They saw that the two men had arrived in a car and approached their front door. (*Id.*) After the two men left, Xu Jin and Liu Fang went outside and discovered a note affixed to their front door, which advised that, if Xu Jin returned to the PRC and spent 10 years in jail, his family would be safe and "that will be the end of it." (*Id.*) As a result of the note delivered by Zheng, Xu Jin explained that he felt that the threats made by the PRC government against him were no longer "mental" but "physical," and he became "very worried about [the] safety" of his wife and daughter. (*Id.*)

F.      The Harassment and Intimidation of the Victims Continued

        In mid-2018, Xinzi Xu discovered that her friends were receiving harassing messages about her family on Facebook that detailed the PRC government's messaging about her parents being wanted fugitives. (PSR ¶ 88.)  The victims were also sent mailings from the PRC, which were designed to further harass Xu Jin, and coerce him to return to the PRC.  In 2019, Liu Yan began to receive numerous letters and packages from the PRC. (*Id.* ¶ 98.)  The mailings were ostensibly coming from Xu Jin's sister, Xu Qin, though Xu Jin testified that based on the tone and tenor of the messages, he understood that she had been compelled to write them. (*Id.* ¶ 100.)  One of the mailings sent to Liu Yan contained a DVD with a video titled "A Family Letter to Brother – Xu Qin." (*Id.* ¶ 99.)  The video contained subtitles, which at one point stated, "When parents are alive, you can still call someplace a home; when parents are gone, you can only prepare for your own tomb." (*Id.*)  The video ended with the subtitles exhorting Xu Jin to return to the PRC: "Come home, brother!" (*Id.*)

G.      The Defendant Maintained a Relationship with the PRC Government

        Other evidence at trial established that the defendant had an ongoing and close relationship with the PRC government and PRC government officials involved in the illegal repatriation scheme.  The defendant's iCloud account contained a picture of the defendant at an event with Li Hongzhong, one of the most senior members of both the PRC government and the Chinese Communist Party. (GX 9; GX 902M; Tr. 553:18-554:24, 565:10-24.)  The defendant's iCloud account also contained a phone number and contact entry associated with Hu, and phone records established that the defendant had numerous calls with Hu in October 2016. (GX 902B-C; GX 308; GX 316.)

H.      The Defendant Remained Involved in the Repatriation Effort

        The defendant continued to participate in the scheme to locate, harass, and attempt to repatriate the victims to the PRC well into 2018.  The defendant's iCloud account contained a screen shot, taken in May 2018, of the address of Liu Yan and her husband. (PSR ¶ 88.)  The account also contained several photographs of Liu Yan's residence and her family car, which, according to metadata, were taken on May 9, 2018. (*Id.*)  Four days after the photographs were taken, the defendant traveled back to the PRC. (*Id.*)  This series of events is particularly noteworthy because Xu Jin and Liu Fang had refused to return to the PRC despite McMahon and others, in 2017, bringing Xu Jin's father to the United States to try to coerce Xu Jin's return.  That is, the PRC government still had a strong interest in harassing Xu Jin and his family members in order to force Xu Jin's return to the PRC.  And indeed, a few months after the defendant took the surveillance photographs at Liu Yan's residence, Zheng delivered an overtly threatening note to the victims, and then, in 2019, Liu Yan and her husband began to receive coercive and threatening mailings from the PRC.

I.      The Defendant Admitted Certain Facts Following His Arrest

        Following his October 28, 2020 arrest, the defendant admitted to certain facts about his involvement in the criminal scheme and obfuscated others. (PSR ¶ 108.)  He initially stated that he did not know why he had been arrested and that, to the extent he was involved in the Xu

Jin matter, he simply wanted to "make some money." (*Id.*) As the interview progressed, the defendant explained that Hu "told [the defendant] to make the arrangements" and asked the defendant to "look for somebody who could help look for that person," indicating that the defendant was asked to hire a private investigator to help locate Xu Jin. (*Id.*) The defendant then said that he found a translator service to help act as an interpreter between McMahon, himself, and Hu. (*Id.*)

When confronted with WeChat messages the defendant sent containing Xu Jin's social security number, the defendant claimed that this information was "public" because "these people are wanted in China." (*Id.*) He admitted, however, that he knew Xu Jin and his family were wanted in the PRC because Hu and another unidentified man the defendant drove around were "talking" in "the back of the car" about how Xu Jin was "a fugitive from Wuhan." (*Id.*) He also specifically identified "Mr. Hu," a reference to Hu Ji, and "the young man," a reference to co-defendant Zhu Feng, and said they came to the United States to "look for that person." (GX 703C; GX 703D.) The defendant said that he believed they had come to the United States for the "Communist Party," and that, while he was unsure whether Hu was in fact police, he was part of the "Overseas Chinese Affairs Office," a reference to one of the PRC organizations involved in the Fox Hunt and Sky Net operations. (PSR ¶ 108.) The defendant also specifically aware of the scheme to use Xu Jin's elderly father to harass Xu Jin, stating "the parent of this person, Xu Jin – actually came and try to ask Xu Jin to go back." (*Id.*) The defendant further admitted that he knew there were "several departments looking for [Xu Jin]" and that the one to find him "gets an award." (*Id.*)

II.    Applicable Law

The Supreme Court has explained that the sentencing court "should begin all sentencing proceedings by correctly calculating the applicable [Guidelines] range. *Gall v. United States*, 552 U.S. 38, 49 (2007). The Supreme Court further has explained that "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Id.* The sentencing court "should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* at 49-50. In doing so, the court "may not presume that the Guidelines range is reasonable," but "must make an individualized assessment based on the facts presented." *Id.* at 50 (internal citation omitted).

Title 18, United States Code, Section 3553(a) provides, in part, that in imposing a sentence, the court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]

(2) the need for the sentence imposed--

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; [and]

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." *United States v. Alexander*, 860 F.2d 508, 512-13 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

III.    Guidelines Calculation

The government agrees with the Guidelines calculation set forth in the PSR. With respect to Counts One and Two, Probation observed in the PSR that, under the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G."), no Guideline expressly has been promulgated for Counts One and Two and there is no sufficiently analogous offense Guideline, such that the provisions of 18 U.S.C. § 3553 should control. With respect to Counts Three and Four, Probation found the combined adjusted offense level to be 25, and, given the defendant's lack of criminal history, found that the applicable Guidelines range is 57-71 months' imprisonment.

With respect to Counts One and Two, as the PSR notes, no Guideline has been promulgated for 18 U.S.C. § 951 (or conspiring to violate § 951), which carries a statutory maximum term of imprisonment of 10 years, and 5 years for conspiring to do the same in violation of 18 U.S.C. § 371. (PSR at 3, ¶¶ 110, 141.) The government agrees with Probation that there is no sufficiently analogous Guideline, and further agrees that the provisions of 18 U.S.C. § 3553 control the imposition of an appropriate sentence, pursuant to U.S.S.G. §§ 2X1.1 and 2X5.1. (*Id.* ¶¶ 110, 141.) The government respectfully requests that the Court impose a significant, deterrent sentence for the defendant's Section 951 convictions. The government provides, in Part IV.C.iv below, information regarding sentences for other defendants convicted of Section 951 offenses.

With respect to Counts Three and Four, which are grouped pursuant to U.S.S.G. § 3D1.2(b), the government agrees with Probation that the appropriate calculation of the defendant's adjusted offense level is:

<u>Counts Three and Four – Xu Jin</u>

Base Offense Level (§ 2A6.2(a))        18

Plus:    Offense involved a pattern of activity involving stalking, threatening, harassing or assaulting the same victim (§ 2A6.2(b)(1)(E))    +2

Plus:    Offense involved a vulnerable victim (§ 3A1.1(b)(1))    <u>+2</u>

Total:    <u>22</u>

<u>Counts Three and Four – Liu Fang</u>

Base Offense Level (§ 2A6.2(a))        18

Plus:    Offense involved a pattern of activity involving stalking, threatening, harassing or assaulting the same victim (§ 2A6.2(b)(1)(E))    <u>+2</u>

Total:    <u>20</u>

<u>Count Three – Xu Xinzi</u>

Base Offense Level (§ 2A6.2(a))        18

Plus:    Offense involved a pattern of activity involving stalking, threatening, harassing or assaulting the same victim (§ 2A6.2(b)(1)(E))    <u>+2</u>

Total:    <u>20</u>

<u>Multiple Count Analysis</u>

Highest Adjusted Offense Level    22

| Group/Count | Level | Units |
| --- | --- | --- |
| Count 3 (Xu Jin) and 4 | 22 | 1 |
| Count 3 (Liu Fang) and 4 | 20 | 1 |
| Count 3 (Xu Xinzi) | 20 | 1 |

Total Units:    <u>3</u>

Plus:    3 levels (§ 3D1.4)    +3

Total:    <u>25</u>

(PSR ¶¶ 144-168.) Accordingly, assuming a Criminal History Category of I, a total adjusted offense level of 25 yields a Guidelines range of 57-71 months' imprisonment. (*Id.* ¶ 217.)

The defendant disputes the applicability of the two-level pattern of stalking enhancement (§ 2A6.2(b)(1)(E)) and the two-level vulnerable victim enhancement (§ 3A1.1(b)(1)), and contends that a two-level minor role reduction (§ 3B1.2(a)) and a two-level acceptance of responsibility reduction (§ 3E1.1) is appropriate. The defendant further disputes the applicability of the grouping analysis. The government addresses each of these arguments below.

IV.    Argument

For the reasons below, the government respectfully submits that a sentence of 71 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. Specifically, the government submits that sentences of 48 months' imprisonment on Counts One and Two and sentences of 71 months' imprisonment – which is the top of the applicable Guidelines range – on Counts Three and Four, all to run concurrently, is appropriate. Such a sentence would constitute just punishment, reflect the severity of the defendant's offense, promote respect for the law, and provide the specific and general deterrent effect called for by the defendant's offenses. Notably, the government's recommended sentence is one month below the 72 months' imprisonment recommended by the Probation Department. In contrast, the defendant's requested sentence of not more than 18 months' imprisonment – *less than one third* of the bottom of the applicable Guidelines range for the stalking convictions alone – would not further the objectives of sentencing.

The government does not object to Probation's recommendation that no fine be imposed in light of the defendant's reported financial condition or to the recommended special conditions of supervised release. There is no forfeiture or requested restitution in this case.

A.    With Respect to Counts One and Two, There Is No Analogous Guideline and Accordingly the Provisions of Section 3553 Control

The appropriate offense level under the Guidelines is typically determined by reference to the statutory index contained in Appendix A to the Guidelines. *See* U.S.S.G. § 1B1.2(a). For statutory violations that are not listed in the appendix, the Guidelines instruct that the "most analogous offense guideline" is to be used. U.S.S.G. § 2X5.1. Where, however, there is no sufficiently analogous Guideline provision, the Court is to sentence the defendant anywhere within the statutory sentencing range based on application of the Section 3553(a) factors. *See* U.S.S.G. § 2X5.1 ("If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control."). As relevant here, courts routinely have held that no sufficiently analogous Guideline provision applies to convictions for violating or conspiring to violate 18 U.S.C. § 951. *See, e.g.*, *United States v. Buryakov*, No. 15-CR-73 (S.D.N.Y.), ECF No. 158 at 6-7, 17 (finding no sufficiently analogous Guideline provision where defendant was convicted of violating § 951 for agreeing to provide information to Russian official); *United States v. Chun*, No. 16-CR-618, ECF No. 17 at 10 (S.D.N.Y.) (parties jointly submitted there was no analogous Guideline and court agreed where defendant was convicted of violating § 951 for providing sensitive information to Chinese officials); *United States v. Butina*, No. 18-CR-218, ECF No. 120 at 11-12 (D.D.C.) (observing "[t]he majority of the courts that have dealt with this issue have determined that § 951

does not have a sufficiently analogous guideline" and similarly finding no sufficiently analogous Guideline provision for conspiracy to violate § 951).[4]

Here, too, no sufficiently analogous Guideline applies to the defendant's convictions for conspiring to act as an illegal agent of a foreign government, in violation of 18 U.S.C. § 371 (Count One), and acting as an illegal agent of a foreign government, in violation of 18 U.S.C. § 951 (Count Two).[5] Accordingly, the provisions of 18 U.S.C. § 3553(a) control, *see* U.S.S.G. § 2X5.1, and both Counts are appropriately excluded from the offense level computation, as explained in the PSR. (PSR ¶¶ 110, 112.) As a result, the Court may sentence the defendant anywhere within the statutory range of zero to 10 years' imprisonment based on application of the Section 3553(a) factors without reference to any Guideline calculation.

The defendant's arguments to the contrary (ECF No. 326 at 2-3) lack merit. His contention that the stalking Guideline, U.S.S.G. § 2A6.2, is sufficiently analogous fails to recognize the gravity and nature of his Section 951 convictions. Although the offense conduct for the defendant's illegal foreign agent violations and stalking violations overlaps, the stalking Guideline alone fails to adequately account for the serious threat to U.S. national security caused by a foreign agent's undisclosed activities in the United States on behalf of a foreign government. Here, as detailed above, the defendant knowingly participated in an international campaign, directed by the PRC government, to threaten, harass, surveil, and intimidate Xu Jin, Liu Fang, and Xu Xinzi. The defendant not only surveilled and stalked the victims, but knowingly agreed to do so on behalf of the PRC government to further its political agenda, namely, coercing Xu Jin and Liu Fang to return to the PRC. (ECF No. 294 at 2-17, 42.) In agreeing to carry out an unsanctioned PRC operation on U.S. soil at the direction of PRC government officials, the defendant threatened not only the personal safety of the victims, but also the United States's sovereignty.

The defendant's alternative assertion that the Guideline for failing to report income taxes, U.S.S.G. § 2T1.1, is sufficiently analogous (in that it also relates to a failure to notify the U.S. government of something) is similarly flawed. In short, it fails to recognize that the

---

[4]     *See also, e.g.*, *United States v. Ji*, No. 18-CR-611 (N.D. Ill.), ECF No. 416 at 6 (finding no analogous Guideline provision for § 951 and conspiracy to violate § 951); *United States v. Soueid*, No. 11-CR-494, ECF No. 59 (E.D. Va.) (finding no sufficiently analogous Guideline provision where defendant was convicted of § 951 for conducting surveillance on Syrian dissidents in the United States on behalf of Syrian government); *United States v. Alvarez*, No. 05-CR-20943 (S.D. Fla.) (finding no sufficiently analogous Guideline provision where defendant was convicted of § 951 for responding to taskings by Cuban intelligence services over 30-year period and sending reports back to Cuba in response to those taskings); *United States v. Duran*, No. 07-CR-20999 (S.D. Fla.), ECF No. 488 at 42-43 (finding no sufficiently analogous Guideline provision where defendant was convicted of 18 U.S.C. §§ 371 and 951 for attempting to bribe and extort a U.S. citizen on behalf of the government of Venezuela).

[5]     The offense level applied for a conspiracy offense is the offense level from the Guideline for the substantive offense. *See* U.S.S.G. § 2X1.1. Because 18 U.S.C. § 951 has no applicable or analogous Guideline, conspiracy to violate 18 U.S.C. § 951 similarly has no applicable or analogous Guideline.

defendant's lack of notification to the Attorney General is but one element of his criminal conduct under Section 951. Section 951 criminalizes the *action* of the agent of a foreign government without notification to the Attorney General, not merely the *failure to notify* the Attorney General. And, as explained above, the defendant took several actions in the United States on behalf of the PRC government, including hiring McMahon to locate and target Xu Jin; passing sensitive information about the victims to McMahon to assist with the surveillance efforts; and arranging meetings with McMahon and Hu. (*Id.* at 10-13, 17, 42.) These actions are nowhere accounted for in the Section 2T1.1 Guideline.

Finally, the defendant's reliance on *United States v. Cothran*, 286 F.3d 173, 178 (3d Cir. 2002), and *Minicone v. United States*, 353 F. Supp. 2d 316, 318 (N.D.N.Y. 2005) (ECF No. 326 at 2) is misplaced. Neither of these cases addresses whether an analogous Guideline applies to 18 U.S.C. § 951. At most, these authorities stand for the proposition that, in determining whether an analogous Guideline provision applies to an offense, the court must look at the definitions of the offense and the defendant's conduct. Here, as explained, the conduct at issue – covertly acting in the United States at the direction of a foreign government – is not adequately encompassed by any Guideline provision, including Sections 2A6.2 and 2T1.1.

In sum, because there is no analogous Guideline provision for the defendant's convictions on Counts One and Two, the government respectfully submits that the Court may sentence the defendant up to the statutory maximum of 60 months' imprisonment for Count One and 120 months' imprisonment for Count 2, based on application of the Section 3553(a) factors. Those factors are addressed below.

B. With Respect to Counts Three and Four, Probation's Guidelines Calculation Is Correct

For the reasons below, the government agrees with Probation's Guidelines calculation for Counts Three and Four.

i. A Two-Level Pattern of Stalking Enhancement Is Appropriate Under U.S.S.G. § 2A6.2(b)(1)(E))

A two-level enhancement for a pattern of stalking pursuant to U.S.S.G. § 2A6.2(b)(1)(E) is appropriate. Under U.S.S.G. § 2A6.2, if a stalking offense involved "a pattern of activity involving stalking, threatening, [or] harassing . . . . the same victim, increase by *2* levels." U.S.S.G. § 2A6.2 (emphasis in original). The Application Notes to the Guideline further explain that a "[p]attern of activity involving stalking, threatening, harassing, or assaulting the same victim means any combination of two or more separate instances of stalking, threatening, [or] harassing . . . the same victim, whether or not such conduct resulted in a conviction." U.S.S.G. § 2A6.2, Application Note 1 (internal quotation marks omitted). "For example, a single instance of stalking accompanied by a separate instance of threatening, harassing, or assaulting the same victim constitutes a pattern of activity for purposes of this guideline." *Id.*[6]

---

[6]     "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a

The evidence at trial plainly establishes a pattern of stalking activity by the defendant and his co-conspirators directed at victims Xu Jin, Liu Fang, and Xinzi Xu. The conspirators' targeting of the victims was a multi-pronged, multi-phased effort over the course of more than three years to locate and compel Xu Jin and Liu Fang to return to the PRC. (ECF No. 294 at 4.) The scheme included: (1) a 2016 approach of Xu Jin's sister-in-law by an unknown individual to tell her to relay the message to Xu Jin that he must return to the PRC; (2) efforts to locate Xu Jin, Liu Fang, and Xinzi Xu in October and November 2016 to further the harassment campaign, (3) the April 2017 coercion attempt using Xu Jin's elderly father; (4) online harassment of Xinzi Xu in May 2018; (5) the posting of threatening notes at Xu Jin and Liu Fang's home in September 2018; and (6) menacing mailings purporting to be from Xu Jin's family in Wuhan sent to Xu Jin's brother-in-law. (*Id.* at 4-17.) The defendant himself played an integral role in furthering this multi-phased scheme: He traveled to the PRC on multiple occasions, made the arrangements to retain McMahon, passed McMahon sensitive personal information about the victims, facilitated meetings with McMahon and Hu, and even returned to the home of Xu Jin's sister-in-law in May 2018 to take pictures of her residence and car. As this Court found, evidence at trial showed that the defendant's efforts were "complex, sustained, involved sensitive personal information and multiple trips to the PRC, and undertaken at the direction of a PRC police officer" and "intended to harass Xu Jin and Liu Fang into returning to China." (*Id.* at 43-44.)

The defendant's objections to the pattern of stalking enhancement (ECF No. 324 at 5-6) are unpersuasive. He asserts that he did not engage in a pattern of activity because he did not visit a victim's home multiple times. But the enhancement applies to "any combination of two or more separate instances of stalking, threatening, harassing, or assaulting the same victim, whether or not such conduct resulted in a conviction" – it is not so narrowly limited to instances of physical stalking at a victim's home. U.S.S.G. § 2A6.2(b)(1)(E). And here, there were multiple instances of stalking and harassment directed at the victims over the course of a three-year period.

The defendant also argues that the offense conduct should only include those instances of stalking and harassment that he personally carried out. But the defendant was part of a larger conspiracy. Accordingly, the relevant conduct for the offense level calculation includes not only his own acts and omissions, but also the acts and omissions of his co-conspirators that are "within the scope of the jointly undertaken criminal activity," "in furtherance of that criminal activity," and "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a). The actions of the defendant's co-conspirators satisfy this test. Their efforts to stalk and harass Xu Jin, Liu Fang, and Xinzi Xu were not only within the scope of and in furtherance of the scheme, but they were also reasonably foreseeable to the defendant. He was fully aware of the goal of the PRC government to harass Xu Jin and Liu Fang into returning to the PRC when he agreed to participate in the scheme, and the further harassment by others to achieve that goal was reasonably foreseeable given the nature of the offense. (ECF No. 294 at 43-44.)

---

plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). Although the "continuing vitality of *Stinson* is subject to debate," the Second Circuit continues to "adhere to *Stinson*" and "defer[s] to the application note[s]." *United States v. Rainford*, 110 F.4th 455, 495 n.5 (2d Cir. 2024).

ii.  A Two-Level Vulnerable Victim Enhancement Is Appropriate Under U.S.S.G.
§ 3A1.1(b)(1))

A two-level enhancement for a vulnerable victim pursuant to 18 U.S.S.G. § 3A1.1(b)(1) is appropriate.  As explained above, as part of the illegal repatriation scheme, in April 2017, the defendant's co-conspirators, including McMahon, forced Xu Jin's elderly and ill father – the vulnerable victim – to travel from the PRC to the United States, against his will, in order to try to coerce Xu Jin to return to the PRC.  The defendant was specifically aware of this effort, as evidenced by his statement during his post-arrest interview that "the parent of this person, Xu Jin – actually came and try to ask Xu Jin to go back."  (PSR ¶ 108.)

Section 3A1.1(b) provides, in relevant part, that a defendant's offense level should be increased by two levels if he "knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct."  U.S.S.G. § 3A1.1(b).  As the Second Circuit has observed, courts generally require that "the vulnerability of the victim must bear some nexus to the criminal conduct."  *United States v. McCall*, 174 F.3d 47, 50 (2d Cir. 1998).  For example, "[t]he adjustment would apply . . . in a robbery where the defendant selected a handicapped victim," U.S.S.G. § 3A1.1(b) (Application Note 2), but might not apply in a fraud case involving the same physically handicapped person."  *Id.*  Courts generally also require that the vulnerable victim must have been "singled out . . . from a larger class of potential victims."  In addition, "broad generalizations about victims based upon their membership in a class are disfavored where a very substantial portion of the class is not in fact particularly vulnerable to the crime in question."  *Id.*  In such cases, courts have required that the enhancement be based on individualized findings as to the vulnerability of particular victims.  *Id.*

Here, Xu Jin's father was forced to travel to the United States to try to coerce his son into returning to the PRC because of his familial relationship to his son.  Notably, however, Xu Jin had other family members in the PRC whom the government could have forced to make the trip, including Xu Jin's younger sister, who PRC officials threatened to imprison if Xu Jin's father did not make the trip (Tr. 1392:1-4), thus making clear she was readily accessible to the PRC government.  It stands to reason that Xu Jin's father was the one forced to make the trip *because* he was elderly and ill, which itself would be expected to place significant pressure on Xu Jin to return to the PRC.  That is, Xu Jin would be more likely to return to the PRC upon seeing the threat posed to his vulnerable father than in response to another family member being forced to travel to the United States.  And indeed, Liu Yan testified that her reaction to Xu Jin's father being forced to travel to the United States was based on his vulnerability: "I cannot believe that the law enforcement of Chinese government were using an elderly man to meet the – I cannot believe that the law enforcement of China were using an old man to meet their goal."  (Tr. 96:11-14.)  Liu Fang similarly testified she felt bad that "[i]n order to serve their purpose, they have forced and threatened an 80-year-old man to come from China to the U.S."  (Tr. 700:21-23.)

Tellingly, as part of the illegal repatriation scheme, in 2019, Xu Jin's sister-in-law received a video that underscores that Xu Jin's father was selected to make the trip to the United States because of his vulnerable state.  (GX 506G.)  The video features footage of Xu Jin's mother, father, and sister, sitting in a living room with subtitles and a montage of old family photographs.  (ECF No. 294 at 9.)  The subtitles repeatedly emphasize the vulnerabilities of Xu Jin's parents in

a transparent effort to manipulate him into returning to the PRC. For example, one of the subtitles states: "When parents are alive, you can still call someplace a home; when parents are gone, you can only prepare for your own tomb." (*Id.*) Another subtitle states: "Dear brother, I believe that you had made the promise from the bottom of your heart to our parents to uphold the filial piety . . . believing that there will be plenty of time for you to carry out the duty as a child. . . . Regrettably, we forget. We forget the cruelty of the time; we forget the shortness of life." (GX 506G.)

As the defendant's post-arrest statement – that "the parent of this person, Xu Jin – actually came and try to ask Xu Jin to go back" – reflects, he was aware of the scheme to force Xu Jin's father to travel to the United States to try to coerce Xu Jin's return to the PRC. That scheme reflected the continuation of efforts over multiple years to follow Xu Jin's parents in order to locate Xu Jin. Indeed, in early October 2016, according to the translator, the defendant advised her that Xu Jin's parents – who were in the United States for Xu Xinzi's graduation – were going to Newark International Airport, and directed that McMahon conduct surveillance because "[m]aybe this a lead to find Mr. Jin Xu."[7] The defendant also provided the translator with a Word document, which was forwarded to McMahon. The document included, among other things, Xu Jin's birthdate and a photograph of Xu Jin's parents. (GX 1020.) Based on Xu Jin's own age (and the fact that he had an adult daughter), the defendant was aware that Xu Jin's father was elderly – which was further evidenced by the photograph the defendant himself provided.

Moreover, the defendant's contention that his post-arrest statement does not demonstrate his knowledge of the April 2017 events because it "confused the timeline" (ECF No. 326 at 3) is unpersuasive. Even if the defendant was not directly involved in this conduct, it occurred as part of the conspiracy and clearly with the defendant's knowledge. That the defendant was aware of these events – which occurred after he contends his role in the conspiracy ended (which, in any event, is not credible given his involvement in 2018 when he surveilled Liu Yan's home) – reflects his ongoing involvement in the scheme, as well as close relationships with others in the scheme who continued to share information with him.

### iii. A Two-Level Minor Role Reduction Is Not Appropriate Under U.S.S.G. § 3B1.2(a)

The two-level minor role reduction the defendant seeks pursuant to U.S.S.G. § 3B1.2(b)[8] (ECF No. 326 at 5-6) is not appropriate. Section 3B1.2(b) provides for a two-level

---

[7]     After Xu Jin's father's trip to the United States, he experienced a brain hemorrhage and needed surgery. (Tr. 1388:3-4; 1396:18-21.) His medical condition made further travel dangerous.

[8]     The defendant argues that he should receive a "two-level minor role adjustment under § 3B1.2(a)." (ECF No. 326 at 5.) The government construes this as a request for a minor role reduction under U.S.S.G. § 3B1.2(b), which provides for a two-level reduction if the defendant was a "minor participant." U.S.S.G. § 3B1.2(a), in contrast, provides for a four-level reduction if the defendant was a "minimal participant." To the extent the defendant in fact is seeking a four-level reduction under U.S.S.G. § 3B1.2(a), the government respectfully submits that it is not

reduction where "the defendant was a minor participant in any activity." U.S.S.G. § 3B1.2(b). Far from being a minor participant, the defendant played a critical and central role in the criminal offenses, with conduct that spanned multiple years and continents.

This Court previously rejected the notion that the defendant was "an unwitting tagalong," finding instead that he "was closer to the hub of the conspiracy, i.e., the Chinese officials overseeing the scheme, than many of the other conspirators."[9] (ECF No. 294 at 43.) As the Court has already found:

> Zhu admitted that he knew the purpose of the surveillance of Xu Jin – whether it was covert or not – was to monitor Xu Jin because he was "wanted in China" as a "fugitive from Wuhan." To make this happen, Zhu acted as a catalyst by "mak[ing] the arrangements" to retain McMahon, as directed by Hu Ji, and hire an interpreter so that Hu Ji could communicate with McMahon. Zhu also transferred sensitive information – information that was likely available only through PRC governmental authorities – to McMahon to facilitate his tracking of Xu Jin. Zhu met with McMahon and Hu Ji. Finally, Zhu took additional action a year and a half after the main surveillance activity in this matter, returning to Liu Yan's Short Hills home in May 2018 to take pictures of her vehicle and her house.

(*Id.* (internal citations omitted).)

The defendant's attempts to minimize the role he played are unavailing. Contrary to his suggestion (ECF No. 326 at 5), the defendant's participation was much more than being "a passenger in the car when Hu Ji and others went to [Xu Jin's] house" and later taking "a photograph that he never shared." As part of the illegal repatriation scheme, the defendant was in direct contact with at least two PRC government officials (Sun Hui and Hu), including regular contact with Hu, the PRC police officer; the defendant hired McMahon, provided him with highly sensitive information about the victims, gave him directions, and received updates from McMahon; the defendant was kept apprised of developments in the scheme (*e.g.*, that Xu Jin's father had been brought to the United States to try to coerce Xu Jin's return); and, from at least September 2016 through May 2018, the defendant engaged in a pattern of travel to the PRC that aligned with efforts to locate Xu Jin and his family.[10] This conduct belies the defendant's contention that "he clearly

---

appropriate for the same reasons that a reduction under U.S.S.G. § 3B1.2(b) is not appropriate, as set forth above.

[9]     The Court made this finding in connection with Counts Two and Three, but the government submits that it applies to Counts One and Two with equal force.

[10]     Although the defendant suggests that he took a single photograph of the residence of Xu Jin's sister-in-law, Liu Yan, the defendant in fact took at least five photographs, including two photographs of her vehicle's license plate. (GX 902H, GX 902I.) And although the defendant contends that he never shared the photograph, as this Court observed, Liu Yan began receiving

lacked knowledge or understanding of the scope and structure of the enterprise and the activities of others" (*Id.* at 5 (internal quotation marks omitted)). Nor is there any significance that the defendant did not personally have actual contact with any of the victims, as the defendant contends (*id.*). The victims were harassed, stalked, and suffered substantial emotional distress because of the defendant's conduct.

Finally, to the extent the defendant suggests that his minor role in the offenses is reflected by the fact that he was not included in the recent prisoner exchange with the PRC (*id.* at 16), such argument should be rejected. Prisoner exchanges reflect complex geopolitical negotiations from which no inferences can or should be drawn. Indeed, the PRC government may not have wished to acknowledge its role in this transnational repression scheme or in Operation Fox Hunt more generally by seeking the return of any defendants from this case.

        iv. A Two-Level Reduction for Acceptance of Responsibility Is Not Appropriate
           Under U.S.S.G. § 3E1.1

The two-level acceptance of responsibility reduction the defendant seeks pursuant to U.S.S.G. § 3E1.1 is not appropriate. Under Section 3E1.1, "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense," the court should "decrease the offense level by two levels." U.S.S.G. § 3E1.1. The Application Notes make clear that "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, Application Note 2. And though the Application Notes recognize that conviction by trial "does not automatically preclude a defendant from consideration for such a reduction," they also specify that the court should only apply the adjustment after conviction by trial in "rare situations":

> This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

*Id.* (emphasis added); *see also, e.g.*, *United States v. Nouri*, 711 F.3d 129, 146 (2d Cir. 2013) (affirming district court's decision not to apply acceptance of responsibility adjustment because defendant contested his guilt at trial by arguing in summation that he lacked criminal intent); *United States v. Kamara*, 85 F. App'x 231, 232-33 (2d Cir. 2003) (affirming district court's rejection of acceptance of responsibility adjustment because defendant's expression of remorse for his conduct only occurred "after the jury found him guilty"); *United States v. Castano*, 999 F.2d 615, 617 (2d Cir. 2003) (per curiam) (holding that defendant was not entitled to acceptance of responsibility adjustment where "nothing in the record indicates that [defendant] had any purpose

---

harassing mailing from Wuhan at her residence subsequent to the defendant's visit. (ECF No. 94 at 44.)

in going to trial other than to deny his factual guilt"). Ultimately, the defendant bears the burden of showing that the acceptance of responsibility reduction is warranted. *United States v. Chu*, 714 F.3d 742 (2d Cir. 2013) (holding that "the defendant bears the burden of demonstrating that he qualifies for [an acceptance of responsibility] reduction" and rejecting reduction even where defendant had pleaded guilty and admitted to the criminal conduct).

Here, the defendant elected to proceed to trial, and, throughout the course of that trial, vigorously contested his guilt. (*See, e.g.*, Tr. 59:18-60:3 (arguments in opening statement that "I'm here to defend a person that I believe is an innocent and is a victim of . . . Operation Foxhunt" and the "evidence will show . . . Jason Zhu didn't know that [the person directing him] is an official for the Chinese government"); Tr. 2071:15-17 (argument in summation that "the government has failed to satisfy its burden of proof in demonstrating that Yong Zhu knowingly acted as an agent for the Chinese government")). The defendant, moreover, only chose to express remorse after conviction on all charges, and even so, has not expressly admitted his guilt. Indeed, after trial, he challenged his convictions (ECF Nos. 277, 288), which is far from accepting responsibility. The acceptance of responsibility adjustment plainly is not warranted. U.S.S.G. § 3E1.1, Application Note 2.

Despite the defendant's arguments to the contrary (ECF No. 324 at 6-7), nothing about the circumstances of the pretrial or trial proceedings suggests this is the "rare" case in which an acceptance of responsibility reduction is warranted after conviction by trial. The defendant's admissions in a post-arrest interview to certain facts that proved elements of his crimes is not a "rare circumstance" that establishes he clearly accepted responsibility for his criminal conduct pre-trial – especially because he also attempted to minimize his role in the offense and to obfuscate certain facts during the interview. *Cf. Castano*, 999 F.2d at 616-17 (acceptance of responsibility reduction not applicable even where defendant was "truthful" about his criminal conduct at his second proffer session because he contested his factual guilt at trial). Further, the defendant's assertions that he would have pleaded guilty had he been competently represented (ECF No. 326 at 10) are neither consistent with the history of the case nor properly raised at this juncture. Indeed, this Court has already held that any such ineffective assistance of counsel challenge must be raised in post-judgment or collateral proceedings. (ECF No. 273, at 9-10.) And even if the defendant could prove that he would have pleaded guilty had he been better represented, that would not itself be sufficient to satisfy his burden of showing that he clearly accepted responsibility for his criminal conduct. *See* U.S.S.G. § 3E1.1, Application Note 2 (noting even a "defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right").

### v. The Grouping Analysis Applied to Multiple Stalking Offenses Is Appropriate Under U.S.S.G. §§ 1B1.2(d) and 3D1.4

Probation appropriately applied U.S.S.G. §§ 1B1.2(d) and 3D1.4, including the three-level enhancement due to the grouping of the multiple object counts. (PSR ¶ 164.) In his objections to the PSR, the defendant objected to the application of U.S.S.G §§ 1B1.2(d) and 3D1.4, which apply to a conspiracy conviction with multiple objects. As Section 1B1.2(d) and its Application Notes instruct, "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit" but only "if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit [each] object

offense." U.S.S.G. § 1B1.2(d); U.S.S.G. § 1B1.2(d) Application Note 4; U.S.S.G. § 3D1.2 Application Note 8; *see also United States v. Robles*, 562 F.3d 451, 455-56 (2d Cir. 2009) (in finding Section 1B1.2(d) applicable, the sentencing court must find "beyond a reasonable doubt" that the defendant conspired to commit each object of the conspiracy).

Here, Section 1B1.2(d) should be applied as the trial evidence showed beyond a reasonable doubt that the defendant was guilty of Count Three and its multiple conspiratorial objects – namely, the interstate stalking of each of Xu Jin, Liu Fang, and Xu Xinzi. (PSR ¶ 142.) Accordingly, the grouping adjustment under Section 3D1.4 applied to the multiple-count conspiracy provides for a three-level enhancement. (*Id.* ¶¶ 162, 164.)

Relying on the arguments made by co-defendant McMahon, the defendant argues that the interstate stalking conspiracy cannot be deemed a "conspiracy to commit more than one offense" because the ultimate goal of the conspiracy was to harass and coerce Xu Jin into returning to the PRC. (ECF No. 324 at 5; *see also* ECF No. 321 at 6-7.) But the defendant's claim that there was an overarching goal that prompted the unlawful conspiracy to stalk each of the three victims does not render Section 1B1.2(d) inapplicable given that the multiple offenses of the conspiracy "refers to all offenses the defendant conspired to commit that fall within the conspiracy that is alleged in the indictment." *United States v. Mitchell*, 120 F.4th 1233, 1244 (4th Cir. 2024); *see also Robles*, 562 F.3d at 456 (multiple objects of a conspiracy need not be articulated in an indictment to be considered under Section 1B1.2(d)).

Further, the defendant argues that the trial evidence did not prove beyond a reasonable doubt that the defendant conspired to stalk each of Xu Jin, Liu Fang, and Xu Xinzi. (ECF No. 324 at 5; *see also* ECF No. 321 at 6-7.) This argument fails. The trial record shows that the defendant provided detailed personal information about all three victims, including their driver's license numbers, social security numbers, and Chinese identification numbers. (GX 901D at 9; GX 3013.) The defendant, through a translator, also sent co-defendant McMahon photographs of Xu Jin, Liu Fang, and Xu Xinzi. (GX 4004 at 13-14.) The defendant repeatedly asked McMahon for additional information on each of the three victims and whether the reports contained Xu Jin's and Xu Xinzi's "recent address[es]." (GX 3026; GX 4004 at 19-22.) The defendant also received detailed information, including housing records, bank reports and educational and enrollment data, about Xu Jin, Liu Fang, and Xu Xinzi. (*See, e.g.*, GX 3027; GX 3028; GX 3037; GX 3038; GX 4007; GX 4008 at 830-41.) In short, all three victims were stalked and harassed as part of the conspiracy, and that conduct is appropriately treated under the grouping analysis in the PSR.

C.     Analysis of Sentencing Factors Under 18 U.S.C. § 3553(a)

18 U.S.C. § 3553(a) requires courts to consider a number of factors in imposing a sentence, including the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to serve as a deterrent, and the need to avoid unwarranted sentencing disparities. For the reasons below, analysis of these factors supports imposing a sentence of 71 months' imprisonment; specifically, sentences of 48 months' imprisonment on Counts One and Two and sentences of 71 months' imprisonment – which is at the top of the applicable Guidelines range – on Counts Three and Four, all to run concurrently to each other.

Such sentences are appropriate because, due to the conduct of the defendant and his co-conspirators, Xu Jin and his family have been terrorized and traumatized. That conduct – threatening, harassing, stalking, surveilling, and intimidating Xu Jin and his family, over a period of years – warrants a sentence within the Guidelines range for the interstate stalking offenses. The fact that the defendant engaged in that conduct in furtherance of a foreign government's interests – a significant consideration not otherwise accounted for by the interstate stalking Guidelines – warrants a sentence at the top of that range.

    i.    The Nature and Circumstances of the Offenses

The nature and circumstances of the defendant's offenses are extraordinarily serious. As detailed above, the defendant's actions furthered the PRC government's illegal operations on U.S. soil – conduct that poses a serious threat to U.S. national security and sovereignty. And because of the conduct of the defendant and his co-conspirators, the lives of Xu Jin and his family have been upended.

Liu Fang testified at trial, for example, that her "life was turned upside down" because of the actions taken against "all the family members and the extended family." (Tr. 732:16-18.) She explained that, because she did not "want to be harmed" she "chose to be away from [her family]" and "cut off all communications." (Tr. 732:20-25.) As a result of "seal[ing] myself up," Liu Fang testified she "lost my friends and all the connection with my relatives and friends in China." (Tr. 733:2-3.) She also testified that she feared for her daughter's safety. (Tr. 730:17-18.) Liu Yan corroborated this testimony, herself testifying that her sister, Liu Fang, had been "on the verge of collapsing" as a result of the illegal repatriation scheme, and had distanced herself from family and friends. (Tr. 126:14-19.) She stated that she had "no proper words to describe the mental pain we have suffered." (Tr. 126:11-12.) In addition, Xu Jin testified that he feared for his personal safety, as well as the safety of his family members – both in the PRC and in the United States. (Tr. 1400:19-1401:03.)

The profound effects of the defendant's conduct are further detailed in the victim impact statements. The victims uniformly describe feeling unsafe and worrying about the safety of themselves and their family members. (PSR ¶¶ 105-07.) One victim, for example, describes spending "countless days crying, worrying about my family's safety, and my own." (*Id.* ¶ 106.) The victims also describe significant health issues, including depression, insomnia, excessive stress, anxiety, and heart disease. (*Id.* ¶¶ 105, 107.) In addition, the victims describe the significant disruption to their daily lives, including that, "in order to minimize harm to others, [the victims] have almost entirely severed ties" with friends and business partners. (*Id.* ¶ 105.) Those victims "dare not venture out casually, and only leave the house to buy essential supplies." (*Id.*) In addition, the victims describe harm to family members in the PRC, including medical issues, interrogations by the PRC government, and lost jobs. (*Id.* ¶¶ 105, 107.)

As shown by these victim impact statements, the defendant's conduct not only was intended to, but in fact did, aid a foreign government in terrorizing individuals living here in the United States.

ii.  <u>The History and Characteristics of the Defendant</u>

The defendant does not have any criminal history, and the government does not contest the assertions of those who have written letters concerning the defendant's personal history and family relationships.  The government respectfully submits, however, that the defendant's arguments with respect to his immigration status, the possibility of deportation, and his medical conditions do not warrant leniency in his sentence, especially when weighed against the other Section 3553(a) factors.

With respect to the defendant's status as a noncitizen, the Second Circuit has counseled against considering the collateral consequences of a defendant's immigration status as a basis for leniency.  *See United States v. Duque*, 256 F. App'x 436, 437-38 (2d Cir. 2007) (summary order) ("The collateral effects of deportability – *e.g.*, (1) the unavailability of preferred conditions of confinement, and (2) the possibility of an additional period of detention pending deportation following the completion of sentence – generally do not justify a departure from the Guidelines range.  While it is true that pertinent collateral consequences of a defendant's alienage might serve as a valid basis for departure if those consequences were extraordinary in nature or degree, the collateral effects at issue here are run of the mill." (internal citations and quotation marks omitted)); *see also Gil v. United States*, No. 02-CR-0757, 2010 WL 3940527, at *1 (E.D.N.Y. Oct. 6, 2010) (following *Duque* in denying motion for adjustment of sentence on grounds of deportability); *cf. United States v. Wills*, 476 F.3d 103, 108-09 (2d Cir. 2007) (abrogated on other grounds); *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (fact that defendant will be deported after serving sentence is not a ground for leniency).

Moreover, the defendant's framing of this issue obscures an aggravating aspect of his criminal conduct.  The defendant's own status as a lawful permanent resident in the United States while maintaining his PRC citizenship is one of the attributes that enabled him to execute his role as a "middleman" in the criminal conspiracy.  That is, the defendant's ability to travel between the PRC and the United States freely (GX 402Y) facilitated in-person meetings with co-conspirators in the PRC government while at the same time providing the PRC officials with whom the defendant worked the comfort that he would be able to hire a U.S. private investigator to track down and harass Xu Jin and his family.  The defendant's ability to travel between the two countries without the hindrance of obtaining visas or other travel documents helped advance the conspiracy's aims; for example, in the fall of 2016, the defendant returned from the PRC to arrange the meeting with himself, McMahon and Hu at Panera Bread, and in May 2018, the defendant traveled to the PRC several days after obtaining surveillance photos from Liu Yan's home.  (GX 402Y; GX 902D at 2-3.)  That the defendant, having been convicted of unlawfully acting as an agent of a foreign government and interstate stalking, will no longer be permitted into the United States should not weigh in favor of a shorter term of imprisonment, but rather is a necessary result to ensure that the defendant, and those similarly situated, cannot take advantage of their lawful immigration status in the United States to further criminal aims as the defendant did here.

Finally, with respect to the defendant's reported health issues, those issues similarly do not warrant leniency when weighed against the other Section 3553(a) factors.  The government sympathizes with the defendant's medical and mental health ailments, but they are not so extraordinary or otherwise of such an unusual nature that the Bureau of Prisons would have

difficulty accommodating them. *Cf. United States v. Crone*, 343 F. App'x 588, at \*2 (2d Cir. 2009) (affirming substantive reasonableness of sentence imposed by district court despite defendant's serious cardiac condition because record supported that condition could be treated "as effectively in prison as out of prison"); *United States v. Kurland*, 718 F. Supp. 2d 316, 319 (S.D.N.Y. 2010) (declining to apply downward departure for defendant's health issues, which included hyperlipidemia, diabetes mellitus, and prostate cancer, noting that defendant was "not afflicted with an extraordinary physical impairment that the Bureau of Prisons would have difficulty accommodating").

### iii. <u>The Need for the Sentence to Serve as a Deterrent</u>

The seriousness of the defendant's offenses warrants a term of imprisonment that would deter others both from undermining national security interests by illegally acting on behalf of foreign governments on U.S. soil and from causing substantial harm to victims in the United States by stalking them and their families. Through its just punishment of the defendant in this case, the Court can send an appropriate message that such conduct is grave and those engaging in such activities will receive serious punishment.

The need for general deterrence is of paramount importance given the PRC government's well-established transnational repression activities in the United States – including activities in connection with Operation Fox Hunt – which undermine U.S. laws, norms, and individuals' rights. Indeed, in recent years, the PRC government repeatedly has engaged in Operation Fox Hunt activities here in this District. *See, e.g.*, *United States v. An, et al.*, No. 22-CR-460 (E.D.N.Y.) (KAM) (six defendants charged – with one convicted and others at large – of conspiring to and/or acting as illegal agents of PRC government in connection with multi-year scheme in which a PRC national living in United States and various U.S.-based and PRC-based family members were threatened in order to coerce the national's repatriation); *United States v. Ying*, No. 22-MJ-1711 (S.D.N.Y.) (charging at-large PRC national with conspiring to and acting as illegal agent of PRC government in connection with multi-year scheme in which PRC nationals living in United States and various PRC-based family members were threatened in order to coerce the nationals' repatriation, including by detaining a pregnant PRC-based relative, and alleging various conduct undertaken in furtherance of the scheme in the Eastern District of New York). Notably, the U.S. Department of Homeland Security has warned that the PRC "likely will continue to pursue transnational repression activity" in the United States – including the PRC's "global 'Operation Fox Hunt.'" *See* Office of Intelligence and Analysis, U.S. Dep't of Homeland Security, "Homeland Threat Assessment: 2024," available at https://www.dhs.gov/sites/default/files/2023-09/23_0913_ia_23-333-ia_u_homeland-threat-assessment-2024_508C_V6_13Sep23.pdf at 7 (last visited Jan. 7, 2025). The pervasiveness and seriousness of the Operation Fox Hunt conduct in the United States, and here in the Eastern District, underscores the need for general deterrence.

The defendant's contention that the "masterminds" of the scheme will not be deterred by this Court imposing a significant custodial sentence here (ECF No. 326 at 16, 19) is not persuasive. The PRC government is not relying solely on its own officials to carry out Operation Fox Hunt objectives; rather, as this case and this defendant demonstrate, it often recruits individuals to act on behalf of the PRC government. Imposing a substantial sentence in this case will help dissuade other potential agents from engaging in such activities in the United States and here in the Eastern District, and will send a clear message that those who act to further Operation

Fox Hunt – or, more generally, who participate in transnational repression activities that threaten and terrorize individuals on U.S. soil – will face severe consequences. Such consequences are likely to have significant deterrent effects: When the victims of such transnational repression schemes are located in the United States, it is more difficult for the PRC government to carry out such schemes relying only on actors outside the United States.

With respect to specific deterrence, contrary to the defendant's contention (*id.* at 10), his purported desire to plead guilty prior to trial – articulated only after his convictions following trial, and inconsistent with the history of the case – has no bearing on the need for specific deterrence. The defendant's argument that specific deterrence is unnecessary because he is likely to be deported to the PRC (*id.* at 18) is similarly unavailing. Even if deported to the PRC – where much of the defendant's criminal conduct occurred – there remains a risk of the defendant again engaging in Operation Fox Hunt conduct from the PRC.[11]

Indeed, the defendant now admits that, even after learning that Hu was a PRC government official, he helped Hu with the repatriation scheme and later took photographs in the hope that Hu would compensate him when the defendant next returned to the PRC. (*Id.* at 9.) Similarly, following his arrest, the defendant stated that he simply wanted to "make some money." (ECF No. 294 at 17.) A substantial sentence will mitigate the risk that, if deported to the PRC, the defendant will again participate in this type of illegal conduct, or any other illegal conduct for which Hu or other PRC officials will provide monetary compensation.

iv. The Need to Avoid Unwarranted Sentencing Disparities

A sentence of 71 months' imprisonment – specifically, sentences of 48 months' imprisonment on Counts One and Two and sentences of 71 months' imprisonment on Counts Three and Four, to run concurrently – would not result in unwarranted sentencing disparities.

With respect to Counts Three and Four, the government has not identified any similarly-situated defendants. For example, the cases imposing sentences where U.S.S.G. § 2A6.2(a) is the applicable Guideline provision often involve stalking of intimate partners – which clearly is distinguishable from the facts here. Because the government has not identified any similarly-situated defendants – nor has the defendant cited any – there is no unwarranted sentencing disparity to be avoided.

With respect to Counts One and Two, courts have imposed significant sentences for Section 951 convictions where – as here – the defendant has engaged in a transnational repression scheme, such as Operation Fox Hunt, on behalf of a foreign government. The Court should avoid unwarranted sentencing disparities by imposing a term of imprisonment – *i.e.*, 48 months on the Section 951 convictions – that is commensurate with the following sentences

---

[11] Notably, co-defendant Zhu Feng undertook significant aspects of the scheme from the PRC, including coordinating details of Xu Jin's father's forced travel to the United States, such as what the father should say at the U.S. border to evade suspicion, and in fact traveling with Xu Jin's father. (ECF No. 17-18.)

imposed upon similarly-situated defendants who were convicted of Section 951 charges based on their involvement in transnational repression schemes:

- *United States v. Li*, No. 24-CR-334 (M.D. Fla.): Li worked at the direction of officers of the PRC Ministry of State Security over an approximately ten-year period to obtain information of interest to the PRC government, including information concerning dissidents and pro-democracy advocates and members of the Falun Gong religious movement; most of the information he provided was publicly available. Li pleaded guilty to conspiracy to act as an illegal agent of the PRC and was sentenced to 48 months' imprisonment. He also was fined $250,000. (ECF No. 39.)

- *United States v. Abouammo*, No. 19-CR-621 (N.D. Cal.): Abouammo was bribed by the Kingdom of Saudi Arabia and the Saudi Royal Family to access, monitor, and convey the confidential user information of anonymous Saudi dissidents that Twitter held. Such information could have been used by the Saudi government to identify and locate the Twitter users who published the critical posts. After conviction by trial of violating, *inter alia*, 18 U.S.C. § 951, the Court sentenced Abouammo to 42 months' imprisonment on his illegal foreign agent conviction.[12] (ECF No. 426.)

- *United States v. Cabrera Fuentes*, No. 20-CR-20129 (S.D. Fla.): Cabrera Fuentes acted under the direction and control of a Russian government official to engage in surveillance of a Russian defector. Following the Russian official's instructions, Cabrera Fuentes arranged for an intermediary to lease a unit to the defector in the Miami area; traveled to Miami to obtain the license plate number and parking location of the defector's car to provide to the Russian official on his next trip to Russia; and took a photo of that defector's car, which he sent to the official. Cabrera Fuentes pleaded guilty to violating 18 U.S.C. § 951 and was sentenced to 48 months' imprisonment. (ECF No. 58.)

- *United States v. Doostdar*, No. 18-CR-255 (D.D.C.): Doostdar was a dual U.S.-Iranian citizen who traveled to the United States on behalf of the Iranian government. He recruited a second individual to attend a rally in New York City protesting the Iranian regime. At the rally, the second individual photographed the protesters and provided those photos to Doostdar. Doostdar pleaded guilty to conspiracy to act as an illegal foreign agent and acting as an illegal foreign agent and was sentenced to 38 months' imprisonment. (ECF No. 121.)

---

[12] The Ninth Circuit subsequently vacated the sentence and remanded for resentencing based on an unrelated Guidelines calculation for Abouammo's other offenses of conviction. See *United States v. Abouammo*, No. 22-10348, 2024 WL 4972564 (9th Cir. Dec. 4, 2024).

- *United States v. Alvarez*, No. 05-CR-20943 (S.D. Fla.): Alvarez was an agent of Cuba's Directorate of Intelligence and its predecessor intelligence agencies. Between the late 1980s and 1990s, Alvarez gathered information within the United States on matters of interest to the Cuban government, including informing on anti-Castro individuals and groups and other elements of the Cuban exile community in South Florida. Alvarez pleaded guilty to conspiracy to act as an illegal foreign agent and was sentenced to 60 months' imprisonment. (ECF No. 236.)

- *United States v. Dumeisi*, No. 03-CR-664 (N.D. Ill.): Dumeisi, who published an Arabic language newspaper from the United States, was recruited by the Iraqi Intelligence Service to collect information regarding individuals and groups considered to be hostile to the Hussein regime. After conviction by trial of acting as an illegal foreign agent and conspiracy to act as an illegal foreign agent, Dumeisi was sentenced to 46 months' imprisonment. (ECF No. 138.)

These cases demonstrate that a sentence of 48 months' imprisonment on Counts One and Two would avoid unwarranted sentencing disparities with sentences imposed on similarly-situated defendants.

In contrast, the cases the defendant cites in his brief as supporting a lower sentence (ECF No. 326 at 17-18) involve defendants who are not similarly situated. As a threshold matter, almost all of the cases the defendant cites involve defendants who – unlike the defendant here – accepted responsibility and pleaded guilty, which itself warrants leniency. Further, the cases are procedurally and factually distinct. In *United States v. Lin*, No. 15-CR-601 (AMD) (E.D.N.Y.), the defendant acted as an illegal agent of the PRC government by using her position with a PRC-based international air carrier at JFK Airport to smuggle items onto carrier flights at the behest of PRC consular officials. The government did not contend that the unaccompanied baggage contained contraband, explosives, or otherwise unsafe items, or that the defendant was aware of the content of the items. And, unlike here, the government did not allege that the defendant caused harm to individuals as part of her conduct. In *United States v. Chun*, No. 16-CR-518 (S.D.N.Y.), the defendant contended that he was coerced into the conduct at issue in order to protect his parents' financial wellbeing, and that even though he acted illegally, he took steps to minimize any direct harm to the United States. The government sought a sentence of 27 months' imprisonment and the defendant was sentenced to 24 months' imprisonment. In *United States v. Soueid*, No. 11-CR-494 (E.D. Va.), the defendant provided information to Syrian intelligence about individuals who protested against the government of Syria and President al-Assad. There, the government did not allege that the defendant caused harm to individuals as part of his conduct.

The defendant contends that the cases he cites in which defendants received higher sentences – ones commensurate with the 48 month sentences the government seeks here – directly threatened U.S. military, technology, and security interests. The defendant's conduct in this case – aiding a foreign government in carrying out an illegal operation on U.S. soil – similarly threatened U.S. national security interests. Notably, in the only case the defendant cites in which a defendant was convicted following trial, *United States v. Dumeisi*, No. 03-CR-664 (N.D. Ill.), that defendant was sentenced to 46 months' imprisonment. And in *United States v. Peng*, No. 19-

CR-589 (N.D. Cal.), the parties and Probation agreed that a sentence of 48 months' imprisonment – the same sentence the government seeks here – was appropriate.

The defendant also cites cases in which defendants received probationary sentences for violations of the Foreign Agents Registration act ("FARA"). (ECF No. 326 at 17.) Those cases are inapposite, as the defendant has been convicted of Section 951 violations, which are distinct from FARA offenses. And in any event, those cases involved undisclosed foreign lobbying schemes – not the stalking and harassment of victims on U.S. soil.

Moreover, the defendant's argument that there would be an unwarranted sentencing disparity if he were sentenced such that he serves more time in prison than three defendants who recently were granted clemency as part of a prisoner exchange (*id.* at 16) is wholly unavailing. There are numerous, individualized, and often complex factors considered when defendants are released from prison before the term of imprisonment has ended – whether the result of a prisoner exchange, clemency, or compassionate release. As such, the amount of time that specific defendants actually spend in prison – as contrasted with the sentences imposed – has no bearing on the appropriate sentence in this case.[13]

V.    Conclusion

For the forgoing reasons, given the serious nature of the criminal conspiracy and the defendant's role in that conspiracy – and the threat to U.S. national security posed by the actions of the defendant and his co-conspirators, as well as to the victims who were terrorized because of the conduct of the defendant and his co-conspirators – the government respectfully

---

[13]    The government further notes that, of the three PRC nationals granted clemency, only one was convicted of violating 18 U.S.C. § 951 and none were convicted of violating 18 U.S.C. § 2261A(1)(B). Ji Chaoqun was convicted after trial of violating Section 951 and conspiracy to violate Section 951 and sentenced to 96 months' imprisonment on that count – far higher than the government seeks here. *See* Executive Grant of Clemency, https://www.justice.gov/d9/2024-11/choaqun_signed_warrant.pdf (Nov. 22, 2024). The other two defendants were convicted of violating 18 U.S.C. § 2252A (Shanlin Jin) and 18 U.S.C. §§ 1831 and 1832 (Yanjun Xu) – child pornography and economic espionage/trade secrets offenses that are not even arguably comparable to the defendant's offenses here. *See* Executive Grant of Clemency, https://www.justice.gov/d9/2024-11/xu_signed_warrant.pdf (Nov. 22, 2024) (Yanjun Xu); Executive Grant of Clemency, https://www.justice.gov/d9/2024-11/jin_signed_warrant.pdf (Nov. 22, 2024) (Shanlin Jin).

submits that a sentence of 71 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

<div style="margin-left: 50%;">

BREON PEACE
United States Attorney
Eastern District of New York

By:    /s/ _____
Meredith A. Arfa
Irisa Chen
Assistant U.S. Attorneys
(718) 254-7000

MATTHEW G. OLSEN
Assistant Attorney General
Department of Justice
National Security Division

By:    /s/ _____
Christine Bonomo
Trial Attorney

</div>

Cc:    Clerk of the Court (by ECF and Email)
       Counsel of Record (by ECF)